# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

CECIL E. HOPKINS,

   individually, and on behalf of a Class of all
others similarly situated,

         Plaintiff,

vs.

KANSAS TEACHERS COMMUNITY
CREDIT UNION,

         Defendant

vs.

MARATHON ROTHSCHILD CREDIT
UNION, et al.,

       Third Party Defendants.

Case No. 08-5052-CV-SW-GAF

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

## PART I

PLAINTIFF'S RESPONSE TO DEFENDANT'S "STATEMENT OF UNDISPUTED FACTS" ................................................................................................................1

PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS ...........................................15

    A.    Defendant's Decision to Enter into the PMP ...........................................15

    B.    The Dealer and Credit Guidelines Governing Defendant's Loans Set Forth Hidden Fees and Finance Charges and Mandatory Down Payments ...................15

    C.    Plaintiff's Loss of Money and Property in Connection with the PMP .................19

    D.    Defendant's Status as a Secured Party and the Owner of Plaintiff's Repossessed Vehicle. ...................................................................................20

    E.    Defendant's Conscious Disregard of Missouri Law and Warnings from the NCUA ...............................................................................................22

## PART II

I.    ARGUMENT AND AUTHORITIES .....................................................................1

    A.    Plaintiff's Commercial Code claims are appropriate under the 2001 Commercial Code and Missouri law.........................................................1

        1.    Defendant's arguments and authorities have been superseded by revised statutes and case law...........................................................1

        2.    Defendant "sent" defective communications. "Receipt" is not a requirement of the Commercial Code for Plaintiff's claims.......................2

            a.    *Springfield Chrysler-Plymouth v. Harmon* is not an accurate or persuasive statement of Missouri law. .........................2

            b.    *Springfield Chrysler-Plymouth* is focused on a different cause of action than the one at issue in Defendant's motion. ..........6

        3.    Plaintiff need not establish actual damages due to a defective notice.....................................................................................10

        4.    Even if the Kansas Consumer Credit Code applies to Plaintiff's claim, the result is still the same as if Missouri law applied.....................11

i

    B.      Defendant's Contention that Plaintiff Incurred No Loss As a Result of Defendant's Unlawful Practices is Meritless. ........................................................15

    C.      The conversion claim withstands summary judgment under the 2001 Commercial Code. ...............................................................................................18

II.    CONCLUSION.............................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Antle v. Reynolds*, 15 S.W.3d 762 (Mo. App. W.D. 2000) ...........................................................19

*Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896 (Tenn. 2007) .............................................3

*Boatmen's Bank of Nevada v. Dahmer*, 716 S.W.2d 876 (Mo. App. W.D. 1986) ........................8

*Chisolm v. TranSouth Financial Corp.*, 194 F.R.D. 538 (E.D.Va. 2000) ............................7, 9, 10

*D.A.N. Joint Venture, III v. Clark*, 218 S.W.3d 455 (Mo. App. W.D. 2007) .....................6, 11, 12

*Dumas v. Albers Medical, Inc.*, 2005 WL 2172030 (W.D. Mo. 2005)...........................................18

*Emerick v. Mutual Ben. Life Ins. Co.*, 756 S.W.2d 513 (Mo. banc 1988) ....................................19

*Erdmann v. Rants*, 442 N.W.2d 441 (N.D. 1989).........................................................................9

*Excel Bank v. National Bank of Kansas City*, 290 S.W.3d 801 (Mo.App.W.D. 2009) ..................1

*Executive Financial Services, Inc. v. Garrison*, 722 F.2d 417 (8th Cir. 1983) ...............................1

*Financial Federal Credit Inc. v. Dinardo*, 2006 WL 734391 (S.D.Tex.2006) .............................9

*FirstMerit Bank v. Miller*, 2009 WL 2940199 (Ohio App. Sept. 10, 2009)...................................9

*Ford Motor Credit Co. v. Updegraff*, 218 S.W.3d 617 (Mo. App. W.D. 2007)............................9

*General Motors Acceptance Corp. v. Stoval*, 872 N.E.2d 91 (Ill.App. 2007)................................9

*Huch v. Charter Communications, Inc.*, 290 S.W.3d 721 (Mo. banc 2009) ................................16

*In re Hull*, 155 B.R. 515, 516 (Bkrtcy.W.D.Mo. 1993).................................................................8

*In re M & S Grading, Inc.*, 457 F.3d 898 (8th Cir. 2006)..............................................................1

*Kennedy v. Fournie*, 898 S.W.2d 672 (Mo. App. E.D. 1995) ..................................................19, 20

*Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88 (Mo.App. W.D. 2008) ......1, 8, 10, 11

*Metro Auto Auction v. Director of Revenue*, 707 S.W.2d 397 (Mo. banc 1986)..........................19

*Minnesota Supply Co. v. Raymond Corp.*, 472 S.W.3d 524 (8th Cir. 2006)...................................3, 12

Case 3:08-cv-05052-GAF   Document 126   Filed 11/30/09   Page 4 of 52

*Owen v. General Motors Corp.*, 533 F.3d 913 (8th Cir. 2008) ................................................17, 18

*Owens v. Automobile Recovery Bureau, Inc.*, 544 S.W.2d 26 (Mo. App. W.D. 1976).................19

*Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707 (Mo.App. W.D. 2009) .........................................16

*Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237 (Mo. banc 2001) ...........................16

*Springfield Chrysler-Plymouth v. Harmon*, 858 S.W.2d 240 (Mo. App. S.D. 1993)......2, 3, 4, 6, 9

*State v. McElroy*, 130 P.3d 100 (Kan. 2006) ................................................................................15

*State v. Van Hoet*, 89 P.3d 606 (Kan. 2004) ................................................................................15

*Textron Financial Corp. v. Trailiner Corp.*, 965 S.W.2d 426 (Mo. App. S.D. 1998).......3, 4, 9, 10

*Thompson v. U.S.*, 408 F.2d 1075 (8th Cir. 1969) ..........................................................................1

*Topeka Datsun Motor Co v. Stratton*, 736 P.2d 82 (Kan. App. 1987) .............................12, 12, 15

## **Missouri Statutes**

§ 301.600 RSMo ............................................................................................................................19

§ 301.620 RSMo ............................................................................................................................19

§ 310.210.4 RSMo .........................................................................................................................19

§ 310.215 RSMo ............................................................................................................................19

§ 365.020(11) RSMo ......................................................................................................................5

§ 400.9-101 RSMo, at Official Comment .......................................................................................1

§ 400.9-102 RSMo.........................................................................................................................1

§ 400.9-102(a)(71)(A) RSMo .......................................................................................................19

§ 400.9-102(a)(71)(A) RSMo, at Official Comment ....................................................................19

§ 400.9-201(26) RSMo ..................................................................................................................7

§ 400.9-201(26) RSMo, at Official Comment ...............................................................................7

§ 400.9-504 RSMo (Supp. 1992)...................................................................................................8

iv

§ 400.9-611 RSMo ....................................................................................................7

§ 400.9-611 RSMo, at Official Comment ..................................................................7

§ 400.9-619 RSMo.................................................................................................. 19

§ 400.9-619 RSMo, at Official Comment ................................................................ 20

§ 400.9-625 RSMo.................................................................2, 6, 7, 10, 11, 12, 14

§ 407.025.1 RSMo ...................................................................................15, 16, 17

§ 408.551 RSMo ......................................................................................................6

§ 408.551 RSMo (Supp. 1992) ................................................................................5

§ 408.556 RSMo ..................................................................................6, 9, 10, 11

§ 408.556 RSMo (Supp. 1992) ....................................................................4, 5, 6

§ 408.557 RSMo ..................................................................................9, 10, 11

§ 408.557 RSMo (Supp. 1992) ................................................................................6

## Kansas Statutes

K.S.A. § 16a-1-103 ....................................................................................11, 13, 14

K.S.A. § 16a-5-103(1) ...................................................................................11, 15

K.S.A. § 16a-5-103(1), at Consumer Credit Code Comments .........................12, 13, 14

K.S.A. § 84-9-625, at Official Comment ................................................................14

K.S.A. § 84-9-507(1) (1972)...................................................................................14

K.S.A. § 84-9-507(1) (1972), at Official Comment  ...............................................14

Case 3:08-cv-05052-GAF   Document 126   Filed 11/30/09   Page 6 of 52

## PART I

### PLAINTIFF'S RESPONSE TO
### DEFENDANT'S "STATEMENT OF UNDISPUTED FACTS"

1.      On March 25, 2004, plaintiff purchased a 2001 Chevrolet Monte Carlo (the "Vehicle") in Parsons, Kansas, from the Mayse Automotive Group (the "Kansas Car Dealer"). Deposition Transcript of Cecil Hopkins, Jr. at pp. 58-77 (Ex. C).

**RESPONSE:**

Uncontroverted.


2.      Plaintiff executed a Retail Installment Contract and Security Agreement (the "Kansas Installment Contract") in Parsons, Kansas with the Kansas Car Dealer for the purchase of the Vehicle. Kansas Installment Contract (Ex. L); Hopkins Dep. at 76-20-77:6 (Ex. C).

**RESPONSE:**

Uncontroverted.


3.      Plaintiff purchased the Vehicle primarily for his personal, family or household use. First Amended Petition ¶¶ 4, 25, 36 (Ex. B); Hopkins Dep. at 66:25-67:10 and 122:12-17 (Ex. C).

**RESPONSE:**

Uncontroverted.


4.      Under the terms of the Kansas Installment Contract, plaintiff agreed to make a series of monthly installment payments (in excess of four installments) beginning on May 8, 2004, to pay for the Vehicle. Kansas Installment Contract (Ex. L, p.1); Hopkins Dep. At 76:20-77:6; 79:17-80:6; 81:19-82:19 (Ex. C).

1

**RESPONSE:**

Uncontroverted.

5.     The amount plaintiff financed under the Kansas Installment Contract was less than $25,000.00. Kansas Installment Contract (Ex. L, p. 1).

**RESPONSE:**

Uncontroverted.

6.     The Kansas Car Dealer is regularly engaged in the business of selling automotive vehicles via retail installment agreements in which customers are extended credit and allowed to make a series of installment payments toward the purchase of a vehicle. Affidavit of Mark Kolarik Aff. ¶ 30 (Ex. V).

**RESPONSE:**

Objection.   Mr. Kolarik lacks personal knowledge of the matter set forth in his affidavit and has not set forth information sufficient to show that he is competent to testify as to the matters stated therein.   Specifically, in his deposition, Mr. Kolarik denied having any direct relationship or "dealings" with the Mayse Automotive Group sufficient to opine as to its business practices.  *See* **Ex. 1,** at p.110-113.

Without waiving, and subject to his objection, Plaintiff states: this fact is Uncontroverted.

7.     Defendant Kansas Credit Union is a credit union located in Pittsburg, Kansas. Kolarik Aff. ¶ 2 (Ex. V).

**RESPONSE:**

Uncontroverted.

2

8.      The Kansas Car Dealer assigned the Kansas Installment Contract to the Kansas Credit Union. Kolarik Aff. ¶ 34 (Ex. V); Hopkins Dep. at 83:3-12 and 100:11-25 (Ex. C); Kansas Installment Contract (Ex. L, p. 1).

**RESPONSE:**

Controverted, in part.

Plaintiff admits that Plaintiffs' installment contract reflected an assignment to the Kansas Teachers Community Credit Union.

However, Plaintiff disputes that Defendant and the "Kansas Car Dealer" had a direct relationship except through the Portfolio Management Program and Centrix Financial, LLC, or that Defendant and the "Kansas Car Dealer" had an independent relationship because the terms of the Plaintiffs' motor vehicle sale and loan were determined pursuant to the standardized guidelines and formulas of the Portfolio Management Program. *See* **Ex. 2, 3, 4, 12, 13, 29**; **Ex. 1** at 109:8 to 109:10, 113:5 to 114:3.

9.      In the section of the Kansas Installment Contract bearing the heading DEFAULT, plaintiff agreed that he would be in default of the Kansas Installment Contract if he failed to make payments as required by the terms of the Kansas Installment Contract. Kansas Installment Contract (Ex. L, p. 2); Hopkins Dep. at 76:20-77:6 and 150:15-18 (Ex. C).

**RESPONSE:**

Uncontroverted.

10.      The Kansas Credit Union has no record of receiving any payments on the Kansas Installment Contract. Kolarik Aff. ¶¶ 36-37 (Ex. V); (Ex. P).

**RESPONSE:**

3

Objection. This is an assertion of fact which requires Plaintiff to speculate about the contents of Defendant's records. Further, the term "Kansas Credit Union" is unclear because Defendant has not defined the term or clarified it to include its loan servicer, Centrix Financial.

Without waiving, and subject to his objection, Plaintiff states: this fact is Uncontroverted for purposes of this summary judgment motion.

11. Plaintiff has no documents demonstrating that he made any payments. Hopkins Dep. (Ex. C) at 82:4-6.

**RESPONSE:**

Objection. The assertion of fact misstates the cited deposition testimony.

Without waiving, and subject to his objection, Plaintiff states: this fact is Uncontroverted.

12. Plaintiff defaulted under the terms of the Kansas Installment Contract. Hopkins Dep. at 139:22-14:14 (Ex. C); Suggestions In Support of Plaintiff's Motion for Class Certification (Court Doc. 58) at 7 (admitting that "Plaintiff fell into default after obtaining his motor vehicle loan.").

**RESPONSE:**

Uncontroverted.

13. Upon default, the Kansas Installment Contract provides various remedies to the secured creditor - the Kansas Credit Union - including the right to repossess the Vehicle. Kansas Retail Installment Agreement (Ex. L, p. 2); Hopkins Dep. at 150:15-18 (Ex. C).

**RESPONSE:**

Objection. The reference to the Retail Installment Agreement, and the term "various remedies" is vague and overbroad. The document speaks for itself.

4

Without waiving, and subject to his objection, Plaintiff states: this fact is Uncontroverted for purposes of this summary judgment motion.

14.    Centrix serviced the Kansas Installment Contract on behalf of the Kansas Credit Union. Kolarik Aff. ¶ 35 (Ex. V).

**RESPONSE:**

Uncontroverted.

15.    On or about July 30, 2004, after plaintiff defaulted under the Retail Installment Contract, Centrix repossessed the Vehicle in Carl Junction, Missouri. Kolarik Aff. ¶ 38 (Ex. V); Hopkins Dep. at 87:23-25 and 88:7-89:9 (Ex. C).

**RESPONSE:**

Objection.   The referenced exhibits do not provide support for the date of the repossession. Further, the term "Centrix" is unclear because Defendant has not defined the term or clarified it to include the Defendant.

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted, in part.

Plaintiff admits that his vehicle was repossessed on or about July 30, 2004 in Carl Junction, Missouri.

Plaintiff disputes that "Centrix" repossessed his motor vehicle or had any possessory right to the motor vehicle.   To the extent Centrix repossessed his vehicle, it was acting as Defendant's agent.

5

16.     On or about July 30, 2004, Centrix sent plaintiff a letter (the "pre-sale" notice) to his address at 505 Karen Drive, Carl Junction, Missouri. The letter advised that the Vehicle had been repossessed and would be sold if he failed to pay the full balance owing under the Kansas Installment Contract. Kolarik Aff. ¶ 39 (Ex. V); July 30, 2004 pre-sale notice (Ex. Q).

**RESPONSE:**

Objection.  The contents of the letter are set forth in the letter, and are not disputed.  The characterization of the letter as a "pre-sale notice" is inappropriate and improper because the letter did not follow the safe harbor format of §§ 400.9-613 and/or 400.9-614 RSMo, or contain the content required by §§ 400.9-613 and/or 400.9-614 RSMo.

Further, the term "Centrix" is unclear because Defendant has not defined the term or clarified it to include the Defendant.

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted, in part.

Plaintiff admits that on or about July 30, 2004, Centrix sent to plaintiff the letter attached as Ex. Q to Defendant's Motion for Summary Judgment.

Plaintiff disputes Defendant's characterization of the letter as a "pre-sale notice" and its assertion that the letter "advised that the Vehicle had been repossessed and would be sold if he failed to pay the full balance owing under the Kansas Installment Contract."  The letter speaks for itself and establishes Defendant's violation of the Commercial Code.


17.     When plaintiff purchased the Vehicle in March 2004, he was living with his girlfriend at 505 Karen Drive, Carl Junction, Missouri 64834. Hopkins Dep. at 46:9-51:25 (Ex. C).

**RESPONSE:**

Uncontroverted.

18.     When filling out the paperwork necessary to purchase the Vehicle and arrange financing from the Kansas Credit Union in March 2004, plaintiff repeatedly (and truthfully) stated that he resided at the 505 Karen Drive address, and listed that address as his mailing address. (Exs. K-M).

**RESPONSE:**

Uncontroverted.

19.     Accordingly, the address listed on plaintiff's July 30, 2004, pre-sale notice is 505 Karen Drive, Carl Junction, Missouri, 64834. (Ex. Q).

**RESPONSE:**

Uncontroverted.

20.     Unbeknownst to the Kansas Credit Union, shortly after he purchased the Vehicle in March 2004, plaintiff stopped residing with his girlfriend at the 505 Karen Drive address and stayed with a friend for several months. Hopkins Dep. at 46:9-51:25 (Ex. C). During this time period, plaintiff's mail was still being delivered to his girlfriend's 505 Karen Drive address, not the address where he was staying with a friend. Id. at 51:12-19.

**RESPONSE:**

Objection.   This is a compound assertion of separate facts, the first of which requires Plaintiff to speculate about Defendant's knowledge.   Further, the term "Kansas Credit Union" is unclear because Defendant has not defined the term or clarified it to include Centrix.

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted in part.

Plaintiff admits that his mail was still being delivered to his girlfriend's 505 Karen Drive address after he moved out.

Plaintiff lacks knowledge as to what Defendant or Centrix knew at that time and therefore disputes any assertion of fact concerning Defendant's or Centrix's knowledge.


21.     Plaintiff never received a copy of the pre-sale notice sent to his Carl Junction, Missouri address of record. Hopkins Dep. at 116:4-19 (Ex. C). Furthermore, he never read the pre-sale notice until the night before his deposition. Id.

**RESPONSE:**

Objection.  This assertion of fact misstates Plaintiff's deposition testimony.

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted.

The question propounded, and Plaintiff's answer was as follows:

Q.     You did not receive -- You do not recall receiving this document in July 2004?
A.     No, I do not.

*See* Hopkins Dep. at 116:10 to 116:12 (Def.'s Ex. C).

The cited deposition testimony merely establishes that the Plaintiff does not recall if he received this document in July 2004.  *See* Hopkins Dep. at 116:10 to 116:12 (Def.'s Ex. C). Further, this fact does not create a genuine issue of fact or law because, as explained in detail below, the Commercial Code does not set forth or establish any requirement that the debtor establish that he received a defective communication in order to recover statutory damages

8

pursuant to § 400.9-625 RSMo. Instead, Defendant violates the Commercial Code by sending a defective communication. This is a legal issue for the Court to decide.

22. After the Vehicle was repossessed, plaintiff did not make any attempt to make additional payments on the delinquent balance or otherwise cure his default under the Kansas Installment Contract. Hopkins Dep. at 85:13-87:21, 93:13-94:2, and 140:15-142:14 (Ex. C); Kolarik Aff. ¶ 40 (Ex. V).

**RESPONSE:**

Objection. This assertion of fact mischaracterizes Plaintiff's deposition testimony. Further, the phrase "did not make any attempt to …otherwise cure his default under the Kansas Installment Contract" is vague and ambiguous beased upon the cited deposition testimony and the failure of Defendant to specify what it means by "cure his default."

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted in part.

Plaintiff admits that he "did not make any attempt to make additional payments on the delinquent balance." However this admission is immaterial to Plaintiff's claim or Defendant's Motion for Summary Judgment because, as explained below, § 400.9-625 and applicable case law, *see Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88, 92 (Mo.App.W.D. 2008), puts no obligation on Plaintiff to "attempt to make additional payments on the delinquent balance or otherwise cure his default.

Plaintiff disputes the assertion that he "did not make any attempt to …otherwise cure his default under the Kansas Installment Contract." The cited testimony reveals that Plaintiff and/or his girlfriend had a number of telephone conversations with a person they believed was

9

employed by Defendant concerning their loan and Defendant's records of receipt of payments by them. *See* Hopkins Dep. at 85:13-87:21, 93:13-94:2, and 140:15-142:14 (Ex. C).

23.     On the day following the Vehicle's repossession, plaintiff contacted the Kansas Credit Union because his girlfriend had told him that she/they were current on the payment schedule because of money orders she had sent to cover the required installment payments. Hopkins Dep. (Ex. C) at 90:15-91:4.

**RESPONSE:**

Objection. This assertion of fact misstates Plaintiff's deposition testimony.

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted in part.

Plaintiff admits that he contacted the Kansas Credit Union following the Vehicle's repossession and that his girlfriend reported to him that she had made payments to Defendant through money orders.

Plaintiff disputes that he contacted the Kansas Credit Union ***because*** of what his girlfriend told him. Plaintiff testified that he called Defendant following the repossession to "find out what was going on." Hopkins Dep. (Ex. C) at 85:13-85:18. Plaintiff further states that this admission is immaterial to Plaintiff's claim or Defendant's Motion for Summary Judgment because, as explained below, § 400.9-625 and applicable case law, *see Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88, 92 (Mo.App.W.D. 2008), puts no obligation on Plaintiff to "attempt to make additional payments on the delinquent balance or otherwise cure his default.

24.     When the Vehicle was repossessed, plaintiff owed the Kansas Credit Union $15,713.00 under the terms of the Kansas Installment Contract. Kolarik Aff. ¶ 41 (Ex. V).

**RESPONSE:**

Uncontroverted for purposes of this summary judgment motion.

25.    On or about October 27, 2004, the Vehicle was sold at the Manheim Auto Auction in Kansas City, Missouri for $8,569.65. Kolarik Aff. ¶ 42 (Ex. V).

**RESPONSE:**

Uncontroverted.

26.    Plaintiff does not contend that the fair market value of the Vehicle was more than the $8,569.65 sale price obtained at the Manheim Auto Auction. Suggestions In Support of Plaintiff's Motion for Class Certification (Court Doc. 58) at 33 (stating that plaintiff "does not contend that the sale of his motor vehicle at auction should have generated more proceeds."); Hopkins Dep. at 128:20-21(Ex. C).

**RESPONSE:**

Uncontroverted.

27.    Professor George Hoffer is a professor at Virginia Commonwealth University. Dr. Hoffer has studied the American automotive industry for 40 years, and has conducted many studies regarding the valuations of used automobiles. Hoffer Report (Ex. W).

**RESPONSE:**

Objection.  Defendant's Exhibit W, and the Curriculum Vitae for Dr. Hoffer speaks for themselves.

Without waiving, and subject to his objection, Plaintiff states: this fact is Uncontroverted.

28. In this case, Professor Hoffer studied documents regarding the Vehicle's condition, odometer mileage, and other factors relating to the Vehicle's value (such as the Vehicle's interior, available options, existence of frame damage, and other factors that affect the value of a used automobile). Hoffer Report (Ex. W).

**RESPONSE:**

Objection. This fact is an improper attempt to cause Plaintiff to admit alleged facts concerning the bases of Defendant's expert's opinion testimony.

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted. Defendant's expert report indicates that it was co-authored by David W. Harless. It is unclear from the report whether Professor Hoffer or Professor Harless conducted any studies attributed to Professor Hoffer.

29. Professor Hoffer concluded that the $8,569.65 price obtained for the Vehicle at auction is consistent with the fair market value of a car in its condition, and that "the price obtained for the vehicle is well within the standard of reasonableness." Hoffer Report at 2, ¶ 5 (Ex. W).

**RESPONSE:**

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted, in part.

Defendant's expert report indicates that it was co-authored by David W. Harless. Plaintiff does not dispute that the report states the conclusion "the price obtained for the vehicle is well within the standard of reasonableness."

30.     The fair market value of the Vehicle on the date it was repossessed was less than $15,713.00. Hoffer Report at 2, ¶ 5 (Ex. W); Suggestions In Support of Plaintiff's Motion for Class Certification (Court Doc. 58) at 33 (stating that plaintiff "does not contend that the sale of his motor vehicle at auction should have generated more proceeds.") Hopkins Dep. at 128:20-21(Ex. C).

**RESPONSE:**

Without waiving, and subject to his objection, Plaintiff states: this fact is Controverted, in part.

Plaintiff admits that "the fair market value of the Vehicle on the date it was repossessed was less than $15,713.00."

Plaintiff disputes that the assertion of fact is supported by the cited evidence.  Plaintiff objected to questions propounded to him which sought expert opinion from him and he stated he had no opinion on the value of his car at auction.  Hopkins Dep. at 128:5-21(Ex. C).

31.     In Count I of the First Amended Petition, plaintiff alleges that he is (and the putative class members are) entitled to statutory damages under section 9-625(c) of the Missouri UCC. First Amended Petition ¶ 52 (Ex. B). Plaintiff contends that he should recover statutory damages of $10,878.56. Suggestions In Support of Plaintiff's Motion for Class Certification (Court Doc. 58) at 22.

**RESPONSE:**

Uncontroverted in Part; Controverted in Part.

Plaintiff alleges that he and the putative class members are entitled to statutory damages under section 9-625(c) of the Missouri Commercial Code, and for all other relief allowed by the Commercial Code and Missouri law. Plaintiff's *First Amended Petition* speaks for itself.

Plaintiff now contends that the statutory damages under §400.9-625(c)(2) should be $10,761.06 as set forth at ¶ 18 of Defendant's Notice of Removal.

32.     In Count I, plaintiff alleges that the Kansas Credit Union should be barred from collecting the deficiency balance on the amount he owes under the Kansas Installment Contract (and on amounts owed by putative class members). First Amended Petition ¶ 53 (Ex. B).

**RESPONSE:**

Uncontroverted.

33.     In Count II of the First Amended Petition, plaintiff asserts a claim under the Missouri Merchandising Practices Act ("MMPA"). First Amended Petition, ¶ 56 (Ex. B).

**RESPONSE:**

Uncontroverted.

34.     In Count III of the First Amended Petition, plaintiff asserts a common law claim for conversion. First Amended Petition at pp. 23-24 (Ex. B).

**RESPONSE:**

Uncontroverted.

14

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

**A.      Defendant's Decision to Enter into the PMP**

1.      Defendant entered into Centrix Financial's Portfolio Management Program ("PMP") in an effort to target subprime borrowers for motor vehicle loans. **Ex. 1,** at 14:25-15:14; 16:6-16:18; 17:11-18:2 (Deposition of Mark S. Kolarik).

2.      At the time Defendant entered into the PMP, it had not performed any independent audits of Centrix, it had not solicited legal advice or opinions concerning the PMP, and it had not reviewed any of the documents and forms that Centrix would use in connection with the servicing of the vehicle loans.  **Ex. 1,** at 24:20-25:4; 132:2-132:23; 154:1-154:12; 162:5-162:17; 162:18-163:18; 164:5-166:6.

3.      At the time it entered into the PMP, and continuing thereafter, Defendant did not scrutinize Centrix's compliance with Missouri law in connection with its loan servicing based upon Centrix's representation that it was complying with the law.  **Ex. 1** at 162:18-163:18; 164:5-166:6.

4.      At the time it entered into the PMP, Defendant was aware of the significant risk of default and delinquencies on the loans, but believed that due to the default insurance, "the overall profitability or revenue from the program would exceed the losses on individual loans." **Ex. 1,** at 18:11-19:14; 196:2-196:9; 199:20-200:9.

5.      At the time it entered into the PMP, Defendant committed to funding a minimum of $2 million annually in PMP loans. **Ex. 10**

**B.      The Dealer and Credit Guidelines Governing Defendant's Loans Set Forth Hidden Fees and Finance Charges and Mandatory Down Payments**

6.      In connection with the PMP, Defendant originated subprime loans to motor vehicle purchasers pursuant to the provisions of a *Standard Loan Placement Agreement* which

15

set forth specific credit and underwriting guidelines for its loans. *See* **Ex. 11**, at No. 1. [Def.'s Answer to Interrogatory No. 1]; **Ex. 2**, at §§ 1, 3.2 [*Standard Loan Placement Agreement*, dated December 31, 2002]; **Ex. 3** ["Financial Institution Approval of Sub-Prime Credit Guidelines"]; Def.'s Ex. V [Kolarik Affidavit, at ¶ 7]

7.      Defendant made hundreds of subprime loans pursuant to the standardized dealer and credit guidelines which it expressly adopted as its own guidelines. **Ex. 1** at 43:9-44:20; **Ex. 11**, at No. 1; **Ex. 12** ("The objective of this policy is to adopt the Centrix Credit Guidelines and procedures which are to be used to underwrite and service loans originated through the Centrix loan program…. It is management's responsibility to ensure the guidelines and procedures are followed by Centrix."); *see also* **Ex. 2-4; Ex. 11**, at No. 2 [Def.'s Answer to Interr. No. 2];

8.      Pursuant to the *Standard Loan Placement Agreement,* Defendant could not provide financing for motor vehicle sales unless the terms of the sale of the motor vehicle, as reflected in a *Retail Installment Contract and Security Agreement*, were made in conjunction with specific credit and dealer guidelines. **Ex. 2,** at A; **Ex. 3**; **Ex. 4** [Dealer Guidelines]; **Ex. 12**; **Ex. 29**.

9.      These credit and dealer guidelines mandated financing pursuant to a formula which set the maximum price of the motor vehicle based upon an "advance rate" which was "115% of the wholesale price of the auto"; and the annual percentage rate on the loan (typically 17.9% APR). *See* **Ex. 2-4**; **Ex. 11**, at No. 2 [Def.'s Answer to Interr. No. 2]; **Ex. 5** [Deposition Ex. 42]; **Ex. 4** and **Ex. 30** ("an advance of 115% means that the price of the auto will be 115% of the wholesale price of the auto"); **Ex. 25**; **Ex. 26**; **Ex. 1** at 51:9-51:21.

10.     In connection with the financing of a vehicle loan, Defendant paid the following fees to Centrix and to the motor vehicle dealer: (1) a rate participation to Centrix; (2) default

16

insurance premiums to Centrix; (3) "acquisition fee" to dealer; and (4) "admin fee" to dealer. **Ex. 5**; *see also* **Ex. 2**, at A; **Ex. 5**.

11. These fees and finance charges were paid to the participants in the PMP in connection with the loans, and were used to obtain insurance for losses caused by the borrower's default. **Ex. 2-4**; **Ex. 11**, at No. 2; **Ex. 25**; **Ex. 5**.

12. In conjunction with each loan, Defendant obtained three different types of "default insurance" protecting it from monetary losses caused by a borrower default. **Ex. 2**, at §§ 2.7, 3.3; **Ex. 5**; **Ex. 6**; **Ex. 26**; **Ex. 1**, at 53:7-53:13.

13. The "default insurance" was designed to reimburse Defendant for such things as (1) first payment defaults; (2) the difference between the amount it obtained when a repossessed motor vehicle was sold at auction and the loan amount, and (3) if the entire vehicle was lost or not able to be repossessed. *See* **Ex. 2**, at A; **Ex. 3** ("The Credit Guidelines also form the basis upon which the GAP default insurance is provided for each PMP loan. Therefore, the GAP insurance policy is only provided when Centrix's Credit Guidelines are used for underwriting the loans, the financial institution cannot change the Centrix Credit Guidelines."); **Exh. 7** ("First Payment Defaults").

14. The PMP expressly promoted its inclusion of this insurance into the loans to accommodate this risky lending program and the high rates of default. *See* **Ex. 2**, at § 1; **Ex. 31**.

15. As to Defendant's loans, approximately **50%** defaulted and resulted in repossession. *See* **Ex. 11** at No.1; **Ex. 1** at 199:20-200:9.

16. The inclusion of default insurance in connection with the loans was integral to Defendant's decision to enter into the PMP. **Ex. 1** at 27:25-28:25.

17. The PMP professed that "[b]ecause of the PMP Default protection insurance and other products offered by Centrix Financial, a defaulted PMP loan should not be considered a loss by the financial institution." *See* **Ex. 9** at KSTCU00026 ("By financially protecting the loans, the majority of the risk of loss and the reserves supporting any potential loss are transferred from the credit union to the insuring institution."); **Ex. 43** ("because of the PMP Default Protection insurance and other procedures offered by Centrix Financial, a defaulted PMP loan should not be considered a loss by the financial institution."); **Ex. 6-7; Ex. 26**.

18. The premiums for the default insurance were calculated from the terms of the loan and paid to the participants in the PMP as a percent of the "Amount Financed" on the motor vehicle loan (to insure the deficiency loss), a set charge of $125.00 (to insure a total vehicle loss), and as part of Centrix's "Rate Participation" (to insure against first payment defaults). *See* **Ex. 1** at 28:22-28:25; 53:7-53:13; 114:21-116:21; 123:8-125:6; 212:19-212:25 **Ex. 2**, at § 2.7 and A; **Ex. 4, 6**; **Ex. 7** (for "First Payment Defaults" "Centrix refunds the financial institution the total amount of the deal…"); **Ex. 11**, at No. 2; **Ex. 25**; **Ex. 5**; **Ex. 26**; **Ex. 27**.

19. There were no disclosures to the vehicle purchasers of the fees and charges paid to Centrix, the motor vehicle dealer, or for the premiums for default insurance. *See* and *compare* **Ex. 5** and **19**, the *Retail Installment Contract* and the disclosure of the "*Itemization of Amount Financed*" with the "*Audit Recap*" Summary, which shows the hidden fees and finance charges which were not identified or disclosed on the *Retail Installment Contract* or the *Itemization of Amount Financed*; **Ex. 1** at 127:5-127:8; 202:25-203:4.

20. Defendant provided the funding for the loans, and paid fees to Centrix and the dealers based upon the borrower's promise to pay the amounts set forth in the Retail Installment Contracts. *See* **Ex. 1** at 31:25-32:16; 47:23-49:15; 59:22-60:11

18

21.     There were no disclosures to the borrowers that their loans included charges for insurance for their expected default, although the premiums for this insurance was calculated as a percentage of the amount financed on the motor vehicle loan:  **Ex. 5**; **Ex. 2** at A; *see also* **Ex. 6** (Declarations Page for insurance policies); **Exh. 7** ("Centrix refunds the financial institution the total amount of the deal…"); **Ex. 1** at 49:3-49:15; 57:23-59:9; 123:8-125:6; 125:7-125:14; 127:5-127:8; 202:25-203:4 (retail installment contract does not show payment of "acquisition fees" to dealer although Defendant paid them to dealer based upon borrower's agreement to pay amount set forth in retail installment contract).

###     C.      Plaintiff's Loss of Money and Property in Connection with the PMP

22.     Prior to his purchase of his motor vehicle in connection with the PMP, Plaintiff was not a member of the Kansas Teachers Community Credit Union. **Ex. 28**; *see also* **Ex. 1** at 21:25-22:4.

23.     In connection with his purchase of his motor vehicle on or about March 25, 2004, Plaintiff executed a *Retail Installment Contract and Security Agreement.*  Def.'s Exhibit V, at  ¶ 32; **Ex. 19**.

24.     According to his standard form *Retail Installment Contract and Security Agreement* the "cash price" or total price of the motor vehicle was $16,165.00. **Ex. 19**.

25.     In connection with his motor vehicle purchase, Plaintiff paid $1,000 as a down payment.  **Ex. 19**; *see also* **Ex. 1** at 57:15-57:22; **Ex. 32**, at ¶ 11.

26.     In connection with his motor vehicle purchase, Plaintiff also paid $1,175.00 for a GMPP Service Contract, $49.00 "Admin/Doc. Fee" and $495.00 for a GAP coverage product. **Ex. 19**.

19

27. Based upon the "Amount Financed" of $15,713 and the 17.90% "Annual Percentage Rate," the loan required a payment of a $9,262.06 "Finance Charge" through 66 monthly payments of $378.41. **Ex. 19; Ex. 1** at 114:21-116:21; 123:8-125:6

28. Based upon these figures, Defendant paid the participants in the PMP $3,640.26 in fees and charges which were not disclosed to the Plaintiff in the mandated disclosures set forth in his *Retail Installment Contract and Security Agreement*. **Ex. 5, 28,** and **Ex. 2,** at § 3.3 (lender is to disburse loan proceeds); **Ex. 5**; **Ex. 1** at 57:23-59:9; 105:25-106:3 (retail installment contract does not show payment of "acquisition fees" to dealer although Defendant paid them to dealer based upon borrower's agreement to pay amount set forth in retail installment contract).

29. The $3,640.26 in fees and charges included: (1) $1,461.31 in default insurance premiums (which was calculated as a set percentage of the Amount Financed); (2) $1,383.95, as a fee to Centrix Financial (calculated as a set percentage of the Finance Charge and monthly payment); and (3) the following uniform fees totaling $795 that were ultimately paid to the motor vehicle dealer: $595.00: "acquisition fee" and $200.00: "admin fee." **Ex. 5**; *see also* **Ex. 2**, at A;; **Ex. 1** at 57:23-59:9; 105:25-106:3; 114:21-116:21; 123:8-125:6

30. Defendant's records for the Plaintiff's loan reflect Defendant's review of the pricing on the Plaintiff's vehicle to include hidden fees and the down payment. **Ex. 29**; **Ex. 1** at 93:1-93:14; 94:3-94:15.

**D.      Defendant's Status as a Secured Party and the Owner of Plaintiff's Repossessed Vehicle.**

31. In connection with the Plaintiff's loan, Defendant took a security interest in his motor vehicle and was reflected as the secured party and lienholder on his *Certificate of Title* and in the Missouri Department of Revenue's records. **Ex. 13** ("Financial Institution Oversight of

20

Centrix Servicing"); **Ex. 14** ("Title-Lien Perfection"); **Ex. 15** (Notice of Lien); **Ex. 16**, at Hopkins-000032-34 (Mo. Dept. of Revenue Records); *see also* **Ex. 8**; **Ex. 1** at 132:2-132:8.

32.     Defendant became the "secured party" on the Plaintiff's loan by perfecting its security interest in his motor vehicle pursuant to the provisions of Missouri law at §§ 301.600, *et seq.* RSMo by filing a *Notice of Lien* with the Missouri Department of Revenue. **Ex. 15.**

33.     The financing for the sale of Plaintiff's motor vehicle was provided by Defendant pursuant to the PMP, who received an assignment of the *Retail Installment Contract and Security Agreement* the day the motor vehicle was purchased. **Ex. 15**; **Ex. 16**; *see also* § 365.130 RSMo; **Ex. 14** ("Centrix PMP Procedure for Title-Lien Perfection;" describing procedure to perfect security interest under Missouri law); Defendant's Exhibit V, at ¶ 34.

34.     On or about July 30, 2004, Defendant, through its servicing agent Centrix, sent to the Plaintiff a standard form, computer generated "pre-sale" communication which was governed by the provisions of Missouri's Commercial Code and consumer protection laws at §§ 400.9-610 through 400.9-614 RSMo. **Ex. 20**.

35.     Defendant admits that the July 30, 2004 communication failed to comply with or contain the content required by Missouri's Commercial Code. *See* Doc. No. 91-1, at Counterclaim, at ¶4.

36.     In February 2006, Centrix sent a letter to Plaintiff which admitted that the July 30, 2004 communication failed to comply with or contain the content required by Missouri's Commercial Code. **Ex. 22** and **23.**

37.     At no time since February 2006 has Defendant sought to identify those Class members to whom Centrix sent this letter (**Ex. 22** and **23**) or to repudiate Centrix's conduct. **Ex. 1** at 168:5 to 168:12.

21

38.     In September 2004, Defendant obtained a repossession title or certificate of ownership from the Missouri Department of Revenue transferring ownership of Plaintiff's motor vehicle to it.  **Ex. 16**, at Hopkins-00024; **Ex. 1** at 160:8-160:19.

39.     According to Defendant's records, it sold the Plaintiffs' motor vehicle at a private auction in October 2004 where it obtained $8,569.65.  **Ex. 3**;  Defendant's Exhibit V at ¶ 42.

40.     On or about November 4, 2004, Defendant sent to Plaintiff a letter which asserted that Plaintiff's deficiency balance was $7,596.12, although its internal records reflected a deficiency of only $5,825.87.  Defendant's Exhibit V at ¶ 44; **Ex. 30**; **Ex. 1** at 145:7-146:1.

**E.     Defendant's Conscious Disregard of Missouri Law and Warnings from the NCUA**

41.     Defendant performed no oversight of Centrix's collection and repossession activities undertaken on its behalf. **Ex. 1** at 33:19-34:12; 66:19-69:19; 132:2-132:23; 154:1-154:12; 162:5-162:17; 162:18-163:18; 164:5-166:6.

42.     Defendant did not review or scrutinize the any of the pre-sale communications, including the July 30, 2004 communication sent to Plaintiff, before they were sent to the Class members.  **Ex. 1** at 68:11-68:22; 154:1-154:12; 162:5-162:17; 162:18-163:18; 164:5-166:6.

43.     Defendant took no action in response to an NCUA letter issued in September 2004, concerning higher-risk lending activities such as subprime lending, indirect lending programs, outsourced lending relationships. **Ex. 1** at 178:13-179:14: **Ex. 17**.

44.     Defendant took no action in response to an NCUA Risk Alert issued in June 2005, concerning the risks and "unsafe and unsound practices" inherent in the PMP and "outsourced indirect, subprime automobile lending and participation activity in such loans." *See* **Ex. 1** at 179:17-180:21; **Ex. 18,** at ¶ 19.

22

45.     Defendant took no action in response to a letter issued in October 2006 concerning the *April Smith* lawsuit and the deficient Commercial Code communications at issue in this lawsuit.  *See* **Ex. 1** at 194:15-196:1; **Ex. 24.**

## PART II

**I.  ARGUMENT AND AUTHORITIES**

**A.  Plaintiff's Commercial Code claims are appropriate under the 2001 Commercial Code and Missouri law.**

**1.  Defendant's arguments and authorities have been superseded by revised statutes and case law.**

Defendant cannot establish its right to judgment as a matter of law on Plaintiff's Commercial Code claim. Defendant's Motion primarily relies upon cases construing the provisions of the **1972** version of the Commercial Code, instead of the provisions of the current, **2001** version, as well as recent Missouri cases construing those provisions. *See Def.'s Sugg*. at p.12-14; *Excel Bank v. National Bank of Kansas City*, 290 S.W.3d 801, 804 (Mo.App.W.D. 2009)("The UCC was substantially revised effective July 1, 2001."). The lack of legal merit in Defendant's *Motion* is evident when the 1972 and 2001 versions of the Commercial Code are compared to determine if Defendant's authorities remain viable. They are no longer viable.

The 2001 revisions to Article 9 of the Uniform Commercial Code were among the most material of the revisions to the entire Uniform Commercial Code. *See generally* § 400.9-101, at Official Comments; *see also Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88, 95 n.5 (Mo.App.W.D. 2008)("In July 2001, a comprehensive revision of Article 9 went into effect."). And, of those revisions to Article 9, the revisions to Part 6 were the most significant. With respect to the revisions of Part 6 of Article 9, the Official Comment to § 400.9-102 states:

> Part 6 of Article 9 extensively revises former Part 5... This Article (including the accompanying conforming revisions … includes several special rules for "consumer goods," "consumer transactions," and "consumer-goods transactions.

§ 400.9-102, at Official Comment at ¶¶ 4(i) and (j).[1]

---

[1] *See also In re M & S Grading, Inc*. 457 F.3d 898, 902 n.2 (8th Cir. 2006)(quoting *Thompson v. U.S.*, 408 F.2d 1075, 1084 n.15 (8th Cir. 1969): "Official Comments to the Uniform Commercial Code are not binding upon the courts but they are persuasive in matters of interpretation ....").

1

Throughout its briefing in the *Motion for Summary Judgment*, in opposition to the *Motion for Class Certification*, and in support of its proposed counterclaims, Defendant failed to demonstrate to the Court that the cases it relies upon construing the 1972 Commercial Code are still viable under the provisions of the 2001 Commercial Code, and related Missouri law as it exists in 2009. Indeed, with respect to the purposes in which the cases are offered, the cases are either distinguishable or simply not still viable. Defendant has, apparently intentionally, not cited to recent cases construing the 2001 Commercial Code in analogous situations because those cases undermine its arguments.

      2.      **Defendant "sent" defective communications. "Receipt" is not a requirement of the Commercial Code for Plaintiff's claims.**

          a.      ***Springfield Chrysler-Plymouth v. Harmon*** **is not an accurate or persuasive statement of Missouri law.**

For example, Defendant's first argument in support of its motion for summary judgment on Plaintiff's cause of action for statutory damages under § 400.9-625(c) of the 2001 Commercial Code asserts, based upon the 1993 decision in *Springfield Chrysler-Plymouth v. Harmon*, 858 S.W.2d 240 (Mo. App. S.D. 1993), that the cause of action fails because Plaintiff testified that he did not recall receiving the pre-sale communication that is the subject of this claim. Defendant also raises this argument in opposition to class certification, suggesting that the Class members must individually establish that they received the communications. For a number of reasons, Defendant's argument fails as a matter of law.

First, heightened scrutiny must be given to the *Springfield Chrysler-Plymouth* decision because it was entered in 1993, long before the substantive revisions in the 2001 Commercial Code at issue in this lawsuit became effective. The decision cannot withstand such scrutiny.

Case 3:08-cv-05052-GAF   Document 126   Filed 11/30/09   Page 31 of 52

Respectfully, it suffers from a number of defects which prevent any court, state or federal, from relying upon it as persuasive authority or as an accurate statement of Missouri law in 2009.[2]

In *Springfield Chrysler-Plymouth*, the Plaintiff-automobile dealer sought a deficiency judgment from the Defendant-buyer after he defaulted on his car loan. *Id.* at 241. The Defendant-buyer asserted in his defense that the Plaintiff-dealer failed to send a proper notice required under the 1972 Commercial Code, at § 400.9-504 RSMo Supp 1992. The Defendant also argued that the Plaintiff failed to send the notice to his current address and thus he never received it. *Id.* at 242. In response, the Plaintiff-dealer argued that the parties agreed in the contract that "reasonable notice" would consist of mailing the notice to the address set forth in the security agreement and thus all it had to do was send a notice to that address. *Id.* at 243. The Court of Appeals agreed with the secured party, and explained its reasoning as follows:

> Having determined that Plaintiff took the necessary steps to reasonably notify Ted of the sale, ***we find it unnecessary to decide ground (a) where Ted claims the contents of the notice failed to comply with § 400.9-504(3).***
>
> Implicit in Ted's argument is the fact that he received no notice. Therefore, an unreceived but properly sent notice, defective or not, could not be prejudicial to Ted's right to protect his interest in the sale of the collateral. Protection of that right is the purpose of the statutory notice. *Cherry Manor,* 797 S.W.2d at 821. Ted's failure to protect his interest in the collateral did not result from a defective or ambiguous notice.

*Id.* at 244 (emphasis added).

This reasoning is flawed even under the 1972 Commercial Code. In fact, in 1998, the Court of Appeals for the Southern District, in *Textron Financial Corp. v. Trailiner Corp.*, 965 S.W.2d 426 (Mo. App. S.D. 1998), rejected that portion of the *Springfield-Plymouth* decision which made the content of the notice "irrelevant" if the debtor denied or failed to recall receiving the notice. To be fair, although the Court of Appeals did not mention the *Springfield Chrysler-*

---

[2] *See Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006)("Decisions of intermediate state appellate courts are persuasive authority that we follow when they are the best evidence of what state law is.").

*Plymouth* decision, it reached an opposite conclusion, stating: "Missouri courts consistently have held that the secured party who seeks a deficiency judgment following repossession and sale of collateral bears the burden of proving compliance with the notice requirements of § 400.9-504(3)." *Id.* at 429 (citing cases). The Court of Appeals held as follows:

> From our analysis in the four preceding paragraphs, ***we conclude that compliance with the notice provisions of § 400.9-504(3) is an element of Plaintiff's case that it had to plead <u>as well as prove</u>.*** …Also, practical considerations favor this view since the secured party directs the transactions that dispose of the collateral. Therefore, the facts proving compliance with notice requirements are peculiarly available to such creditor.
>
> ***
>
> ***Even if a debtor concedes that a commercially reasonable sale was held, a creditor must prove it gave notice to the debtor in its own right. … Plaintiff is simply wrong when it argues otherwise***.

*Id.* at 429, 431 (emphasis added; internal citation omitted).

Consequently, the Court of Appeals reversed the judgment awarding a deficiency to the secured party because the secured party's failure to plead compliance with the notice provisions of § 400.9-504 took the issue outside of the pleadings and prevented it from proving its compliance with those statutory provisions. *Id.* at 432. Hence, *Springfield Chrysler-Plymouth* and *Textron* are at odds because *Textron* made the content of the notice critical to the dealer's right to a deficiency judgment. *Textron* accurately reflects Missouri law as it exists in 2009.

Moreover, the flaw in the reasoning in *Springfield Chrysler-Plymouth* is evident by reference to the 1992 version of Chapter 408 of Missouri's Statutes, which incorporated very specific notice requirements for deficiency actions. In 1992, § 408.556 RSMo stated:

> 1. In any action brought by a lender against a borrower arising from default, ***the petition shall allege the facts of the borrower's default, facts sufficient to show compliance with the provisions of sections 400.9-501 to 400.9-507,*** RSMo, which provisions are hereby deemed applicable to all credit transactions, with respect to any sale or other disposition of collateral for the credit transaction, the amount to which the lender is entitled, and an indication of how that amount was determined.

4

**2. *A default judgment may not be entered in the action in favor of the lender unless the petition is verified by the lender, or sworn testimony, by affidavit or otherwise, is adduced showing that the lender is entitled to the relief demanded*.**

§ 408.556 RSMo (Supp. 1992)(emphasis added).

Next, in 1992 § 408.557 RSMo stated:

1. When a lender sells or otherwise disposes of collateral in a transaction in which an action for a deficiency may be commenced against the borrower, ***prior to bringing any such action or upon written request of the borrower, the lender shall give the borrower the notice described in this section.*** A lender gives notice to the borrower under this section when he delivers the notice to the borrower or mails the notice to him at his last known address.

**2. *The notice shall be in a writing and conspicuously state***:

(1)     The name, address and telephone number of the lender to whom payment of any deficiency is to be made;

(2)     An identification of the goods sold or otherwise disposed of;

(3)     The date of sale or other disposition;

(4)     The nature of the disposition if other than a sale, or, if a sale, whether or not the goods were sold at public auction and the name and address of the person who conducted the auction;

(5)     The amount due the lender immediately prior to the disposition after deducting the amount of any refund of interest and, if known to the creditor, insurance premiums;

(6)     The sale price;

(7)     Expenses incurred by the lender permitted to be deducted from the sale price before application to the debt pursuant to sections 400.9-501 to 400.9-507, RSMo, itemized and identified to show the nature of each such expense; and

(8)     The remaining deficiency, or surplus, as of the date of sale, computed by subtracting item (7) from item (6) and subtracting the difference so determined, if more than zero, from item (5).

§ 408.557 (Supp. 1992)(emphasis added).

In 1992 Chapter 408 applied to a secured party's deficiency claim based on a motor vehicle sale in Missouri. *See* § 408.551 (Supp. 1992)(application to motor vehicles sales governed by Chapter 365); § 365.020(11)("retail installment transaction" for sale of motor vehicle). Hence, in 1992, like it is today, the content of the notice was entirely relevant to the

5

plaintiff-dealer's ability to recover the deficiency on an installment loan as established by §§ 408.556 and 408.557 RSMo (1992 Supp). The Court of Appeals in 1993 failed to address the very provisions of Chapter 408 which governed the secured party's right to a deficiency from the debtor. So too does Defendant in it *Motion for Leave to File First Amended Answer*. This is fatal under Missouri law. The *Springfield Chrysler-Plymouth* case is not persuasive or indicative of how the Missouri Supreme Court would rule in 2009, in the face of § 408.556 RSMo.

    **b.** ***Springfield Chrysler-Plymouth* is focused on a different cause of action than the one at issue in Defendant's motion.**

   Defendant's argument based upon the *Springfield Chrysler-Plymouth* decision also fails because that case is focused on a ***different cause of action*** – the secured party's deficiency claim – than the one asserted by Plaintiff here – a claim for statutory damages under § 400.9-625(c) RSMo. The causes of action are materially different, which is why the case is inapplicable here.

   Importantly, a retail installment contract "creates ***two different relationships***: the relationship of buyer to a seller and the relationship of an obligor to the secured party." *See D.A.N. Joint Venture, III v. Clark*, 218 S.W.3d 455, 459 (Mo.App.W.D. 2007)(emphasis added). A deficiency action is "an attempt to enforce an obligation arising out of the sales contract component of a retail installment contract after the remedies created by the security agreement component of that contract have been exhausted." *See Id.* As it did in 1993, in 2009, Chapter 408, and § 408.556 RSMo, apply to deficiency actions based upon motor vehicle installment sales transactions. *See* § 408.551 RSMo.

   In contrast to the deficiency action at issue in *Springfield Chrysler-Plymouth*, here the roles of the plaintiff and defendant are reversed, the cause of action is different, and the 2001 Commercial Code governs the issue. Here, the Plaintiff is the debtor, and the Defendant is the secured party, and the claim is for statutory damages under § 400.9-625(c) RSMo. Under the

6

2001 Commercial Code, the element the debtor must prove for his claim is that the secured party "***sent***" the deficient notice. *See* § 400.9-611(b) RSMo. It is undisputed in this litigation that Centrix, as agent for Defendant, sent the deficient communications to each of the Class members. There is no individualized factual issue concerning "receipt" for Plaintiff's claim, or for the Class members' claims, so as to relate to the propriety of class certification.

Indeed, the Commercial Code says nothing about the debtor's "receipt" of the notice. *See* § 400.9-611 RSMo, and Official Comment to § 9-611 at ¶ 2 ("This section requires a secured party who wishes to dispose of collateral under Section 9-610 to ***send*** 'a reasonable authenticated notification of disposition' to specified interested persons, subject to certain exceptions. The notification must be reasonable as to the manner in which it is sent, its timeliness…and its content.")(emphasis added). Next, § 400.9-201(26) states: "A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course *whether or not such other actually comes to know of it.*" The Official Comment to § 400.9-201(26) states:

> 26. "Notifies". New. This is the word used when the essential fact is the proper dispatch of the notice, not its receipt. Compare "Send". When the essential fact is the other party's receipt of the notice, that is stated. The second sentence states when a notification is received.

§ 400.1-201 RSMo, Official Comment at ¶ 26; *see also Executive Financial Services, Inc. v. Garrison*, 722 F.2d 417, 419 (8th Cir. 1983)("'Send notice' and 'receives notice' are defined terms under the code").

The definitions are different and they are used in different situations in the Commercial Code depending upon the section being dealt with. *Compare* V.A.M.S. § 400.1-201(25) & (26) *with* V.A.M.S. § 400.1-201(38)."); *Chisolm v. TranSouth Financial Corp.,* 194 F.R.D. 538, 568 n. 40 (E.D.Va. 2000)("Courts uniformly afford creditors the benefit of a presumption of receipt

7

once a conforming notice is sent when creditors seek deficiency judgments.… Presently, the Court discerns no principled reason why this presumption should only operate in the favor of the creditor. Thus, the Court disagrees with Defendant's repeated statements that consumers will have to demonstrate receipt of the notice."). Thus, under the Commercial Code, the secured party violates §§ 400.9-610-400.9-614 by ***sending*** a defective communication, regardless of receipt by the debtor and regardless of the action the debtor took after his vehicle was repossessed.

In this respect, Defendant also argues that because Plaintiff stated that he contacted the credit union in efforts to locate his repossessed vehicle, the "purpose" of the statutory notice requirement was met, and Plaintiff's claim fails, simply because the Plaintiff was aware that his vehicle was repossessed and contacted his secured party. This argument has no merit whatsoever under the 1972 or 2001 Commercial Code. *See In re Hull*, 155 B.R. 515, 516 (Bkrtcy.W.D.Mo. 1993)(citing cases: Under Missouri law, written notice is required to meet the notice requirements of § 400.9-504(3).… Even where the creditor can prove that a debtor received oral notice and had actual knowledge of an impending sale, such notice is insufficient to conform to Missouri's strict interpretation of § 400.9-504(3)); *Mancuso*, 254 S.W.3d at 92 ("A creditor is held to the requirement of strict compliance with these notice provisions.… Any doubt about what constitutes strict compliance is resolved in the debtor's favor."); *Boatmen's Bank of Nevada v. Dahmer*, 716 S.W.2d 876, 878 (Mo.App.W.D. 1986)("Resolution of the issue in favor of written notice also comports with the rule that if there be doubt upon any condition, it be decided in favor of the interest of debtors.").

The 2001 Commercial Code did not change the provisions requiring the "sending" of a notice from the 1972 Commercial Code.[3] The *Springfield Chrysler-Plymouth* court understood

---

[3] Indeed, courts construing the 1972 and 2001 versions of the Commercial Code routinely reject a requirement of proof that the debtor received a notice required by § 9-611. *See, e.g. Auto Credit of Nashville v. Wimmer*, 231

the distinction between "sending" the notice and "receipt" of the notice as set forth in those definitions. *See id*. 858 S.W.2d at 242-43. It erred when it failed to consider in its analysis the elements of the deficiency claim and Chapter 408, which governed the claim for a deficiency.

The Commercial Code and Chapter 408 place the burden of compliance with Part 6 of Article 9 on the plaintiff-secured party, especially if it is seeking to obtain a deficiency from the debtor. *See Ford Motor Credit Co. v. Updegraff*, 218 S.W.3d 617, 622-23 (Mo. App. W.D. 2007); *Textron,* 965 S.W.2d at 427; §§ 408.556 and 408.557 RSMo.[4]

Specifically, as Plaintiff explains in detail in his response to Defendant's *Motion for Leave to File First Amended Answer*, which is incorporated herein for this purpose, in order to obtain a deficiency judgment, Missouri law requires the secured party to allege specific facts about the sale of the collateral as set forth in § 408.556 RSMo, as well as its compliance with the notice provisions of § 400.9-610(b); *Updegraff*, 218 S.W.3d at 623.[5] The secured party then must prove that it gave a notice that strictly complied with §§ 400.9-613 and 400.9-614 RSMo to the debtor. *See* §§ 408.556 and 408.557 RSMo; *see also Textron*, 965 S.W.2d at 427, 429-31;

---

S.W.3d 896, 903 (Tenn. 2007); *FirstMerit Bank v. Miller*, 2009 WL 2940199, at *2-3 (Ohio App. Sept. 10, 2009); *General Motors Acceptance Corp. v. Stoval*, 872 N.E.2d 91, 99-100 (Ill.App. 2007); *Financial Federal Credit Inc. v. Dinardo*, 2006 WL 734391, at *5 (S.D.Tex.2006); *Chisolm v. TranSouth Financial Corp.*, 194 F.R.D. 538, 551 (E.D.Va. 2000); *Erdmann v. Rants*, 442 N.W.2d 441, 444 (N.D. 1989).

[4] Since 2001, §§ 408.556 and 408.557 have been amended to incorporate the 2001 Commercial Code, including, specifically, §§ 400.9-613 and 500.9-614 RSMo.

[5] Section 408.556 states:

> 1. In any action brought by a lender against a borrower arising from default, the petition shall allege the facts of the borrower's default, facts sufficient to show compliance with the provisions of sections 400.9-601 to 400.9-629, RSMo, which provisions are hereby deemed applicable to all credit transactions, with respect to any sale or other disposition of collateral for the credit transaction, the amount to which the lender is entitled, and an indication of how that amount was determined.
> 2. A default judgment may not be entered in the action in favor of the lender unless the petition is verified by the lender, or sworn testimony, by affidavit or otherwise, is adduced showing that the lender is entitled to the relief demanded.

Also, § 408.557 states: "When a lender sells or otherwise disposes of collateral in a transaction in which an action for a deficiency may be commenced against the borrower, prior to bringing any such action or upon written request of the borrower, the lender shall give the borrower the notice provided in section 400.9-614, RSMo, for consumer goods transactions or section 400.9-613, RSMo, for all other transactions that are not consumer goods transactions."

*Chisolm*, 194 F.R.D. at 568 n.40. Defendant's *Motion for Leave to File First Amended Answer* seeks to assert counterclaims against some of the Class members for deficiency judgments, but makes no effort to comply with the pleading requirements of Missouri law set forth above. Defendant has not satisfied its burden with respect to either summary judgment on Plaintiff's statutory damages claim or its proposed counterclaims for deficiency judgments.

Altogether, Defendant's "receipt of the notice" argument is meritless under Missouri law and does not mandate the entry of summary judgment. There is a violation of the Commercial Code if a deficient notice was sent. "Receipt" is irrelevant to Plaintiff's Commercial Code claim.

### 3. Plaintiff need not establish actual damages due to a defective notice.

Also contrary to Defendant's arguments, the 2001 Commercial Code, which governs Plaintiff's affirmative claims for statutory damages, does not require the debtor to prove that a defective notice, or his failure to receive the notice, caused him any injury or actual damages. *See* § 400.9-625(c)(2). Defendant's argument was specifically rejected by the Court of Appeals in the 2008 *Mancuso v. Long Beach Acceptance Corp.* decision. The Court of Appeals stated:

> Ms. Mancuso does not claim that any deficiency of the notice precluded her from exercising her right of redemption, or caused her damage in any other way. Nevertheless, she has standing to bring this action. The statutory subsection "provides a minimum, statutory, damage recovery for a debtor" independent of a showing of damage. Section 400.9-625, cmt. 4. It is "designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted." *Id.*

*Id.,* 254 S.W.3d 88, 92 (Mo.App. W.D. 2008).

Defendant does not cite to *Mancuso* in the **entirety** of its briefing although it is dispositive of its argument when the plaintiff is seeking the statutory damages under § 400.9-625, as opposed to a deficiency judgment governed by §§ 408.556 and 408.557 RSMo.

10

Defendant has not established a right to judgment as a matter of law on Plaintiffs' Commercial Code claim under § 400.9-625 RSMo and its *Motion* must also be denied on this basis.

### 4. Even if the Kansas Consumer Credit Code applies to Plaintiff's claim, the result is still the same as if Missouri law applied.

Next, Defendant's reliance on the Kansas Consumer Credit Code ("KCCC") as a defense to the Plaintiff's claim for statutory damages under the Uniform Commercial Code is entirely unwarranted. Even if the KCCC applies to the Plaintiff's Commercial Code claim, his claim for statutory damages under § 400.9-625(c)(2) is still appropriate, and certainly not precluded, under the provisions of the KCCC. As a result, Plaintiffs sees no reason to dispute whether the KCCC applies to his claim, because the result is the ***same*** as if Missouri law wholly applies to his claim.

Importantly, the KCCC expressly states that the provisions of the Commercial Code "supplement" its own provisions thereby mandating that the KCCC and the Missouri Commercial Code be read *in pari materia*. It states:

> Unless displaced by the particular provisions of K.S.A. 16a-1-101 through 16a-9-102, ***the uniform commercial code*** and the principles of law and equity, including the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause ***supplement its provisions***.

K.S.A. § 16a-1-103 (emphasis added).

The KCCC, at K.S.A. § 16a-5-103(1), speaks only to the right of a secured party to obtain a deficiency judgment from a debtor. The KCCC affects the relationship of the *buyer* and the *seller*. S*ee D.A.N. Venture*, 218 S.W.3d at 459. It states: "a consumer is not liable for a deficiency unless the creditor has disposed of the goods in good faith and in a commercially reasonable manner." As explained above, in Missouri, Chapter 408 of the Revised Statutes speaks directly to the secured party's deficiency claim against the debtor.

11

The provisions of the **Uniform Commercial Code** at Article 9 govern security interests and it is the consumer protection provisions of § 9-625 which set forth a statutory penalty for the secured party's failure to dispose of the collateral in a commercially reasonable manner. *See* § 400.9-610(b) and § 400.9-625 RSMo. Here, this is an action related to the security interest and the relationship between the *obligor* and the *secured party*. *See D.A.N. Venture*, 218 S.W.3d at 459. Indeed, the Consumer Credit Code Comments to K.S.A. § 16a-5-103(1), at ¶1, *specifically incorporate* the former version of Part 5 of Article 9 of the Commercial Code, including former § 9-507, which set forth the statutory damages penalty. Those Comments state:

> **Where there has been a default with respect to a secured consumer credit transaction, the rights of the creditor and consumer are controlled by Part 5 (Default) of UCC Article 9 [U.C.C. § 9-501 et seq.],** except to the extent that such rights are changed by this Act.

K.S.A. § 16a-5-103, Consumer Credit Code Comments, at ¶1 (emphasis added). The second Consumer Credit Code Comment, at ¶ 2, explains that the KCCC modifies the Commercial Code "in certain instances where the lender is subject to claims and defenses arising from sales and leases (Section 3.405)." Those modifications are not at issue here and thus the Commercial Code's statutory penalty operates in connection with the KCCC. *See id.*

Defendant has substantially premised its KCCC arguments in support of its motion for summary judgment upon the Kansas Court of Appeals' 1987 decision in *Topeka Datsun Motor Co v. Stratton*, 736 P.2d 82 (Kan. App. 1987). Certainly, this Court is not bound by *Topeka Datsun*, since it is neither persuasive authority nor an accurate statement of the law. *See Minnesota Supply Co*, 472 F.3d at 534.

In *Topeka Datsun*, the Kansas Court of Appeals held that the Commercial Code's statutory penalty did **_not_** apply if the transaction was also governed by the Kansas Consumer Credit Code. The Court of Appeals stated:

When the disposal of consumer collateral is commercially unreasonable but even a commercially reasonable sale would have resulted in an amount still owing, the UCCC bar against a deficiency judgment secures to the debtor the full protection of the UCC default provisions. In such cases, the bar to a deficiency will also convey a punitive message which will work toward future consumer protection. It is only when a commercially reasonable disposal of the collateral would have yielded a higher sum than the amount still owing that the debtor will not be fully protected from all injury from the violation of U.C.C. § 9-504. In such a circumstance, the debtor loses the benefit of the complete cancellation of his debt plus the surplus which could have been obtained if a proper disposal had been carried out. The debtor must be granted both the benefit of the bar to a deficiency and the damages provided by U.C.C. § 9-507(1) in order to obtain complete relief from the injury suffered.

We conclude that unless the commercially unreasonable conduct of the creditor causes the debtor in a consumer transaction to lose the benefit of a surplus which would have resulted from a commercially reasonable sale of the collateral, the remedy of the debtor is limited to the denial of a claim for deficiency judgment under the UCCC. The penalty provided in K.S.A. 84-9-507(1) for cases involving consumer goods does not apply when the transaction is covered by the UCCC and a commercially reasonable sale of the collateral would still have resulted in an amount owing by the debtor.

*Id.*, 736 P.2d at 90.

The Kansas Court of Appeals' reasoning is flawed. To reach the "policy" result it clearly desired, the Kansas court engaged in "result-oriented" reasoning which failed to address § 16a-1-103 and the Comment to § 16a-5-103, cited above, as well as the express language of former § 9-507 and its Official Comment. Specifically, former Commercial Code § 9-507 stated:

If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part. ***If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus 10 per cent of the cash price.***

K.S.A. § 84-9-507(1) (1972)(emphasis added). The Official Comment to that section stated:

Case 3:08-cv-05052-GAF   Document 126   Filed 11/30/09   Page 42 of 52

The section further provides for damages where the unreasonable disposition has been concluded, and, ***in the case of consumer goods, states a minimum recovery***.

Official Comment to § 9-507, at ¶ 1 (emphasis added).

Although the Kansas Court of Appeals expressly found there to be "***no conflict***" between the KCCC and the Commercial Code's provisions, *see* 736 P.2d at 90 ("there is no conflict inherent in the remedial provisions of the two laws"), it rejected the Commercial Code's statutory penalty although it was clearly ***mandated*** by § 16a-1-103, the Comment to § 16a-5-103, and the express language of former § 9-507 and its Official Comment ***to apply the penalty***.

Further, although the Kansas court referenced the statutory penalty in former § 9-507 in its holding, its reasoning only applied to the *actual damages* caused by a commercially unreasonable sale of collateral. It ignored the statutory penalty. Thus, although the Kansas court found "no conflict" between the KCCC and the Commercial Code, it disregarded ***all*** of the provisions of the KCCC and the Commercial Code which directed the result it was to reach – the application of the statutory penalty – in consumer transactions. The effect was to abrogate the statutory penalty given to consumers in former § 9-507 in every instance it would apply.

The 2001 revisions to the Commercial Code provided greater protections to consumers. Kansas adopted the current version of the Commercial Code in Chapter 84 of the Kansas statutes. The Official Comment to K.S.A. § 84-9-625 (and § 400.9-625 RSMo) now states:

Subsection (c)(2) provides a minimum, statutory, damage recovery for a debtor and secondary obligor in a consumer-goods transaction. It is patterned on former Section 9-507(1) and ***is designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted***.

K.S.A. § 84-9-625, Official Comment at ¶ 4 (emphasis added).

Consequently, to the extent that the 1987 *Topeka Datsun* decision and its bar on the application of the statutory penalty of the Commercial Code, unless the consumer incurred *actual*

14

*damages*, could even be considered as "persuasive" authority on the issues before it, that decision was legislatively overruled by Kansas' enactment of the current version of the Uniform Commercial Code. *See State v. McElroy*, 130 P.3d 100, 106 (Kan. 2006)(quoting *State v. Van Hoet*, 89 P.3d 606 (Kan. 2004): "When the legislature revises an existing law, it is presumed that the legislature intended to change the law from how it existed prior to the amendment, and it is presumed that the legislature does not intend to enact useless or meaningless legislation.").

As a result, even if the KCCC applies to the Plaintiff's claims, Defendant's pre-sale communications still are reviewed with reference to the same provisions of Uniform Commercial Code §§ 9-613 and 9-614 under either Missouri's of Kansas' enactments, the bar on the deficiency judgment still applies to the lender's contract claim under K.S.A. § 16a-5-103, and the statutory penalty still applies under Uniform Commercial Code § 9-625 to the obligor's claim against the secured party. Defendant has not established its right to summary judgment on the statutory damages claim even if the KCCC applies to Plaintiffs transaction.

### B. Defendant's Contention that Plaintiff Incurred No Loss As a Result of Defendant's Unlawful Practices is Meritless.

Defendant argues that it is entitled to judgment as a matter of law on Plaintiff's MMPA claim because Plaintiff failed to make an installment payment on his loan. Defendant asserts that Plaintiff cannot establish a causal connection between Defendant's unlawful practices and a "monetary loss" as required by § 407.025.1 RSMo.

This argument not only misstates § 407.025.1 RSMo governing Plaintiff's claim, it also avoids Missouri case law on this issue, and ignores uncontestable facts which evidence the Plaintiff's ascertainable loss of money ***and*** property within the scope of § 407.025.1 RSMo. Defendant's argument lacks legal and factual merit and is entirely frivolous.

The MMPA, at § 407.025.1 RSMo, provides a civil action to:

15

> [a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers **an ascertainable loss of money or property**, **real or personal**, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020….

§ 407.025.1 RSMo (emphasis added).

The MMPA, and its definition of unlawful practices in § 407.020 RSMo, are broadly construed to provide protections to consumers. *See, e.g., Huch v. Charter Communications, Inc.*, 290 S.W.3d 721, 724 (Mo. banc 2009); *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001). In *Plubell v. Merck & Co., Inc.*, the Court of Appeals explained the "causation" element of § 407.025 upon which Defendant premises its motion. It stated:

> The MMPA does not require that an unlawful practice cause a "purchase." A civil suit may be brought by "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and *thereby suffers an ascertainable loss* of money or property, real or personal, *as a result of* [an unlawful practice]." § 407.025. "[A]s a result of" modifies "ascertainable loss"; it does not modify "purchases or leases." ***Thus, a plaintiff's loss should be a result of the defendant's unlawful practice, but the statute does not require that the purchase be caused by the unlawful practice.*** Therefore, the class members are not individually required to show what they would or would not have done had the product not been misrepresented and the risks known.

*Plubell v. Merck & Co., Inc.,* 289 S.W.3d 707, 714 (Mo.App. W.D. 2009)(emphasis added).

It is undisputed that Plaintiff purchased a motor vehicle and obtained financing from Defendant in connection with the PMP. *See* Def's Fact Nos. 1-8. In connection with the PMP, Defendant committed unlawful practices. *See generally* Plaintiff's Fact Nos. 1-45; *First Amended Petitio*n, at ¶¶ 65-67. Defendant's argument, and motion for summary judgment as to Plaintiff's MMPA claim, are *factually meritless* because Plaintiff in fact, suffered "an ascertainable loss of money or property" caused by Defendant's commission of unlawful practices in connection with the PMP – he suffered a ***loss of the vehicle*** he acquired in connection with the PMP and that he legally owned under Missouri law. *See* Def's Fact No. 15.

16

Defendant's argument plainly ignores the "***or property***" element of § 407.025 RSMo, and that is part of the Class definition, and is a non-starter from its inception. Of course Plaintiff and the Class members all lost property – their repossessed vehicles – as a result of the PMP.

Even if the Court puts the clear "loss of property" to the side, it cannot be disputed that Plaintiff also incurred a "loss of money" caused by Defendant's commission of unlawful practices in connection with the PMP. The PMP utilized specific credit and dealer guidelines and formulas for the pricing of the motor vehicles, and the terms of the credit union's financing, which ensured payment of a number of hidden fees and finance charges to the participants in the PMP, and the insurability of the borrower's default. *See* Plaintiff's Fact Nos. 6-14; 17-21; **Ex. 2-5, 30-31.** These guidelines required a ***mandatory down payment*** for vehicle purchases and Plaintiff, and each of the Class members, made a down payment in connection with their purchase. *See* **Ex. 32**, at ¶ 11. Defendant's argument ignores the mandatory, class-wide down payments and focuses on the installment payments. It cannot be disputed that Plaintiff and each Class member suffered an ascertainable "loss of money" in connection with their vehicle purchases and Defendant's unlawful practices by their down payments.

The cases cited by Defendant in support of its Motion are factually and legally distinguishable. For example, in *Owen v. General Motors Corp.*, 533 F.3d 913 (8th Cir. 2008), the plaintiffs alleged that they incurred a monetary loss as a result of the defendant's failure to disclose a product defect. *Id.* at 922. The Eighth Circuit granted summary judgment on the MMPA claim because the plaintiff could not prove that his vehicle suffered the claimed defect, so as to establish a causal relationship between the supposed monetary loss and the unlawful practice of failing to disclose the defect, which was assumed for purposes of analysis. *See id.*, at 922-23. Here, in contrast, the unlawful practices (which were not at issue in *Owen*) are disputed,

and the "defect" (which was at issue in *Owen*) – Plaintiff's loss of his vehicle and his monetary down payment – cannot be reasonably disputed. As set forth in the *First Amended Petition* and in Plaintiff's Additional Facts 1-45 and related Exhibits above, Plaintiff will prove Defendant's commission of one or more unlawful practices (such as its imposition of hidden fees and finance charges for undisclosed default insurance premiums) at trial. *Owen* focuses on a different issue and does not establish the absence of disputed facts justifying judgment as a matter of law.[6]

Defendant's motion for summary judgment on Plaintiff's MMPA claim is belied by the facts and the law. The Court should deny the *Motion for Summary Judgment*.

**C. The conversion claim withstands summary judgment under the 2001 Commercial Code.**

Defendant asserts that summary judgment is appropriate on Plaintiff's conversion claim because it cannot be liable for conversion if Plaintiff was in default on his loans at the time his vehicles were repossessed and it had a right to take possession of his vehicle. Defendant's arguments lack merit and fail to comprehend the 2001 amendments to the Commercial Code and their interrelationship with Missouri's certificate of title statutes. Contrary to Defendant's argument, Plaintiff may properly assert a conversion claim against Defendant because Defendant unlawfully exercised ownership over his vehicle by obtaining title to it pursuant to Missouri's certificate of title statutes after having sent defective Commercial Code communications.

"Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Emerick v. Mutual Ben. Life Ins. Co.*, 756 S.W.2d 513, 523 (Mo. banc 1988). It is an appropriate theory of recovery "where the

---

[6] Similarly, in *Dumas v. Albers Medical, Inc.*, 2005 WL 2172030 (W.D. Mo. 2005), the plaintiff alleged nationwide consumer protection act claims related to the sale of a counterfeit drug, despite having no evidence that the he even purchased a counterfeit drug or any means to establish the claim as to himself or the proposed class members. *Id.* at *2-4. As set forth in his *Additional Facts* and related Exhibits, Plaintiff is able to prove his claims by reference to evidence in the record. *Dumas* does not support the entry of summary judgment.

18

defendant rightfully assumes possession, but wrongfully retains possession." *Kennedy v. Fournie*, 898 S.W.2d 672, 678 (Mo. App. E.D. 1995)(citing *Owens v. Automobile Recovery Bureau, Inc.*, 544 S.W.2d 26, 32 (Mo. App. W.D. 1976)).

Defendant perfected its security interest in Plaintiff's vehicles when it filed a *Notice of Lien* with the Missouri Department of Revenue. *See* §§301.600, 301.620 RSMo; §400.9-102(a)(71)(A) RSMo and Official Comment to § 400.9-102, at ¶ 2(b). After repossessing the Plaintiff's vehicle, Defendant obtained legal ownership of the vehicle.

Missouri is a "strict title" state. As such, Defendant was required to obtain title and ownership to the vehicle through the provisions of § 310.215 RSMo so that it could validly sell the vehicle at auction. *See* § 310.210.4 RSMo; *Metro Auto Auction v. Director of Revenue*, 707 S.W.2d 397, 403 (Mo. banc 1986); *Antle v. Reynolds*, 15 S.W.3d 762, 764 (Mo. App. W.D. 2000). Here, after taking possession of Plaintiff's vehicle, Defendant obtained legal ownership of the vehicles through § 301.215. Because Defendant obtained ownership of the vehicle after sending an admitted defective Commercial Code communication, Defendant's ownership of the vehicle is undoubtedly tied to the Commercial Code communication. *See* §§ 301.215 RSMo.

Indeed, § 400.9-619 specifically incorporates Missouri's certificate of title statutes into Part 6 of Article 9 so as to mandate compliance with the Commercial Code even though the secured party has obtained title to the vehicles. It states that "[a] transfer of the record or legal title to collateral to a secured party under subsection (b) or otherwise is not of itself a disposition of collateral under this article and does not of itself relieve the secured party of its duties under this article." The Official Comments to § 400.9-619 explain that "[a] secured party who has obtained record or legal title retains its duties with respect to the enforcement of its security

19

interest, and the debtor retains its rights as well." [7]  Although it would appear that § 400.9-619 is intended to apply to the commercial reasonableness of the *sale* of the vehicle, it is § 400.9-610 which states that "*every aspect* of the disposition of the collateral" must be "commercially reasonable." If the Court is to harmonize the provisions of the Commercial Code with Missouri's certificate of title statutes, then it must find that a conversion occurred because Defendant obtained ownership of Plaintiff's vehicle after issuing a defective pre-sale communication.

Defendant cites to *Kennedy v. Fournie*, 898 S.W.2d 672 (Mo. App. E.D. 1995), in support of its *Motion*, arguing that the conversion claim fails as a matter of law, regardless of the insufficiency of the pre-sale communications, if the Class members were in default on their loans and they failed to make efforts to cure their defaults. *Kennedy*, however, is no longer controlling on this issue given the 2001 revisions to Article 9 of the Commercial Code, which now make the insufficiency of the communications entirely relevant to the conversion claim. Again, Defendant has not considered whether its arguments accurately reflect and apply Missouri law and the current 2001 Commercial Code as affected by Missouri's certificate of title statutes.

For these reasons, Defendant's *Motion for Summary Judgment* should be denied.

## II.    CONCLUSION

Defendant's *Motion for Summary Judgment* sets forth no arguments or undisputed facts which demonstrate that it is entitled to summary judgment on any of Plaintiff's causes of action. The Court should deny the *Motion for Summary Judgment* in its entirety.

---

[7] *See also* § 400.9-619, at Official Comment, at ¶3 ("Applicable non-UCC law (e.g., a certificate-of-title statute, federal registry rules, or the like) may provide a means by which the secured party may obtain or transfer record or legal title for the purpose of a disposition of the property under this Article. The mechanism provided by this section is in addition to any title-clearing provision under law other than this Article.").

Dated: November 30, 2009        Respectfully submitted,

WALTERS BENDER STROHBEHN & VAUGHAN, P.C.

By: */s/ Garrett M. Hodes*
 J. Michael Vaughan – Mo. Bar 24989
 R. Frederick Walters – Mo. Bar 25069
 Garrett M. Hodes – Mo. Bar 50221
    2500 City Center Square
    1100 Main Street
    Kansas City, Missouri 64105
    (816) 421-6620
    (816) 421-4747 (Facsimile)

ATTORNEYS FOR PLAINTIFF AND
PROPOSED CLASS COUNSEL

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically with the United States District Court for the Western District of Missouri with notice of case activity to be generated and sent electronically by the Clerk of the Court to all designated persons this **30th day of November 2009**:

*/s/ Garrett M. Hodes*
Attorneys for Plaintiff

21

**EXHIBITS**
**(Filed Under Seal Pursuant to Protective Order)**

| *No.* | *Description* |
|---|---|
| 1 | Transcript of Deposition of Mark S. Kolarik |
| 2 | Standard Loan Placement Agreement dated December 31, 2002 (KSTCU0011085) |
| 3 | Financial Institution Approval of Sub-Prime Credit Guidelines (Centrix-NCUA000915) |
| 4 | Centrix Financial Dealer Program (KSTCU00070; Centrix-NCUA000864) |
| 5 | Audit Recap for Cecil E. Hopkins (KSTCU000921)(Deposition Exhibit 42) |
| 6 | Scheduled Property Floater Inland Marine Policy – Lender's Indemnity Coverage (KSTCU00136); Lender's Indemnity Coverage Motor vehicle Repossession Loss Endorsement Rate Schedule (KSTCU000143) |
| 7 | Centrix/LMG PMP Procedure – First Payment Default (Centrix-NCUA000981) |
| 8 | Portfolio Servicing Agreement dated December 31, 2002 (KSTCU001070) |
| 9 | Kansas Teachers Credit Union, December 16, 2002 Minutes of the Board of directors (KSTCU000772) |
| 10 | Centrix Financial, LLC – Annual Funding Commitment (KSTCU000418) |
| 11 | Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories |
| 12 | Kansas Teachers Credit Union – Centrix PMP Loan Policy (KSTCU000420) |
| 13 | Financial Institution Oversight of Centrix Servicing (Centrix-NCUA000923) |
| 14 | Centrix PMP Procedure – Title-Lien Perfection (Centrix-NCUA000971) |
| 15 | Notice of Lien Application (KSTCU000910) (PEAK5-0156) |
| 16 | Certification of Records, Missouri Department of Revenue (Hopkins000023) |
| 17 | NCUA Letter to Credit Unions, Letter No. 04-CU-13, "Specialized Lending Activities" (LAN 00326) |
| 18 | NCUA Risk Alert No. 05-RISK-01, "Specialized Lending Activities – Third Party Subprime Indirect Lending and Participations" (LAN-00329) |
| 19 | *Retail Installment Contract and Security Agreement*, dated March 25, 2004 (Doc. No. 1-4)(PEAK5-0090) |
| 20 | Letter dated July 30, 2004 to Cecil Hopkins (Peak5 000006) |
| 21 | Letter dated November 4, 2004 to Cecil Hopkins (PEAK5 0144) |
| 22 | Letter dated February 1, 2006 to Cecil E. Hopkins (Doc. No. 1-2) |
| 23 | Check dated January 30, 2006, payable to Cecil E. Hopkins in the amount of $100.00 |
| 24 | Letter dated October 6, 2006 from National Credit Union Association to Kansas Teachers Credit Union (Centrix-NCUA002042) |
| 25 | Letter dated September 22, 2005 from Everest National Insurance Company to Centrix Financial, LLC (Deposition Exhibit 54) |
| 26 | Letter dated August 25, 2005 from Centrix to Mark Kolarik (Deposition Exhibit 53) |
| 27 | Defendant's Loan Servicing Electronic Records |

i

| 28 | Membership Application – Kansas Teachers Community Credit Union |
|----|----------------------------------------------------------------|
| 29 | Vehicle Summary with NADA Values |
| 30 | Financial Institution Procedure for Centrix PMP – Financial Institution Accounting Procedure for Over-Advance by Dealer (Centrix-NCUA001003) |
| 31 | Introduction to Centrix and its Portfolio Management Program (KSTCU000026) |
| 32 | Affidavit of Christi M. Gumbs |