IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **CECIL E. HOPKINS, individually and on behalf of a class of others similarly situated,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 08-05052-CV-SW-GAF** |
| **KANSAS TEACHERS COMMUNITY CREDIT UNION,** | ) | |
| **Defendant/Third Party Plaintiff,** | ) | |
| **v.** | ) | |
| **MARATHON ROTHSCHILD CREDIT UNION, et al.,** | ) | |
| **Third Party Defendants.** | ) | |

**REPLY SUGGESTIONS IN SUPPORT OF DEFENDANT KANSAS TEACHERS COMMUNITY CREDIT UNION'S MOTION FOR SUMMARY JUDGMENT**

In opposing defendant Kansas Teachers Community Credit Union's ("Kansas Credit Union's") motion for summary judgment, plaintiff repeatedly contends that the 2001 revisions to Article 9 of the Uniform Commercial Code ("UCC") render defendant's reliance upon citations to pre-2001 case law invalid. However, although there were revisions to some portions of Article 9 of the UCC, *the provisions at issue in this case* – notably the notice and damages provision set forth in sections 9-611 and 9-625 – *did not change in any way relevant to this case*. Indeed, the UCC's official comments explain that there were no changes to the pre-sale notice provisions relevant to consumer transactions, and emphasize that pre-2001 case law was not being abrogated, reversed or modified. In other words, plaintiff's frequent references to changes

made to Article 9 are merely a ruse to distract this Court from the Kansas Credit Union's reliance on well-settled (and still controlling) case law.

Plaintiff also tries to "muddy the waters" by setting forth a number of additional facts that he claims preclude summary judgment. However, none of these additional facts have anything to do with whether the Kansas Credit Union is entitled to summary judgment *as to his claims*. The bulk of plaintiff's additional facts allege that *other* consumers in the Centrix PMP program had to make inflated installment payments because the repayment of *their* loans resulted in the payment of allegedly hidden fees and finance charges. Notably, these alleged facts have no bearing on *plaintiff's* claim because he did not pay any finance charges, hidden or otherwise, as he did not make *any* installment payments. Similarly, plaintiff contends that that Kansas Credit Union wrongfully disregarded "warning" letters from the National Credit Union Association ("NCUA"). These so-called warnings do not have any conceivable impact on *plaintiff's* claims because the first of these three letters was sent in September 2004 – months *after* the purchase, default, and repossession of plaintiff's Vehicle.

In conclusion, this summary judgment motion relates only to the viability of *plaintiff's* claims. Plaintiff's assertion of facts that do not bear on his claims not only fails to prevent summary judgment, but also demonstrates that the circumstances of each putative class member's transaction vary greatly, and that individual factual and legal issues predominate over common issues.

## PART I

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Plaintiff Has Not Controverted Any Of Defendant's Undisputed Material Facts.

Plaintiff has failed to controvert any of the 34 material facts set forth in defendant Kansas Credit Union's Statement of Undisputed Facts ("Defendant's Facts or "DSOF").

#### 1. Most of Defendant's Facts Are Entirely Uncontroverted.

Plaintiff has admitted 23 of the 34 facts set forth in Defendant's Facts. *See* plaintiff's response to DSOF ¶¶ 1-7, 9-14, 17-19, 24-27, 32-34.

#### 2. Of Those Facts That Plaintiff Controverts In Part, Plaintiff Admits The Portion Relevant For Summary Judgment To Be Entered.

As explained below, plaintiff has admitted the relevant part of another 10 facts set forth in Defendant's Facts. *See* plaintiff's response to DSOF ¶¶ 8, 15, 16, 20, 22-23, 28-31.

In plaintiff's response to DSOF ¶ 8, plaintiff admits that his Retail Installment Contract was assigned to the Kansas Credit Union. Plaintiff merely clarifies that this assignment occurred through the PMP. *Id*.

In plaintiff's response to DSOF ¶ 15, plaintiff admits that he defaulted under the Retail Installment Contract, and that his vehicle was repossessed on or about July 30, 2004 in Carl Junction, Missouri. Plaintiff merely clarifies that Centrix was the Kansas Credit Union's agent and asserts an invalid legal argument that the repossession was improper. *Id*.

In plaintiff's response to DSOF ¶ 16, plaintiff admits on or about July 30, 2004, Centrix sent to plaintiff the letter attached as Ex. Q to Defendant's Motion for Summary Judgment. Plaintiff's attempt to controvert the fact consists of his semantics argument about whether this letter may be called a "pre-sale notice." *Id*.

In plaintiff's response to DSOF ¶ 20, plaintiff admits that shortly after he purchased the Vehicle in March 2004, he moved out of the residence that he was sharing with his girlfriend at 505 Karen Drive, Carl Junction, Missouri, 64834, and that his mail was still being delivered to that address although he was no longer living there. It is unclear what plaintiff is attempting to controvert. *Id*.

In plaintiff's response to DSOF ¶ 22, plaintiff admits that after the Vehicle was repossessed, he did not make any attempt to make additional payments on the delinquent balance owed under the Retail Installment Contract. In plaintiff's response to DSOF ¶ 23, plaintiff admits he contacted the Kansas Credit Union following the Vehicle's repossession to "find out what was going on" and that his girlfriend had reported to him that she made payments to the Kansas Credit Union through money orders. Although plaintiff attempts to argue about the legal significance of these facts, he does not controvert their factual accuracy.

In plaintiff's response to DSOF ¶ 28, plaintiff admits that Defendant's expert report indicates that the authors of the report studied documents regarding the Vehicle's condition, odometer mileage, and other factors relating to the Vehicle's value (such as the Vehicle's interior, available options, existence of frame damage, and other factors that affect the value of a used automobile). In plaintiff's response to DSOF ¶ 29, plaintiff admits that Defendant's expert report states the conclusion "the price obtained for the vehicle is well within the standard of reasonableness." Plaintiffs' objections and attempts to controvert these facts are immaterial because in his response to DSOF ¶ 30, plaintiff admits that "the fair market value of the Vehicle on the date it was repossessed was less than $15,713.00," the ultimate fact material to his claims.

Finally, in plaintiff's response to DSOF ¶ 31, plaintiff controverts that he is making a claim for statutory damages under § 400.9-625(c)(2) for $10,878.56, and clarifies that he now

contends that his claim for statutory damages is $10,761.06. This distinction is immaterial because it does not nullify the fact that plaintiff is making a claim for statutory damages under the UCC.

### 3. Plaintiff Has Only Attempted to Controvert One of Defendant's Facts, But He Has Failed to Cite Any Evidence Controverting that Fact.

Plaintiff has only attempted to controvert one of Defendant's Facts in its entirety. *See* plaintiff's response to DSOF ¶ 21. In plaintiff's response to DSOF ¶ 21, plaintiff refuses to admit that he did not receive a copy of the pre-sale notice sent to his Carl Junction, Missouri address of record in July 2004. Plaintiff does not, however, set forth any evidence that he did receive this pre-sale notice in July 2004, but rather argues that his deposition testimony only establishes that he does not recall receiving the notice. Plaintiff then improperly controverts this fact with a legal argument regarding the legal effect of plaintiff's inability to establish that he received the pre-sale notice. Plaintiff's failure to properly convert this fact violates this Court's Local Rule 56.1(a) which requires the suggestions in opposition to a motion for summary judgment to identify the *facts* as to which the party contends a genuine issue of fact exists, not the law. Plaintiff has therefore failed to properly controvert DSOF ¶ 21.

## B. Plaintiff's Additional Facts Do Not Preclude Summary Judgment.

Plaintiff's Statement of Additional Facts ("Plaintiff's Facts" or "PSOF") consists of 45 paragraphs that he contends prevent summary judgment in this matter. Plaintiffs' Opposition to Summary Judgment (the "Opposition") (Court Doc. 126) at 15-23.[1] Plaintiff's Facts do not prevent summary judgment because (a) most of Plaintiff's Facts do not even relate to plaintiff's claims, and (b) the few facts that are tied to plaintiff's claims do not establish a basis for avoiding summary judgment.

### 1. Plaintiff Paid No Finance Charges Or Fees – Hidden Or Otherwise.

Most of Plaintiff's Facts are designed to create the impression that other members of the putative class were charged undisclosed fees and/or finance charges by purchasing a vehicle through the PMP because such fees were embedded in their loans. *See* PSOF ¶¶ 6-21. However, it is undisputed that *plaintiff* did not pay any of these allegedly undisclosed fees. The only portion of Plaintiff's Facts which relates to the losses incurred by plaintiff is entitled "Plaintiff's Loss of Money and Property in Connection with the PMP" and consists of nine paragraphs. PSOF ¶ 22-30. Not one of these paragraphs alleges that plaintiff ever paid a single dollar to either Centrix or the Kansas Credit Union, much less that plaintiff paid any "hidden fees" to these parties or anyone else. *Id.*

Instead, plaintiff merely indicates that on March 25, 2004, he entered into a retail installment contract to purchase a vehicle for $16,165.00. PSOF ¶ 22-24. At the dealership, he made a $1,000 down payment to the dealer – not to the Kansas Credit Union. PSOF ¶ 25. Plaintiff does not allege that the amount of his down payment was hidden, nor can he because it is clearly and accurately set forth on the retail installment agreement. PSOF ¶ 25; Plaintiff's

[1] The Opposition consists of two parts and each part is separately numbered. For brevity and clarity, when the Opposition is cited herein, the Kansas Credit Union will cite the page number set forth in the footer created by the ECF system.

Exhibit 19. Plaintiff also alleges that he elected to purchase a service contract, pay the dealer an administration fee, and purchase GAP insurance coverage. PSOF ¶ 26. Again, plaintiff does not and cannot allege that these fees were hidden as they are reflected on the retail installment agreement. PSOF ¶ 26; Plaintiff's Exhibit 19.

When plaintiff's allegations finally turn to the existence of "hidden fees," plaintiff reveals that – as to him – such fees are entirely hypothetical. Plaintiff first alleges that – if he had actually made all of his installment payments – he would have paid $9,262.06 in "finance charges" over the life of his loan. PSOF ¶ 27. Plaintiff then contends that a portion of the $9,262.06 in finance charges *he never actually paid* would have been used to reimburse the Kansas Credit Union for the $3,640.26 it paid (1) to purchase default insurance, (2) to pay Centrix for administering the PMP, and (3) to pay the dealer for administration and acquisition fees. PSOF ¶ 28-30. In other words, plaintiff theorizes that there are hidden fees "built into" loans obtained by the PMP that are passed on to consumers through their loan installment payments. PSOF ¶ 28-39; *see also* First Amended Petition at ¶ 66 ("These losses include … the payment of hidden fees and undisclosed premiums for the default protection and other insurance policies built into the cost of their loans, …").

The merits of his theory are immaterial as to him because it is undisputed that the only money he actually paid to anyone for the purchase of his vehicle through the PMP was the $1,000 down payment that he made to the auto dealer, Mayse Automotive, and that the terms of this payment were accurately reflected on the retail installment agreement. DSOF ¶¶ 11-12; PSOF ¶ 25; Plaintiff's Exhibit 19.

**2. The NCUA Letters Are Irrelevant To Plaintiff's Claims**

Plaintiff contends summary judgment is inappropriate because the Kansas Credit Union "disregarded" letters sent by the NCUA which plaintiff characterizes as warnings about the PMP. PSOF ¶¶ 43-45. These letters have no possible relationship to *plaintiff's* claims.

It is undisputed that plaintiff purchased the Vehicle on March 25, 2004, fell into a rapid default, and the Vehicle was repossessed on July 30, 2004. DSOF ¶¶ 1, 15-16. Critically, all of the NCUA's "warnings" that the Kansas Credit Union allegedly "disregarded" were sent *after* these events had already occurred. *See* PSOF ¶¶ 43-45 (alleging that the Kansas Credit Union disregarded warnings sent in September 2004, June 2005, and October 2006). Even if plaintiff's characterization of these letters were accurate – and it is not[2] – there is no conceivable way that the Kansas Credit Union could have disregarded letters that it had not yet received.

[2] *See Edison Fund v. Cogent Investment Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 222 (S.D.N.Y. 2008) (holding that the September 2004 NCUA letter "certainly did not serve as a directive to credit unions to stop this type of lending.")

## PART II

## <u>ARGUMENT AND AUTHORITIES</u>

### I. THE KANSAS CREDIT UNION IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNT I.

In its Suggestions in Support of Summary Judgment (Court Doc. 95), the Kansas Credit Union demonstrated that is entitled to summary judgment on Count I for two separate reasons: (1) under Missouri law, a properly addressed but unreceived pre-sale notice does not give rise to liability, since it could not be prejudicial to plaintiff's right to protect his interest in the sale of collateral; and (2) the Kansas U3C applies to plaintiff's purchase and prohibits a "double whammy" of UCC statutory damages in addition to the elimination of any remaining deficiency balance owed to the Kansas Credit Union. The arguments in the Opposition fail to nullify either basis for summary judgment on Count I.

#### A. The 2001 Revisions To The UCC Have No Impact On The Kansas Credit Union's Entitlement To Summary Judgment On Count I Because The Revisions Did Not Supersede Any Of The Rules Relating To Consumer Transactions Involved In This Case.

Plaintiff contends that the 2001 revisions to the UCC render the Kansas Credit Union's arguments "no longer viable." Opposition at 30. Indeed, plaintiff initially promises that "the lack of legal merit in Defendant's *Motion* is evident when the 1972 and 2001 version of the Commercial Code are compared to determine if Defendant's authorities remain viable." *Id*. Tellingly, plaintiff never actually follows up on the promised comparison of the 1972 and 2001 versions of the UCC. Instead of pointing to any specific change in the statutes at issue here, he merely underlines and bolds the words "<u>**1972**</u>" and "<u>**2001**</u>" and cites legal authorities for the proposition that there were substantive changes to Part 6 of Article 9 of the UCC.

However, and as set forth in more detail below, none of the revisions to Part 6 of Article 9 of the UCC abrogate, modify or reverse any of the law relied upon in the Kansas Credit

Union's motion for summary judgment. Indeed, plaintiff concedes elsewhere that the UCC notice provisions at the heart of Count I were not revised in 2001. *See* Opposition at 37 (admitting that "[t]he 2001 Commercial Code did not change the provisions requiring the 'sending' of a notice from the 1972 Commercial Code.")

     **B.     The Kansas Credit Union Is Entitled To Summary Judgment on Count I Because It Took Reasonable Steps to Provide Plaintiff With Notice Of The Sale Of The Vehicle, As Required Under Missouri Law.**

Under Missouri law, the Kansas Credit Union is entitled to summary judgment on Count I because it took reasonable steps to send plaintiff a pre-sale notice, but plaintiff did not receive the properly addressed notice because he had moved without informing the Kansas Credit Union of his change in address. Suggestions in Support of Summary Judgment (Doc. 95) at 12-14. This principle of Missouri law was set forth in *Springfield Chrysler-Plymouth v. Harmon*, 858 S.W.2d 240, 244 (Mo. Ct. App. 1993), which controls the resolution of plaintiff's UCC claim. In *Springfield Chrysler*, the Missouri Court of Appeals squarely held that the sufficiency of a pre-sale notice required by the UCC is irrelevant when the debtor fails to receive a properly sent notice: "an unreceived but properly sent notice, defective or not, could not be prejudicial to [debtor's] right to protect his interest in the sale of the collateral." *Id.* at 244. As discussed below, *Springfield Chrysler* has not been reversed, distinguished or called into question by a single Missouri judicial opinion, and has not been abrogated by statute. On the contrary, the continuing viability of the decision was reaffirmed in 2004 – three years after the 2001 revision to the UCC.

**1. *Springfield Chrysler-Plymouth v. Harmon* Is An Accurate Statement Of Missouri Law.**

To avoid summary judgment on Count I, plaintiff first contends that the *Springfield Chrysler* decision is not an accurate or persuasive statement of Missouri law. Opposition at 31-35. His argument contains two subparts, and each lacks merit.

In his first sub-argument, plaintiff contends that the *Springfield Chrysler* decision must be given "heightened scrutiny" because "it was entered in 1993, long before the substantive revisions in the 2001 Commercial Code at issue in this lawsuit became effective." Opposition at 31. There are a number of problems with this argument. First, the precedential value of an appellate court's decision does not wither away simply because of the passage of time, particularly in the rather modest span of 17 years. Second, plaintiff does not (and cannot) point to any specific aspect of the 2001 revisions to the UCC that somehow impacts the merits of the *Springfield Chrysler* decision. *See* Opposition at 31-35. On the contrary, he contends that the reasoning in *Springfield Chrysler* was flawed before the 2001 revisions were enacted. *See* Opposition at 32 ("this reasoning is flawed even under the 1972 Commercial Code."). Finally, the continuing viability of *Springfield Chrysler* as a correct and proper articulation of Missouri law was recently reaffirmed in *Food Services Corp. v. Rheam*, 145 S.W.3d 484, 492 (Mo. Ct. App. 2004).

In *Food Services*, a judgment creditor filed an action asking the circuit court to quiet title to the property at issue, declare that it owned an undivided interest in the property, and allow it to partition and sell the property. *Id.* at 486. After the circuit court entered summary judgment for the judgment creditor, the judgment debtor appealed and argued, among other things, that the creditor had failed to meet the applicable notice requirements. *Id.* at 491-93. The Court of Appeals rejected the debtor's argument and held that the creditor was not entitled to set aside the

deed because the creditor took steps that were "reasonably required" under the circumstances to satisfy the purpose of the applicable notice requirement. *Id.* at 492-93. In reaching this decision, the *Food Services* court specifically analyzed the factual similarity of the judgment creditor's efforts to send notice to the efforts made in *Springfield Chrysler*, and specifically relied upon the holding that "if the judgment creditor takes steps that are 'reasonably required' by the rule and under the circumstances of the case to inform the person who is to be notified, the statutory notice requirement is met." *Id.* at 492. Simply put, *Springfield Chrysler* continues to be a correct and accurate statement of Missouri law.

In his second sub-argument, plaintiff contends that the *Springfield Chrysler* was "rejected" by the Missouri Court of Appeals in *Textron Financial Corp. v. Trailiner Corp.*, 965 S.W.2d 426 (Mo. Ct. App. 1998). Opposition at 32-35. Plaintiff's argument is without merit because, as plaintiff concedes, the *Textron* decision makes no reference whatsoever to *Springfield Chrysler*. Opposition at 32-33. This is not surprising because *Textron* has nothing to do with the issue at hand, but rather is limited to an analysis of the procedural sufficiency of pleading requirements, namely whether a secured party had adequately plead sufficient facts in its court papers to later present evidence to prove up a deficiency judgment against a debtor. 965 S.W.2d at 431. The issue of whether a creditor had taken "reasonable steps" to comply with the UCC pre-sale notice requirement was not before the court in *Textron*. *Id.* In any event, the supposed "rejection" of the *Springfield Chrysler* decision was short-lived; as previously discussed, when a debtor-creditor notice compliance issue arose in the 2004 *Food Services* decision, the Court re-affirmed without dissent the continuing viability of *Springfield Chrysler*. *Food Services*, 145 S.W.3d at 492 (citing *Springfield Chrysler*, 858 S.W.2d at 243-244).

### 2. The reasoning of *Springfield Chrysler-Plymouth v. Harmon* applies to plaintiff's claims.

Plaintiff also contends that *Springfield Chrysler* may be distinguished from the current matter because unlike that case, where a dealership was suing a delinquent car buyer for a deficiency judgment, in this case, the tables are turned because plaintiff is suing the Kansas Credit Union for statutory damages. Opposition at 35-39. Plaintiff's argument lacks merit because he fails to explain how this factual difference has any policy or legal ramifications that require this court to distinguish this matter from *Springfield Chrysler*.

Plaintiff cites *D.A.N. Joint Venture, III v. Clark*, 218 S.W.3d 455, 459 (Mo. Ct. App. 2007) for the routine proposition that installment contracts create two sets of legal relationships – one between a buyer and seller and another between an obligor and secured party. Opposition at 35. Plaintiff does not explain why this proposition is important to his argument or somehow distinguishes this case from the rule of law articulated in *Springfield Chrysler*. However, a brief review of *Clark* illustrates the missing step in plaintiff's argument. In *Clark*, the assignee of a retail installment contract brought suit against the car buyer to collect the balance due on the contract approximately six and a half years after the buyer defaulted on the contract. *Id.* at 460. Under those circumstances, the Missouri Court of Appeals explained that there was a material distinction between whether the assignee was suing in it capacity as (1) the assignee of the car seller or (2) as the assignee of a secured party because the statute of limitations would differ depending on the type of interest involved in the suit. *Id.* at 458-60.

In contrast to *Clark*, plaintiff cannot articulate how his status as a plaintiff-debtor in this action distinguishes him from the defendant-purchaser in *Springfield-Chrysler* who also was sent a properly addressed but unreviewed pre-sale notice. Put another way, plaintiff has not explained why the exact same steps taken in *Springfield Chrysler* would be legally sufficient for

a car dealer attempting seeking to obtain a deficiency judgment against a purchaser but insufficient when a credit union seeks to defend itself against a UCC claim filed by a debtor.

Instead of explaining how this distinction could be meaningful, plaintiff simply expands upon his earlier argument that the *Springfield Chrysler* court was mistaken when it held that it was unnecessary to decide whether "the contents of the notice failed to comply with section 400.9-504(3)" when a debtor (such as plaintiff) failed to receive a properly addressed notice. *Springfield Chrysler* at 244-45. However, as plaintiff admits, there have been no substantive changes to the pre-sale notice requirements in Missouri since *Springfield Chrysler* was decided. *See* Opposition at 37 ("The 2001 Commercial Code did not change the provisions requiring the 'sending' of a notice from the 1972 Commercial Code."); *accord* Official Comment 1 to Mo. Rev. Stat. § 400.9-611 (explaining that the language of former section 400.9-504(3) (at issue in *Springfield Chrysler*) is the source for current Mo. Rev. Stat. § 400.9-611).

Similarly, there has been no change in the Missouri common law. For example, plaintiff cites a handful of Missouri cases for the proposition that the burden of compliance with the UCC notice requirements rests on the secured party. Opposition at 36-38. This concept is not in tension with *Springfield Chrysler*, but rather was specifically set forth in that case too: "[a]ny doubt as to what constitutes strict compliance with the notice requirement is resolved in favor of the debtor" before reaching its ultimate conclusion. *Id.* at 242.

**3. Conclusion.**

As a federal court sitting in diversity, this Court is obligated to enforce the substantive law of the state of Missouri. *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006). "Decisions of intermediate state appellate courts are persuasive authority that we follow when they are the best evidence of what state law is." *Id.* As set forth above, the *Springfield Chrysler* decision is persuasive authority which has not been abrogated, reversed, modified or

called into a question since it was decided in 1993. On the contrary, it has been recently affirmed as correctly stating the law of the State of Missouri.

While Missouri has staked out a minority view on the issue relevant here - whether it is necessary to examine the sufficiency of the content of a pre-sale notice sent by a creditor such as the Kansas Credit Union when, despite the reasonable steps taken to send the notice to the debtor, the notice is unreceived - that does not make Missouri's law any less worthy of enforcement by the federal courts. When statutes such as the UCC notice provisions are capable of multiple reasonable interpretations, Missouri state courts are free to choose the interpretation that forwards the public policy of their State and are not constrained to only adopt the interpretation favored by a majority of other sovereign states. For example, when it adopted the "absolute bar" rule instead of the more widely followed "rebuttable presumption rule," Missouri adopted out a minority position as to the availability of a deficiency judgment when a secured party fails to comply with former section 9-507. *See generally McKesson Corp. v. Colman's Grant Village*, 938 S.W.2d 631, 635 and Official Comment 4 to Mo. Rev. Stat. § 9-625. Because the "absolute bar" rule may apply in favor of a small subsection of the members of the putative class if a class is certified in this matter, plaintiff does not take issue with Missouri's decision to adopt that minority legal rule. *See* Plaintiff's Reply to Defendant's Opposition to Class Certification (Doc. 130) at 30 (citing *McKesson* and arguing that the "absolute bar" rule should prevent the Kansas Credit Union from obtaining an off-set as to certain class members). Plaintiff should not be heard to have the Court enforce only those minority views that suit his interests and/or the interests of some putative class members.

## C. THE KANSAS CREDIT UNION HAS NOT ARGUED THAT PLAINTIFF NEEDS TO ESTABLISH ACTUAL DAMAGES DUE TO A DEFECTIVE NOTICE.

The Kansas Credit Union never argued that plaintiff has to prove actual damages due to a defective notice to recover under Count I. Nonetheless, plaintiff briefly reiterates that he does not have to establish actual damages to recover under Count I. To clarify any misunderstanding, the Kansas Credit Union does not contend that *plaintiff* has to demonstrate any actual damages to recover under Count I.[3]

## D. PLAINTIFF CANNOT RECOVER STATUTORY DAMAGES UNDER COUNT I BECAUSE THE KANSAS U3C GOVERNS THE SCOPE OF REMEDIES AVAILABLE TO HIM FOR RECEIVING AN ALLEGEDLY INADEQUATE "PRE-SALE" NOTICE AFTER ENTERING INTO A CONSUMER CREDIT TRANSACTION IN THE STATE OF KANSAS.

Plaintiff contends that he is entitled to the "double whammy" of both: (1) statutory damages in excess of $10,000 under section 9-625 of the Missouri UCC; and (2) an order prohibiting the Kansas Credit Union from obtaining a deficiency judgment against him for any remaining balance owed by him. However, under the Kansas U3C, plaintiff is not entitled to recover statutory damages unless he can demonstrate that a commercially reasonable sale of the Vehicle would have generated a surplus amount (*i.e.*, that the Vehicle could have been sold for *more* than he owed under the Kansas Installment Contract). *Topeka Datsun Motor Co. v. Stratton*, 736 P.2d 82 (Kan. App. 1987). Plaintiff offers no such evidence, instead arguing only that *Topeka Datsun* does not apply here. For the reasons set forth below, plaintiff is incorrect and his claim for statutory damages is squarely controlled by *Topeka Datsun*.

[3] In contrast, other members of the putative class would have to demonstrate actual damages to recover under Count I. As explained in the Opposition to Plaintiff's Motion for Class Certification at 28-29, the Oklahoma UCC does require actual proof of damages to recover under Count I. *See also* Oklahoma Code. Sec 12A 1-9-614, official cmt.

### 1. It is Undisputed That The Kansas U3C Applies In This Case.

Plaintiff does not dispute that the Kansas U3C applies in this case, but rather attempts to dispute what effect the U3C has on his claims. Opposition at 40.

### 2. The *Topeka Datsun* Decision Is Well Reasoned And Directly Controls Plaintiff's Claim For Statutory Damages.

Under *Topeka Datsun*, a plaintiff such as Mr. Hopkins cannot recover statutory damages available under Article 9 of the UCC in a transaction covered by the Kansas U3C unless he can demonstrate that the value of the repossessed vehicle was greater than the amount owed by the debtor. 736 P.2d at 90. The *Topeka Datsun* case controls the current matter because it involves nearly identical facts. Like the current plaintiff, the debtor in *Topeka Datsun* asserted a claim for statutory damages under the UCC premised on an allegation that the "pre-sale" notice sent to him did not contain the language required by Article 9 of the Uniform Commercial Code. *Id.* The trial court entered a deficiency judgment on behalf of the car dealer for $3,083.51 and denied the debtor's counter-claims for damages and attorney's fees. *Id.* On appeal to the Kansas Court of Appeals, the Court of Appeals found that the notice sent to the debtor did not comply with UCC but refused to award the debtor the so-called "double whammy" of statutory damages in addition to the elimination of the remaining deficiency. *Id.* at 88-89. Plaintiff cannot demonstrate any reason for this Court not to follow the Kansas Court of Appeals' decision in *Topeka Datsun*.

### 3. The 2001 revisions to the UCC did not abrogate the *Topeka Datsun* doctrine.

Plaintiff contends that the 2001 revisions to the UCC abrogate *Topeka Datsun*'s prohibition against the "double-whammy" of both statutory damages and the elimination of any deficiency judgment. Opposition at 43-44. Plaintiff's position lacks merit because there have been no revisions to the applicable statutes, and the official comments to the UCC make clear that courts may continue to follow existing legal precedent such as *Topeka Datsun*.

First, contrary to plaintiff's suggestion, *there was no substantive change* or *legislative revision* to the language of the Kansas UCC regarding the scope and availability of damages in consumer transactions. *Compare* former section 84-9-507(1) *with* current section 84-9-625(c)(2) (emphasis added):

| | |
|---|---|
| **If the collateral is consumer goods**, the debtor has a right to recover **in any event an amount not less than the credit service charge plus ten percent of the principal amount of the debt or the time price differential plus ten percent of the cash price**. Former section 84-9-507(1). | **If the collateral is consumer goods**, a person that was a debtor or a secondary obligor at the time the secured party failed to comply with this part may recover for that failure **in any event an amount not less than the credit service charge plus ten percent of the principal amount of the debt or the time price differential plus ten percent of the cash price**. Current section 84-9-625(c)(2). |

Second, the 2001 revisions specifically instruct courts that they may rely on existing legal precedent such as *Topeka Datsun* as to the handling of deficiency balances in consumer transactions to prevent overcompensation or double recovery. More specifically, both the Kansas and Missouri UCC contain a new statutory provision designed to limit the possibility of a double recovery or other over compensation in non-consumer transactions. K.S.A. § 84-9-626 and Mo. Rev. Stat. § 400.9-626. These statutes plainly state that the new statutory prohibition on overcompensation only applies in non-consumer transactions, and that courts may continue to apply previously developed common law rules in consumer transactions:

> The limitation of the rules in subsection (a) to transactions other than consumer transactions **is intended to leave to the court the determination of the proper rules in consumer**

> **transactions.** The court may not infer from that limitation the nature of the proper rule in consumer transactions and **may continue to apply established approaches.**

K.S.A. § 84-9-626(b) and Mo. Rev. Stat. § 400.9-626(b) (emphasis added). Furthermore, the official comments in Part 6 of the UCC reinforce the statutory language's plain instruction that courts are free to follow established legal precedent as to the handing of deficiencies in consumer transactions:

> Subsection (b) provides that the limitation of subsection (a) to transactions other than consumer transactions **is intended to leave to the court the determination of the proper rules in consumer transactions.** It also instructs the court not to draw any inference from the limitation as to the proper rules for consumer transactions and **leaves the court free to continue to apply established approaches to those transactions**.

Official comment 4 to K.S.A. § 84-9-626 and Mo. Rev. Stat. § 400.9-626 (emphasis added).

> Because Section 9-626 does not apply to consumer transactions, **the statute is silent as to whether a double recovery or other over-compensation is possible in consumer transactions**.

Official comment 3 to K.S.A. § 84-9-625 and Mo. Rev. Stat. § 400.9-625 (emphasis added).

In summary, the relevant language regarding the scope and availability of statutory damages in consumer transactions did not change in 2001, and the legislature explicitly instructed courts that it did not intend to change the legal rules regarding the handling of deficiencies or double recoveries in consumer transactions. Accordingly, *Topeka Datsun*'s prohibition against allowing a recovery of statutory damages in addition to the elimination of a deficiency balance has not been abrogated by statute.

#### 4. Plaintiff Cannot Demonstrate That The Fair Market Value Of The Vehicle Is More Than The Amount He Owed Under The Kansas Installment Contract.

Plaintiff does not dispute the fair market value of his Vehicle was less than amount of his deficiency at the time it was repossessed and resold. *See* plaintiff's response to DSOF ¶ 24 (admitting that plaintiff owed the Kansas Credit Union $15,713.00 for the Vehicle on the date it was repossessed) and ¶ 30 (admitting that the fair market value of the Vehicle on the date it was repossessed was less than $15,713.00"). Accordingly, plaintiff is not entitled to recover statutory damages. *Topeka Datsun*, 736 P.2d at 90.

## II. PLAINTIFF CANNOT RECOVER UNDER COUNT II BECAUSE HE HAS FAILED TO DEMONSTRATE AN "ASCERTAINABLE LOSS" THAT OCCURRED "AS A RESULT" OF AN ALLEGEDLY UNFAIR PRACTICE.

Although plaintiff agrees that the MMPA requires him to prove a causal connection between a loss of money or property and an unfair or deceptive merchandising practice, he makes only a cursory attempt to demonstrate that any aspect of the PMP actually caused him to lose property or money. Opposition at 44-47.

### A. Plaintiff Does Not (And Cannot) Demonstrate How He Lost Ownership Of His Vehicle "As A Result Of" An Unfair Practice.

Plaintiff initially contends that he can satisfy the MMPA's causation requirement because he suffered the loss of his Vehicle "as a result" of the PMP. Opposition at 45-46. However, plaintiff does not even try to articulate how any of the allegedly unfair practices at issue *caused* him to lose ownership of his vehicle, but instead seems to believe that the causal connection may be assumed by the Court. *See* Opposition at 46 ("Of course Plaintiff and the Class members all lost property – their repossessed vehicles – as a result of the PMP.")

At this stage of summary judgment proceedings, plaintiff has a duty to demonstrate how at least one of the Kansas Credit Union's allegedly unfair practices resulted in his vehicle being

lost (a/k/a repossessed and resold). *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, *but must set forth specific facts showing that there is a genuine issue for trial*) (emphasis added). In dereliction of his obligation, plaintiff has not even tried to point to a single specific fact tying the loss of his Vehicle to one of the allegedly unlawful practices. *See* Opposition at 45-46. He cannot do so because, in reality, plaintiff lost ownership of the Vehicle because he failed to make a single installment payment on the Vehicle.

**B. Plaintiff Does Not (And Cannot) Demonstrate That He Lost Money "As A Result Of" The Allegedly Unfair Practices.**

Unlike his argument about the loss of his Vehicle, plaintiff at least attempts to articulate how he lost money "as a result" of the PMP. Opposition at 46-47. Plaintiff contends that he lost his $1,000 down payment because the terms of the PMP guidelines "ensured payment of a number of hidden fees and finance charges to the participants in the PMP, and the insurability of the borrower's default." Opposition at 46. The problem with this argument is rather simple – plaintiff did not actually pay any of the hidden fees that he blames for the loss of his down payment.

As set forth above, plaintiff's hidden fee theory is based on his contention that there are undisclosed finance charges and fees built into the putative class member's loans. *Supra* at part I, pp. 4-6; *see also* First Amended Petition at ¶ 66 ("These losses include … the payment of hidden fees and undisclosed premiums for the default protection and other insurance policies *built into the cost of their loans, …*") (emphasis added). Under plaintiff's theory, the undisclosed fees are paid by the putative class members over the life of their loans as they make installment payments. *Id.* Unlike other putative class members, plaintiff never made any installment

payments. *See* plaintiff's response to DSOF ¶¶ 10-11; s*ee also* deposition transcript of plaintiff's expert Dr. Kurt Krueger at 35 attached hereto as Exhibit 1 (admitting that "Mr. Hopkins had not paid any interest or principal on the loan …").[4] Because he never made any installment payments, plaintiff never paid "any interest or principal on the loan" much less any of the fees allegedly hidden therein.

While plaintiff certainly made a $1,000 down payment, he does not contend that there were hidden fees embedded in the down payment he made to the dealer. *See* PSOF ¶ 25. Any such claim would lack merit because the down payment amount is clearly and accurately set forth in the retail installment agreement. Plaintiff's Exhibit 19.

Under these facts, summary judgment is appropriate on plaintiff's MMPA claim. Indeed, this court may simply adopt the reasoning utilized in *Owen v. General Motors Corp.*, 533 F.3d 913 (8th Cir. 2008). In *Owen*, the court assumed the existence of an unlawful practice (failure to disclose defective wipers) but found that the plaintiff could not demonstrate a causal connection between the practice and the supposed monetary loss. *Id.* at 922-923. Similarly, this Court could assume that the PMP loans contain hidden fees, but award summary judgment because plaintiff never paid on his loan and therefore never paid any of the wrongful fees.

## III. PLAINTIFF CANNOT RECOVER UNDER COUNT III BECAUSE HE HAD NO RIGHT TO POSSESS THE VEHICLE AFTER HE DEFAULTED UNDER THE TERMS OF THE KANSAS INSTALLMENT CONTRACT.

Plaintiff's conversion claim is controlled by *Kennedy v. Fournie*, 898 S.W.2d 672, 678 (Mo. Ct. App. 1995), in which the Missouri Court of Appeals explained that in order to establish a conversion claim under Missouri law, a plaintiff "must show it had title to, or a right of property in, and a right to the immediate possession of the property concerned at the alleged date

[4] Plaintiff disclosed Dr. Krueger as an expert witness on November 2, 2009, so his testimony was unavailable for citation in the Kansas Credit Union's initial summary judgment briefing.


of conversion." *Id.* at 678. Here, Plaintiff cannot bring a conversion claim because he did not have title to, or a right of property in, or the right to immediate possession of the vehicle at the time of conversion because he was in default under the terms of the Kansas Retail Installment Contract. Plaintiff's reliance on the 2001 revisions to the Uniform Commercial Code ("UCC") and the Missouri certificate of title statutes does not change this result.

Plaintiff argues that his conversion claim withstands summary judgment under the 2001 revisions to the UCC which reference the Missouri certificate of title statutes. However, he cites no authority to support this argument. Instead, Plaintiff baldly asserts that Defendant unlawfully obtained title to Plaintiff's vehicle under the Missouri certificate of title statutes after sending allegedly defective pre-sale notices under the UCC, and therefore Plaintiff may proceed on his conversion claim. Whether a secured party sends sufficient pre-sale notice under the UCC has no bearing on whether it has obtained legal title to the collateral under the Missouri certificate of title statutes. These two bodies of law are separate and distinct. As such, while the failure to send sufficient pre-sale notice may give rise to a claim under the UCC, it does not also give rise to a conversion claim. *Kennedy*, 898 S.W.2d at 679. Plaintiff's argument is not supported by Missouri law, and therefore should be rejected.

Plaintiff cites two cases which explain that the Missouri certificate of title statute, Mo. Rev. Stat. § 301.210.4, requires the transfer of a vehicle's certificate of title between the buyer and seller to constitute a lawful transfer under Missouri law. *Metro Auto Auction v. Dir. of Revenue*, 707 S.W.2d 397, 403 (Mo. banc 1986); *Antle v. Reynolds*, 15 S.W.3d 762, 764 (Mo. Ct. App. 2000). Neither case involves the application of the UCC notice provisions to the certificate of title statutes. These cases instead show, as Plaintiff admits, that Defendant obtained legal ownership of Plaintiff's vehicle under section 301.215. Because Defendant obtained legal

ownership to the vehicle after Plaintiff's default, Plaintiff did not have title to or a right of immediate possession of the vehicle. Accordingly, his conversion claim fails under Missouri law.

Plaintiff's reliance on the language and comments of Mo. Rev. Stat. § 400.9-619 to support a conversion claim is also misplaced. The provisions cited by plaintiff simply state that a secured party who obtains a transfer of legal title must still comply with the provisions of the UCC in enforcing its security interest. Mo. Rev. Stat. § 400.9-619(c). Most significantly, the statute does *not* provide that a sufficient pre-sale notice is required before a secured party may obtain title of the collateral. Rather, the comments to that statute explain that "a transfer of record or legal title . . . to a secured party prior to the exercise of those remedies merely puts the secured party in a position to pass legal or record title to a transferee at foreclosure." *Id.* cmt. 2. In this case, the Kansas Credit Union obtained title to the vehicle after Plaintiff's default. Therefore, the Kansas Credit Union not Plaintiff, had the right to possession of the collateral at the time of repossession.

That a non-complying pre-sale notice was sent to Plaintiff does not change this result. As explained in *Kennedy v. Fournie*, a debtor who receives a defective notice may pursue any UCC remedy regardless of whether the secured party obtained legal title to the collateral. *Kennedy*, 898 S.W.2d at 679 (citing *Commerce Bank of St. Louis v. Dooling*, 875 S.W.2d 943, 947 (Mo. Ct. Ap. 1994)). However, an action for conversion is not one of the UCC remedies. *Id.* Plaintiff further claims, without any support, that *Kennedy* is no longer controlling after the 2001 revisions to the UCC. As shown above, the 2001 revisions do not affect the holding of *Kennedy* because the references to the Missouri certificate of title statutes in section 400.9-619 merely explain that a secured party must comply with the UCC whether or not it obtains legal title to the

collateral. Further, the Missouri courts have cited *Kennedy* after 2001, without any indication that it is no longer controlling after the revisions to the UCC. *See, e.g.*, *Consumer Fin. Corp. v. Reams*, 158 S.W.3d 792, 680 (Mo. Ct. App. 2005) (citing *Kennedy*, 898 S.W.2d at 680); *Bell v. Lafont Auto Sales*, 85 S.W.3d 50, 54 (Mo. Ct. App. 2002) (citing *Kennedy*, 898 S.W.2d at 678). For all these reasons, plaintiff's conversion claim fails as a matter of law.

**CONCLUSION**

Defendant Kansas Teachers Community Credit Union respectfully requests that the Court grant its motion for summary judgment.

Respectfully submitted,

STINSON MORRISON HECKER LLP

*s/ Marc D. McKay*
William E. Hanna, Mo. Bar No. 39556
Marc D. McKay, Mo. Bar No. 53216
1201 Walnut, Suite 2900
Kansas City, Missouri 64106-2150
phone: (816) 842-8600
fax: (816) 691-3495
email: whanna@stinson.com
email: mmckay@stinson.com

ATTORNEYS FOR DEFENDANT
KANSAS TEACHERS COMMUNITY CREDIT UNION

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2010, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Western District of Missouri, with notice of same being electronically served by the Court, addressed to:

R. Frederick Walters
Garrett M. Hodes
WALTERS BENDER STROHBEHN & VAUGHAN, P.C.
2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
ATTORNEYS FOR PLAINTIFF

Leslie K. Rosenfeld
Leon G. Kusnetzky, PC
9201 Ward Parkway, Suite 304
P.O. Box 8579
Kansas City, Missouri 64114
ATTORNEYS FOR UNITED CATHOLIC CREDIT UNION AND MARATHON CREDIT UNION

Thomas Martin
1200 Main Street, Suite 2300
Kansas City, Missouri 64105
ATTORNEYS FOR ADVANCIAL FEDERAL CREDIT UNION

*s/Marc D. McKay*
Attorney for Defendant Kansas Teachers Community Credit Union