**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

CECIL E. HOPKINS,

    individually, and on behalf of a Class of all
others similarly situated,

                Plaintiff,

vs.

KANSAS TEACHERS COMMUNITY
CREDIT UNION,

                Defendant

vs.

MARATHON ROTHSCHILD CREDIT
UNION, et al.,

            Third Party Defendants.

Case No. 08-5052-CV-SW-GAF

**SUGGESTIONS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLASS CLAIMS**
**FOR VIOLATIONS OF UNIFORM COMMERCIAL CODE,**
**<u>RELATED AFFIRMATIVE DEFENSES, AND STATUTORY DAMAGES</u>**

# TABLE OF CONTENTS

## PART I

I.  STATEMENT OF UNCONTROVERTED MATERIAL FACTS.....................................1

    A.  Each of the Class Members' motor vehicles that were used as collateral for Defendant's motor loans were consumer goods. .....................................................1

        1.  Plaintiff's motor vehicle was a consumer good.............................................1

        2.  Each of the Class Members' motor vehicles were consumer goods............2

        3.  In connection with 42 of 98 Class loans, there are co-debtors or co-obligors identified in the Retail Installment Contract and Security Agreement.....................................................................................................4

    B.  Each of the Class Members' Loans was assigned to the Kansas Teachers Community Credit Union ..........................................................................................4

        1.  Plaintiff's motor vehicle loan was assigned to the Kansas Teachers Community Credit Union ............................................................................4

        2.  The Class Members' Loans were assigned to the Kansas Teachers Community Credit Union ............................................................................4

    C.  Each of the Class Members' motor vehicles was repossessed by or on behalf of Defendant......................................................................................................5

        1.  Plaintiff's motor vehicle was repossessed ...................................................5

        2.  Each of the Class Members' motor vehicle was repossessed.....................5

    D.  Each of the Class Members were sent Pre-Sale communications that are governed by the provisions of the Uniform Commercial Code..............................6

        1.  Centrix acted as Defendant's servicing agent .............................................6

        2.  Defendant sent to Plaintiff a pre-sale communication.................................7

        3.  Defendant has identified three versions of the pre-sale communications it sent to the Class Members.............................................7

            a.  The Version 1 Communications .....................................................8

            b.  The Version 2 Communications ...................................................10

        c.      The Version 3 Communications ....................................................11

E.     Defendant admits that Version 1 of the Pre-Sale Communications fails to comply with the provisions of the Uniform Commercial Code............................13

F.     The Class Member's Statutory Damages................................................14

## **PART II**

II.    INTRODUCTION ......................................................................................1

III.   LEGAL STANDARDS ..............................................................................3

IV.   DEFENDANT'S LIABILITY FOR VIOLATIONS OF THE UNIFORM COMMERCIAL CODE.........................................................................3

A.     The consumer protection provisions of Article 9 of the Commercial Code as they apply to the Class Members claims. ...........................................3

     1.    Defendant is held to the requirement of strict compliance with these notice provisions and any doubt about what constitutes strict compliance is resolved in the Class member's favor....................................3

     2.    The secured party's inclusion of "additional information" violates the Commercial Code if that information is unreasonable, misleading or misrepresents the debtor's rights...........................................6

     3.    The Commercial Code provides a minimum statutory remedy to the Class Members regardless of any actual damage to them. ...................8

     4.    The secured party's claim to any remaining deficiency after the vehicle is disposed is barred in the face of a defective notice. ...................9

B.     The consumer protection provisions of the Commercial Code apply to the Class Members' claims. ..........................................................................11

     1.    The motor vehicles used as collateral for Defendant's motor vehicle loans were "consumer goods." ......................................................11

     2.    Defendant is the secured party on each of the loans..................................11

C.     Defendant's communications fail to follow the statutory safe-harbor format....................................................................................................12

D.  Each version of Defendant's pre-sale communication, as to all Class Members, is defective because each fails to contain all content required by UCC §9-614(1). ...................................................................................14

    1.  The communications fail to identify the Secured Party as required by UCC §9-614(1)(A). ............................................................................14

        a.  The UCC does not permit the secured party to identify its agent or some other entity on the pre-sale notice. .........................15

        b.  All versions of the communications misrepresent Centrix as the secured party. .........................................................................16

        c.  The Version 2 and 3 communications misrepresent Defendant's status as additional debtor or secondary obligor. .........................................................................................17

    2.  The communications violate the Commercial Code because they both fail to set forth and describe the Class Members' redemption rights and accounting rights as required by UCC §9-614(1)(A)-(D) *and* they are made unreasonable, misleading and defective by the inclusion of additional information that misrepresents the Class member's redemption and accounting rights. ...........................................18

        a.  The statement of the "current balance" frustrates the purposes of the Commercial Code and causes all versions to violate the Commercial Code regardless of its accuracy or inaccuracy. ...............................................................................20

        b.  Version 2 and 3 communications: the "current balance" is legally and factually inaccurate, and causes the communications to be misleading as to the Class Members' *redemption* rights. .......................................................................21

            (1)  The communications mislead the Class Members into believing that the "current balance" is the "redemption amount." .....................................................22

            (2)  The "current balance" misstates the Class Members' obligations under the parties' contract in order to redeem the collateral. ............................................................24

        c.  Version 1 communications: the amount stated as the "balance on your account" is inaccurate and misleading in every instance to the extent it is intended to set forth either

the redemption amount or the outstanding principal balance on the loan. ................................................................................26

    d.    The statement of the "current balance" is also misleading as to the Class Members' accounting rights. ......................................27

    3.    The communications fail to set forth the Class Members' rights to an accounting, as required by UCC §9-614(1)(A). ....................................28

E.    Defendant violated the Commercial Code on each loan with multiple borrowers or debtors. ..........................................................................29

    1.    Defendant failed to provide Plaintiff with any evidence that the pre-sale communication was sent to co-debtors and co-borrowers ..........30

    2.    Each version of Defendant's pre-sale communication fails to identify any co-debtors and co-borrowers. ..................................................31

F.    Defendant has admitted that its Version 1 communication fails to comply with the Commercial Code ...........................................................31

    1.    Defendant's judicial and evidentiary admissions .....................................31

    2.    Defendant's admissions concerning the defects in the Version 1 communication are consistent with the actual defects. ............................32

V.    SUMMARY JUDGMENT IS APPROPRIATE ON DEFENDANT'S RELATED AFFIRMATIVE DEFENSES. ...............................................................................34

A.    Defendant's Fifth Affirmative Defense, claiming that its notice "substantially complied" with the Missouri Commercial Code has no legal merit. ................................................................................................34

B.    Defendant's Seventh and Thirteenth Affirmative Defenses, claiming a right to set-off a remaining deficiency balance, have no legal merit. ...................35

VI.    DEFENDANT'S LIABILITY FOR STATUTORY DAMAGES ....................................35

A.    The Class Members are entitled to statutory damages. ...........................................37

B.    Application of the statutory damages provisions to the Class Members' claims. ................................................................................................38

VII.    CONCLUSION ................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Boatmen's Bank of Nevada v. Dahmer*, 716 S.W.2d 876(Mo.App.W.D. 1986) ............................9

*Cessna Finance Corp. v. Design Engineering & Const. Intern., Inc.*,
    335 S.E.2d 625, (Ga.App.1985).......................................................................23

*Cherry Manor, Inc. v. American Health Care, Inc.*, 797 S.W.2d 817 (Mo.App. S.D. 1990).......30

*Commercial Credit Equipment Corp. v. Parsons,* 820 S.W.2d 315 (Mo.App.W.D. 1991) .........36

*Consumer Finance Corp. v. Reams*, 158 S.W.3d 792 (Mo.App.W.D. 2005)...............................38

*Coxall v. Clover Commercial Corp.*, 781 N.Y.S.2d 567 (N.Y.City Civ.Ct. 2004) ......................29

*Culbertson v. U.S.*, 960 F.Supp. 1497 (D.Kan. 1997) ...................................................30

*D.A.N. Joint Venture, III v. Clark*, 218 S.W.3d 455 (Mo.App.W.D. 2006). ...............................39

*Dean Machinery Co. v. Union Bank*, 106 S.W.3d 510 (Mo.App. W.D. 2003) .............................4

*Dodson v. University of Ark. for Med. Sciences*, 601 F.3d 750 (8th Cir. 2010) ............................36

*Fielder v. Credit Acceptance Corp.*, 19 F.Supp.2d 966 (W.D.Mo.1998),
    *vacated in part on other grounds*, 188 F.3d 1031 (8th Cir. 1999).....................5, 10, 23, 36

*Fireside Bank v. Superior Court,* 155 P. 3d 268 (Cal. 2007) .......................................36

*Fisherman Surgical Instruments, LLC v. Tri-anim Health Services, Inc.*,
    502 F.Supp.2d 1170 (D.Kan. 2007)....................................................................4

*Ford Motor Credit Co. v. Updegraff*, 218 S.W.3d 617 (Mo.App.W.D. 2007).............................10

*Gateway Aviation, Inc. v. Cessna Aircraft Co.*, 577 S.W.2d 860 (Mo.App.E.D. 1978)...............38

*General Motors Acceptance Corp. v. Stoval*, 872 N.E.2d 91 (Ill.App. 2007) ..............................31

*HEW Federal Credit Union v. Battle*, 772 A.2d 252 (D.C. 2001)...............................................30

*Huntington Nat. Bank of Washington Court House v. Stockwell*,
    460 N.E.2d 303 (Ohio App.,1983)...................................................................30

*In re Carter*, 203 B.R. 697, (Bkrtcy.W.D.Mo.1996) ...................................................30

*In re Downing*, 286 B.R. 900 (Bkrtcy. W.D.Mo. 2002) ...............................................5, 8, 9, 10, 35

*In re Huffman*, 204 B.R. 562 (Bkrtcy.W.D.Mo.1997).................................................................30

*In re Hull,* 155 B.R. 515 (Bankr.W.D.Mo.1993)......................................................................8, 9

*In re Nocita*, 914 S.W.2d 358 (Mo. banc 1996) ...........................................................................5

*In re Schwalb*, 347 B.R. 726 (Bkrtcy.D.Nev. 2006)..................................................................9, 37

*Knutson v. City of Fargo*, 600 F.3d 992 (8th Cir. 2010)...............................................................36

*Lankheit v. Estate of Scherer,* 811 S.W.2d 853 (Mo.App.S.D.1991) ..................................5, 10, 30

*Lendal Leasing, Ltd. v. Farmer's Wayside Stores, Inc.,*
720 S.W.2d 376 (Mo.App. E.D. 1986) ...................................................................... *passim*

*Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88 (Mo.App.W.D. 2008) .........10, 36, 37

*McKesson Corp. v. Colman's Grant Village, Inc.,*
938 S.W.2d 631 (Mo.App.E.D. 1997) ...............................................................................32

*Mendota Ins. Co. v. Hurst*, 965 F.Supp. 1282 (W.D.Mo. 1997).................................................31

*Midstate Educators Credit Union, Inc. v. Werner*, 886 N.E.2d 893 (Ohio App. 2008) ...............36

*Miles v. N.J. Motors, Inc.,* 338 N.E. 2d 784 (Ohio App. 1975).....................................................32

*National Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881 (8th Cir. 2001)..........................................27

*Parks v. CNAC-Joliet, Inc.*, 886 N.E.2d 376 (Ill.App. 2008). ......................................................32

*Structural Polymer Group, Ltd. v. Zoltek Corp.,* 543 F.3d 987 (8th Cir. 2008).............................32

*Thong v. My River Home Harbour, Inc.,* 3 S.W.3d 373 (Mo.App.E.D. 1999).......................20, 30

*Topeka Datsun Motor Co. v. Stratton*, 736 P.2d 82 (Kan.App. 1987) ......................................9, 36

*Travis v. Boulevard Bank N.A.*, 880 F.Supp. 1226 (N.D.Ill. 1995) ............................................23

*Victory Hills Limited Partnership v. Nationsbank, N.A.,*
28 S.W.3d 322 (Mo.App.W.D. 2000)............................................................................9, 38

*Wilmington Trust Co. v. Conner*, 415 A.2d 773 (Del. 1980).......................................................24

## Uniform Commercial Code

§9-613 ........................................................................................................5, 13, 27, 34

§9-614 ..................................................................................................... *passim*

§9-623 ..................................................................................................... *passim*

§9-625(c)(2) .......................................................................................1, 2, 35, 37

## Federal Statutes

15 U.S.C. § 1605(a)(1) ..........................................................................................40

15 U.S.C. § 1638 ....................................................................................................40

15 U.S.C. § 1681(c) ................................................................................................17

15 U.S.C. §1681s-2 .................................................................................................17

## Missouri Statutes

§ 301.215 .................................................................................................................17

§ 301.600.2 .................................................................................................12, 15, 17

§ 301.620(2) .............................................................................................................12

§ 400.1-102(2)(a) and (c) ........................................................................................4

§ 400.9-101 at Comment at ¶ 3.j ......................................................................9, 15

§ 400.9-102(a) ...................................................................................11, 12, 18, 27, 29

§ 400.9-102 at Comments .................................................................................12, 18, 29

§ 400.9-610 .......................................................................................4, 28, 33, 36

§ 400.9-611 .................................................................................4, 16, 18, 30, 31

§ 400.9-613 .................................................................................13, 14, 16, 21, 28

§ 400.9-614 ..................................................................................................... *passim*

Case 3:08-cv-05052-GAF   Document 178   Filed 10/14/10   Page 8 of 67

§ 400.9-614 at Comments ........................................................................ *passim*

§ 400.9-615(a)(1) ...............................................................................17, 22, 23

§ 400.9-623 ........................................................................................ *passim*

§ 400.9-625 ........................................................................................ *passim*

§ 400.9-625 at Comments ...............................................................9, 12, 16, 39

§ 400.9-626(a) ...........................................................................................36, 37

§ 400.9-626(a) at Comments ................................................................................38

§ 408.556.2 ...............................................................................................10, 35, 36

## Kansas Statutes

K.S.A. § 84-9-613 ...............................................................................................13

K.S.A. § 84-9-614 ............................................................................................3, 13

K.S.A. § 84-9-625 ............................................................................................1, 37

## Other Authorities

Barkley Clark, *Law of Secured Transactions Under the Uniform Commercial Code*
(Revised ed. 2010)

¶ 4.08[7] ...................................................................................................22

¶ 4.12[4] .....................................................................................................9

# I. STATEMENT OF UNCONTROVERTED MATERIAL FACTS

## A. Each of the Class Members' motor vehicles that were used as collateral for Defendant's motor loans were consumer goods.

### 1. Plaintiff's motor vehicle was a consumer good.

1. On March 25, 2004, plaintiff purchased a 2001 Chevrolet Monte Carlo (the "Vehicle") in Parsons, Kansas, from the Mayse Automotive Group (the "Kansas Car Dealer"). Order dated August 24, 2010 (Doc. 168), at p.1; *see also* Defendant's Statement of Uncontroverted Material Facts ("DUF") at No. 1 ("DUF-1")(citing to Deposition Transcript of Cecil Hopkins, Jr. at pp. 58-77 (Ex. C)); *see also* **Ex. 33.**[1]

2. Plaintiff executed or signed a Retail Installment Contract and Security Agreement (the "Kansas Installment Contract") in Parsons, Kansas with the Kansas Car Dealer for the purchase of the Vehicle. *See* Order dated August 24, 2010 (Doc. 168), at p.1-2; DUF-2 (citing to Kansas Installment Contract (Doc. 93, at Ex. L); Hopkins Dep. at 76:20-77:6 (Doc. 93, at Ex. C)); *see also* **Ex. 33**.[2]

3. Plaintiff purchased the Vehicle primarily for his personal, family or household use. *See* Order dated August 24, 2010 (Doc. 168), at p.2; DUF-3 (citing to "First Amended Petition ¶¶4, 25, 36 (Doc. 93, at Ex. B); Hopkins Dep. at 66:25-67:10 and 122:12-17 (Doc. 93, at Ex. C)).

---

[1] In its Order dated August 24, 2010 denying Defendant's Motion for Summary Judgment (Doc. 168), the Court determined that a number of facts were uncontroverted and/or established and set them forth in its "Discussion" at p.1-4 with citations to the record. Consequently, Plaintiff has cited to the Court's Order where his motion for partial summary judgment relies on the Court's factual findings. In that regard, Plaintiff has used the designation "DUF-___" to refer to Defendant's Statement of Uncontroverted Material Facts which were set forth in its Motion for Summary Judgment (Doc. 94-95) in a number of his factual citations. The designation "PUF-__" refers to Plaintiff's Statement of Uncontroverted Material Facts in this Motion for Partial Summary Judgment.

[2] Excerpts of Mr. Hopkins' deposition as referenced in the Court's Order and as cited by Defendants are included in **Exhibit 18.**

**2.      Each of the Class Members' motor vehicles were consumer goods.**

4.      The Portfolio Management Program ("PMP") was designed to provide subprime financing to "individuals with impaired credit." **Ex. 23** at "Recitals, at A, at KSTCU001086)(Standard Loan Placement Agreement); **Ex. 25** ("Financial Institution Approval of Sub-Prime Credit Guidelines"); **Ex. 29**  at p.9 at KSTCU00026 ("Introduction to Centrix and its Portfolio Management Program: "Centrix's unique, turnkey process, called the Portfolio Management Program (PMP) is a comprehensive program that enables credit unions to provide special finance loans to their existing and/or new credit-impaired members.")**.**

5.      The "Dealer Guidelines," which governed the terms of the vehicle sales, specifically excluded "vehicles for commercial use." **Ex. 30** ("Ineligible Units: All discontinued vehicles, vehicles for commercial use, one (1) ton vehicles, "grey market" vehicles, salvaged titles, odometer fraud, branded titles, or VIN cloning").

6.      The "Credit Guidelines" for the PMP loans made by Defendant specifically excluded "Vehicles for commercial use." **Ex. 23** at §3.2 (Standard Loan Placement Agreement)("Lender has reviewed, approved and adopted the sub-prime credit guidelines ("Guidelines") which are part of the PMP and will incorporate such Guidelines into its lending policies and procedures in connection with PMP loans."); **Ex. 25** ("Financial Institution Approval of Sub-Prime Credit Guidelines"); **Ex. 31** ("Credit Policy Manual") at §12 at KSTCU000428 ("The following is a list of ineligible vehicles:  Vehicles for commercial use.").

7.      In connection with each PMP loan, Defendant obtained "two forms of insurance to manage the risk inherent in sub-prime automobile lending." **Ex. 40,** at ¶11 (Kolarik Affidavit)(Defendant's Ex. V).

8.     One type of insurance, called "default protection insurance" "paid a portion of the difference between the outstanding principal balance at the time of default and the proceeds received from the sale of the vehicle" or "some, but not all, of the delinquent balance owed by a borrower who defaulted after making at least one installment payment." **Ex. 40,** at ¶¶14-15, 17 (Kolarik Affidavit)(Defendant's Ex. V).

9.     The default protection insurance policies that Defendant obtained or was insured by through the PMP expressly excluded from coverage any vehicles "used in commercial activities." **Ex. 34** at V.D. at KSTCU00139 ("Scheduled Property Floater Inland Marine Policy – Lender's Indemnity Coverage")("Exclusions: vehicles used in commercial activities"); **Ex. 34** at B.4 at KSTCU00139 ("Repossessed Property Modified Single Interest Coverage Form") ("Exclusions: 'Motor vehicles' used in commercial activities.").

10.    Each of the motor vehicles used as collateral in connection with the Portfolio Management Program were consumer goods. **Ex. 40** (Affidavit of Mark S. Kolarik), at ¶¶4, 6, 22 (Portfolio Management Program was for "originating additional consumer auto financing;" "a considerable number of the installment contracts received by the Kansas Credit Union through the PMP resulted in consumer defaults"); **Ex. 14** (Defendant's Supplemental Answer to First Set of Interrogatories), at No. 1 ("In 2002, Centrix Financial LLC ("Centrix") approached KTCCU with a proposed program for originating consumer auto loans;" "Centrix would find and KTCCU would fund consumer automobile loans")).

3. **In connection with 42 of 98 Class loans, there are co-debtors or co-obligors identified in the Retail Installment Contract and Security Agreement.**

11. On 42 of the 98 Class loans, there are co-debtors or co-borrowers identified on the Retail Installment Contract and Security Agreements and/or Missouri Department of Revenue lien records. **Ex. 41,** at ¶¶6, 7, 11 (Affidavit of Christi M. Gumbs); **Ex. 36** at Columns L, M, N (Excel Spreadsheet produced October 27, 2009); **Ex. 37** (Retail Installment Contract and Security Agreement Database); **Ex. 38** (Missouri Department of Revenue Record Database); **Ex. 17**, at No. 5 (Plaintiffs' Second Supplemental Answers to Defendant's First Set of Interrogatories).

B. **Each of the Class Members' Loans were assigned to the Kansas Teachers Community Credit Union.**

1. **Plaintiff's motor vehicle loan was assigned to the Kansas Teachers Community Credit Union.**

12. The Kansas Car Dealer (Mayse Automotive Group) assigned Plaintiff's Kansas Installment Contract to the Kansas Credit Union (Defendant). *See* Order dated August 24, 2010 (Doc. 168), at p.2; DUF-8 (citing to Kolarik Aff. ¶34 (Doc. 93, at Ex. V); Hopkins Dep. at 83:3-12 and 100:11-25 (Doc. 93, at Ex. C); Kansas Installment Contract (Doc. 93, at Ex. L, p. 1)); *see also* **Ex. 35** at Hopkins000034 (Missouri Department of Revenue Records); **Ex. 33.**

2. **The Class Members' Loans were assigned to the Kansas Teachers Community Credit Union.**

13. Defendant obtained a security interest on each of the Class Members' motor vehicles at issue in this case pursuant to the provisions of Missouri law by filing a *Notice of Lien* with the Missouri Department of Revenue. **Ex. 41,** at ¶¶5-7 (Affidavit of Christi M. Gumbs); **Ex. 38** (Missouri Department of Revenue Title Records); **Ex. 40** (Affidavit of Mark S. Kolarik), at ¶¶9-10 (identifying retail installment contracts assigned to Defendant); **Ex. 14** (Defendant's

4

Supplemental Answer to First Set of Interrogatories), at No. 1 (identifying number of Class Members); **Ex. 15** (Defendant's Supplemental Answer to Second Set of Interrogatories), at No. 11 (identifying 98 loans Class Member loans); Doc. 7 (Defendant's *Answer to First Amended Petition*), at ¶5 ("Defendant admits that it made loans to the Plaintiff and members of the putative class for the purchase of motor vehicles."); **Ex. 16** (Plaintiffs' Supplemental Answer to First Set of Interrogatories), at No. 5 (identifying loans within Class definition); **Ex. 27** ("Centrix PMP Procedure – Title-Lien Perfection")("In Missouri: Complete the Notice of Lien and send it to the Department of Revenue. The state will send back the pink copy of the Notice of Lien….").

      C.    **Each of the Class Members' motor vehicles was repossessed by or on behalf of Defendant.**

      1.    **Plaintiff's motor vehicle was repossessed.**

      14.    On or about July 30, 2004, Centrix, as Defendant's agent, repossessed Plaintiff's motor vehicle in Carl Junction, Missouri. *See* Order dated August 24, 2010 (Doc. 168), at p.3; DUF-15 (citing Kolarik Aff. ¶38 (Doc. 93, at Ex. V); Hopkins Dep. at 87:23-25 and 88:7-89:9 (Doc. 93, at Ex. C)).

      2.    **Each of the Class Members' motor vehicle was repossessed.**

      15.    Defendant and/or Centrix caused each of the Class Members' motor vehicles to be repossessed. **Ex. 41**, at ¶¶6-7 (Affidavit of Christi M. Gumbs); **Ex. 38** (Missouri Department of Revenue Title Records); **Ex. 40** (Affidavit of Mark S. Kolarik), at ¶¶9-10 (identifying number of retail installment contracts that "arguably fell into the class definition originally proposed in Plaintiffs' First Amended Petition"); **Ex. 14** (Defendant's Supplemental Answer to First Set of Interrogatories), at No. 1 ("approximately one hundred and four (104) such persons subsequently had their automobiles repossessed by Centrix and/or Centrix Resources."); **Ex. 15** (Defendant's Supplemental Answer to Second Set of Interrogatories), at No. 11 (identifying 98 loans Class

Member loans); **Ex. 16** (Plaintiffs' Supplemental Answer to First Set of Interrogatories), at No. 5 (identifying loans within Class definition); **Ex. 13** (Defendant's Exhibit RR: "Chronological Listing of Class Members by Date of Vehicle Repossession"; Doc. 93, at Ex. RR).

        **D.**      **Each of the Class Members was sent Pre-Sale communications that are governed by the provisions of the Uniform Commercial Code.**

        **1.**      **Centrix acted as Defendant's servicing agent.**

16.     Centrix serviced Plaintiff's Installment Contract on behalf of Defendant. *See* Order dated August 24, 2010 (Doc. 168), at p.2; *see also* **Ex. 40** at ¶¶8, 35 (Kolarik Affidavit)(Defendant's Ex. V); **Ex. 24** at Article 2 and §4.3 ("Compliance with Law") (Portfolio Servicing Agreement); **Ex. 26** ("Financial Institution Oversight of Centrix Servicing").

17.     In connection with the PMP, "[t]he financial institution is responsible for reviewing Centrix's repossession and liquidation activities and ensuring that LMG [Centrix's Loan Management Group] performs these duties in a manner consistent with the financial institution's policies." **Ex. 28** at p.1 ("Financial Institution Oversight of Centrix/LMG Repossession and Liquidation").

18.     In connection with the PMP, Defendant agreed that it was responsible for ensuring Centrix's compliance with respect to the issuance of "notice of sale" letters following repossession. **Ex. 28** at p.3 ("Financial Institution Oversight of Centrix/LMG Repossession and Liquidation")("A NOS (notice of sale letter that us state compliant right to redeem) is issued and forwarded to the borrower.").

6

### 2. Defendant sent to Plaintiff a pre-sale communication.

19. On or about July 30, 2004, Centrix sent plaintiff a letter to his address at 505 Karen Drive, Carl Junction, Missouri "advising him that his vehicle had been repossessed…" *See* Order dated August 24, 2010 (Doc. 168), at p.2.

20. The amount stated as the "balance of $17,108.40 on your account" on Plaintiff's written communications differed from the amount set forth in Defendant's own servicing records ($15,713.00). **Ex. 40** at ¶¶39, 41 (Kolarik Affidavit)("At the time the vehicle was repossessed, Mr. Hopkins owed the Kansas Credit Union $15,713.00 under the terms of the Kansas Retail Installment Contract."); *Compare* **Ex. 4** *with* **Ex. 5** (Def.'s Ex. Q with Ex. P)(Doc. 93, at Ex. P and Q).

### 3. Defendant has identified three versions of the pre-sale communications it sent to the Class Members.

21. There are three versions of the pre-sale communication that Defendant has identified has having been sent to the Class Members and that are at issue in Count I of Plaintiffs' First Amended Petition. *See* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR, Y, Z, and AA (attached hereto as **Ex. 13, 6, 7, 8**); **Ex. 11** (Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters); Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p. 6-8.

22. Defendant has not suggested or asserted in its memoranda (**Exhibits 2, 3**) that Versions 1, 2, or 3 of its pre-sale communications follow the "safe harbor" format set forth at UCC §9-614. Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 21 and attached Exhibits RR and DD and EE (**Ex. 13, 9, 10); Doc. 7**

7

(Defendant's Answer) at "Fifth Defense" ("the presale notice sent to each Class member substantially complied with the provisions of the Uniform Commercial Code").

### a. The Version 1 Communications and Class Members.

23.     From February 2004 to May 2005, Centrix sent Version 1 of the pre-sale communication at issue to 27 persons identified by Defendant as proposed Class Members. *See* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 ("From February 2005 to May 2005, Centrix sent the first version of the pre-sale notice at issue ('Version I') to 27 members of the proposed class (including plaintiff)."); Doc. 93 at attached Exhibits RR and Y (**Ex. 13, 6**); **Ex. 11**(Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters)**;** Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p. 6-8 ("In addition to plaintiff, only 26 other members of the proposed class received the same "pre-sale" notice.").

24.     Of the 27 persons identified by Defendant in its "Chronological Listing of Class Members By Date of Vehicle Repossession" (Doc. 93 at Ex. RR), there are at least 9 persons not identified on that Chronological Listing who are co-debtors or co-obligors on those loans and were identified as such on the related Retail Installment Contract and Security Agreement and/or Missouri Department of Motor Vehicle Records for those 27 transactions. **Ex. 13** at Nos. 5, 7, 11, 12, 13, 14, 19, 23 and 24 (Doc. 93 at Ex. RR at Nos. 5, 7, 11, 12, 13, 14, 19, 23 and 24) **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11, 13  (Affidavit of Christi M. Gumbs); **Ex. 36** at Columns L, M, N (Excel Spreadsheet produced October 27, 2009).

8

25.     The Version 1 communication was not sent to the 9 Class Members who are co-debtors or co-obligors in connection with those 27 loans. *Compare* **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11-13 (Affidavit of Christi M. Gumbs) *with* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and Y **(Ex. 13, 6)**; **Ex. 11** (Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters)**;** Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p. 6-8.

26.     The Version 1 communication does not identify any co-debtors or co-obligors in connection with the Class Members' loans. *Compare* **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11-13 (Affidavit of Christi M. Gumbs) *with* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and Y **(Ex. 13, 6)**; **Ex. 11** (Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters); Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p. 6-8.

27.     The amount stated as the "balance on your account" on each of the Version 1 communications to the Class Members differed from the amount set forth in Defendant's own electronic servicing records for each Class Member as the "Balance at Repo." *See* **Ex. 41**, at ¶16) (Affidavit of Christi M. Gumbs); *compare* **Ex. 36** (Excel Spreadsheet produced October 27, 2009) at Column AN ("Balance at Repo") with amounts set forth on **Ex. 6** (Defendant's "Pre-Sale Notice" letters to Putative Class Members – 02/09/04 – 04/18/05 – Version 1" (Defendant's Exhibit Y)); **Ex. 37** at "Description of Columns" – "Loan Balance at repossession date."

### b. The Version 2 Communication

28. From May 2005 to September 2005, Centrix sent Version 2 of the pre-sale communication at issue to 9 persons identified by Defendant as proposed Class Members. Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and Z (**Ex. 13, 7**); **Ex. 11** (Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters)**;** Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p. 6-8.

29. Of the 9 persons identified by Defendant in its "Chronological Listing of Class Members By Date of Vehicle Repossession" (Doc. 93 at Ex. RR), there are at least 5 persons not identified on that Chronological Listing who are co-debtors or co-obligors on those loans and were identified as such on the related Retail Installment Contract and Security Agreement and/or Missouri Department of Motor Vehicle Records for those 5 transactions. **Ex. 13** at Nos. 29, 34, 35, 36, 37 (Doc. 93 at Ex. RR at Nos. 29, 34, 35, 36, 37); **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11, 14 (Affidavit of Christi M. Gumbs); **Ex. 36** at Columns L, M, N (Excel Spreadsheet produced October 27, 2009).

30. The Version 2 communication was not sent to the 5 Class Members who are co-debtors or co-obligors in connection with those 9 loans. *Compare* **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11-12, 14  (Affidavit of Christi M. Gumbs) *with* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and Z (**Ex. 13, 7**); Doc. 93 at Ex. FF (Chart of Pre-Sale Notice Letters)(**Ex. 11**); Defendant's Suggestions in

Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p. 6-8.

31.     The Version 2 communication does not identify any co-debtors or co-obligors in connection with the Class Members' loans. *Compare* **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11-12, 14 (Affidavit of Christi M. Gumbs) *with* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and Z **(Ex. 13, 7)**; **(Ex. 11)**(Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters)**;** Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p.6-8.

### c.     The Version 3 Communication

32.     Since October 2005, Centrix and/or Flatiron Financial b/d/a Peak 5 sent Version 3 of the pre-sale communication at issue to at least 67 persons identified by Defendant as proposed Class Members. *See* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and AA **(Ex. 13, 8)**; **Ex. 11 (**Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters); Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p. 6-8.

33.     Of the 67 persons identified by Defendant in its "Chronological Listing of Class Members By Date of Vehicle Repossession" (Doc. 93 at Ex. RR), there are at least 25 persons not identified on that Chronological Listing who are co-debtors or co-obligors on those loans and were identified as such on the related Retail Installment Contract and Security Agreement and/or Missouri Department of Motor Vehicle Records for those 67 transactions. **Ex.**

11

**13**, at Nos. 41, 44, 45, 46, 52, 60, 65, 68, 73, 74, 76, 79, 82, 83, 84, 86, 90, 91, 92, 94, 98, 99, 100, 101, 102) (Doc. 93 at Ex. RR, at Nos. 41, 44, 45, 46, 52, 60, 65, 68, 73, 74, 76, 79, 82, 83, 84, 86, 90, 91, 92, 94, 98, 99, 100, 101, 102)); **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11-12, 15 (Affidavit of Christi M. Gumbs); **Ex. 36** at Columns L, M, N (Excel Spreadsheet produced October 27, 2009).

34.     The Version 3 communication was not sent to the 25 Class Members who are co-debtors or co-obligors in connection with those 67 loans. *Compare* **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11-12, 15 (Affidavit of Christi M. Gumbs) *with* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and AA **(Ex. 13, 8)**; **Ex. 11 (**Doc. 93 at Ex. FF)(Chart of Pre-Sale Notice Letters)**;** Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p.6-8.

35.     While the Version 3 communication was sent to the primary borrower on the 64 Class loans identified on Plaintiff's list of Class Members (Second Supplemental Answers to Defendant's First Set of Interrogatories, at Interrogatory No. 5) and the information set forth at Columns L, M, N on the Microsoft Excel spreadsheet that Defendant produced to Plaintiff, the Version 3 communication was not sent to, and Defendant failed to produce any evidence that the Version 3 communication was sent to, the co-debtors or co-borrowers on 28 of those 64 Class loans for which there was a co-debtor or co-borrower. *See* **Ex. 17**, at No. 5; **Ex. 41**, at ¶¶17-18 (identifying Loan Nos. 6, 7, 9, 13, 14, 20, 22, 23, 24, 25, 29, 32, 40, 42, 43, 46, 47, 51, 54, 59, 65, 66, 68, 71, 79, 80, 91 and 98); **Ex. 36,** at Columns L, M, N.

36.     The Version 3 communication does not identify any co-debtors or co-obligors in connection with the Class Members' loans. *Compare* **Ex. 17,** at No. 5 (Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories); **Ex. 41,** at ¶¶11-12, 15 (Affidavit of Christi M. Gumbs) *with* Defendant's Suggestions in Opposition to Plaintiffs' Motion for Class Certification (Doc. 93), at p. 19 and attached Exhibits RR and AA **(Ex. 13, 8)**; Doc. 93 at Ex. FF (Chart of Pre-Sale Notice Letters) **(Ex. 11);** Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer Containing a Counterclaims Against Some Members of the Proposed Class (Doc. 92), at p.6-8.

### E.     Defendant admits that Version 1 of the Pre-Sale Communications fails to comply with the provisions of the Uniform Commercial Code

37.     Defendant has admitted in its memoranda filed with this Court that Version 1 of the pre-sale communications sent to the Class Members fails to comply with the provisions of the Uniform Commercial Code, stating:

> The Kansas Credit Union recognizes that sending a presale notice letter pursuant to the requirements of the Uniform Commercial Code is a prerequisite to obtaining a deficiency judgment against these Class Members. It submits that at least seventy six (76) of the one hundred four (104) pre-sale notice letters sent to proposed Class Members meet this requirement. [FN1]
>
> FN1: Unlike most members of the proposed class, plaintiff has no exposure to such a counterclaim….
>
> ***
>
> In addition to plaintiff, only 26 other members of the proposed class received the same "pre-sale" notice. *See* Letters to Proposed Class Members, Version 1 (Ex. Y); Chronological List of Pre-Sale Notice Letters (Ex. RR); and Diagram of Pre-Sale Notices (Ex. FF).
>
> ***
>
> In approximately May 2005, shortly after April Smith filed her lawsuit, Centrix discontinued using the pre-sale notice form that was the subject of the *April Smith* litigation, and began using pre-sale notice letters that complied with the mandates of the Uniform Commercial Code.

See Defendant's Suggestions in Support of Motion for Leave to File a First Amended Answer (**Ex. 3**)(Doc. 92), at p. 2, 6-7, and 7.

38.     In February 2006, Plaintiff received a letter from Centrix Financial, which stated, in pertinent part:

> Enclosed please find a check made out to you for $100.00. This check is sent in an attempt to settle a potential dispute between yourself and Centrix Financial, LLC arising out of a letter sent to you about Centrix's repossession and sale of your 2001 Chevrolet Monte Carlo in 2004. The letter may have contained an error because it may not have described things like Centrix's phone number, Centrix's address, the secured party, the intended method of sale of the car, a right to an accounting and the particulars of the sale of the car and you may not have understood the letter.

**Ex. 32** (Doc. 93, at Def. Ex. T); **Ex. 18** at 128:24 – 129:12 (Deposition of Cecil Hopkins).

39.     Centrix sent a pre-sale communication in the same form as the Version 1 communication sent to the Class Members to at least 864 other persons. *See* Doc. 76, Overruling Objections to *Subpoena Duces Tecum* to Kutak Rock, LLP); **Ex. 22-A, B** (*Subpoenas Duces Tecum*); **Ex. 39 (**Spreadsheet produced by Kutak Rock, LLP); **Ex. 41**, at ¶22 (Affidavit of Christi M. Gumbs).

### F.     The Class Member's Statutory Damages

40.     Plaintiff's experts, Drs. John O. Ward, Ph.D. and Kurt V. Krueger, Ph.D., have calculated the Class Members' statutory damages as set forth by §400.9-625(c)(2) RSMo and/or K.S.A. 84-9-625(c)(2) using the data set forth on each Class Member's Retail Installment Contracts and Security Agreements for the 98 Class loans. **Ex. 19,** at Ex. 1, at ¶¶2-3, 5.a, 6 (Ward Report); **Ex. 19** at Ex. 2, at ¶¶2-3, 4.a, 5 (Krueger Report); **Ex. 19** at Table 1; **Ex. 19** at Supplemental Disclosure, at Table 1; **Ex. 21** at 4:19-4:23; 14:13-17:1 (Krueger Deposition); **Ex. 20** at 7:2-9:21; 14:2-14:13 (Ward Deposition).

41.     Each of those statutory damages for the 98 Class Members loans as set forth by §400.9-625(c)(2) RSMo and/or K.S.A. 84-9-625(c)(2) is set forth in Table 1 of Dr. Kruger's Supplemental Report and incorporated herein. **Ex. 19** at Ex. 2, at ¶¶2-3, 4.a, 5 (Krueger Report); **Ex. 19** Supplemental Disclosure at Table 1; **Ex. 21** at 29:3-30:23; 31:17-34:6 (Krueger Deposition).

42.     For the Class member loans, Dr. Krueger calculated their statutory damages as $1,187,724.78. **Ex. 19** at Ex. 1, at ¶¶2-3, 5.a, 6 (Ward Report); **Ex. 19** at Ex. 2, at ¶¶2-3, 4.a, 5 (Krueger Report); **Ex. 19** at Supplemental Disclosure at Table 1; **Ex. 21** at 29:3-30:23; 31:17-34:6 (Krueger Deposition).

43.     As is set forth in Table 1 of Dr. Kruger's Report, the Mean statutory damages attributable to the UCC Claim for Damages are $12,119.64. **Ex. 19** at Supplemental Disclosure at Table 1.

## II. INTRODUCTION

This Motion for Partial Summary Judgment is directed towards the Class Members' claims in Count I of the First Amended Petition. **Ex. 1**, at ¶¶8-9, 45-55. Count I alleges that Defendant, Kansas Teachers Community Credit Union, violated the consumer protection provisions of the Uniform Commercial Code with respect to its post-repossession communications sent to the Class Members. Plaintiff seeks summary judgment on his and the Class Members' claims as set forth in Count I, which includes not only a determination of Defendant's liability for those violations, but also the award of statutory damages to be made to each of the Class Members as provided by the formula set forth at UCC §9-625(c)(2). *See, e.g.,* §400.9-625(c)(2) RSMo; K.S.A. §84-9-625(c)(2)). Additionally, Plaintiff seeks summary judgment on three of Defendant's affirmative defenses, which relate either to a contention that the Class Members' communications "substantially complied" with the provisions of the Commercial Code (Fifth Defense) or that assert a right to a "set-off" for deficiencies claimed to be remaining on the loans after disposition of the vehicles (Seventh and Thirteenth Defenses).

For a number of reasons, the Court should grant Plaintiff and the Class Members partial summary judgment. First, the content of the communications is not at issue. As such, the Court may make a straightforward review of those communications according to a legal standard that requires "*strict* compliance" – and not "*substantial* compliance" – with the requirements of the UCC. Further, under that standard the Court construes "any doubts" concerning Defendant's compliance in the Class Members' favor. Thus, Defendant's liability in Count I may be easily determined as a matter of law.

Second, there are three versions of the communications at issue in Count I as to all Class Members. Each of the three versions of the communications fails to comply with the "strict compliance" standard for consumer transactions because (1) they fail to contain all content required by the Commercial Code *and/or* (2) they include "additional information" that misrepresents and misstates the Class Members' redemption and accounting rights, rendering them legally unreasonable and defective.

Third, with respect to **42** of the **98** Class loans, and as to **84** of the **140** Class Members, Defendant violated the Commercial Code in two interrelated respects. Specifically, there are 42 Class loans where, in addition to the primary or first-listed borrower, there is a second co-borrower or co-obligor identified on the Retail Installment Contract and/or motor vehicle lien, and who are Class Members within the Class definition. Defendant was required to send a pre-sale communication to each of these 42 co-obligors pursuant to UCC §9-611(b). It did not. Pursuant to UCC §9-614(1) and (3) Defendant was also required to identify in the notice it sent to each Class member the co-borrowers or co-obligors to whom it mailed a copy of the notice. It did not. Defendant's failure to account for or acknowledge the 42 co-debtors or co-obligors in connection with its post-repossession conduct results in violations of the Commercial Code, at §§9-611(b) and 9-614(1) as to 42 of the 98 Class loans, and as to 84 of the 140 Class members.

Fourth, under both Missouri and Kansas law, and as Defendant admitted in its pleadings, its affirmative defenses which seek to "set-off" any statutory damages by the Class Members' remaining deficiency balances fail as a matter of law in the face of the UCC violations.

Finally, the Uniform Commercial Code sets forth a statutory damage formula at §9-625(c)(2) that is based upon the figures appearing on the Class Member's Retail Installment Contracts and Security Agreements. Given that these figures are not, and cannot, reasonably be

disputed, the amount of statutory damages to be awarded to each Class member has been calculated by Plaintiff's experts, and may be relied upon by the Court when awarding damages.

This Motion for Partial Summary Judgment is premised on the Court's Order dated August 24, 2010 (Doc. 168) denying Defendant's Motion for Summary Judgment, as well as an extensive evidentiary record, which includes a number of factual and judicial admissions made by Defendant in connection with its *Motion for Leave to File a First Amended Answer Containing A Counterclaim Against Some of the Members of the Proposed Class* (Doc. 91, 92), its *Suggestions in Opposition to Motion for Class Certification* (Doc. 93), and in its *Motion for Summary Judgment* (Doc. 94).

## III.     LEGAL STANDARDS

This Court's Order dated August 24, 2010 (Doc. 168) sets forth the applicable standards governing summary judgment that are applied by this Court and is incorporated herein.

## IV.     DEFENDANT'S LIABILITY FOR VIOLATIONS OF THE UNIFORM COMMERCIAL CODE

### A.     The consumer protection provisions of Article 9 of the Commercial Code as they apply to the Class Members' claims.

#### 1.     Defendant is held to the requirement of strict compliance with these notice provisions and any doubt about what constitutes strict compliance is resolved in the Class member's favor.

The Class Members' claims are governed by Article 9 of the Uniform Commercial Code, which has been adopted in Missouri and Kansas as well as other states. *See Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88, 91 n.2 (Mo.App.W.D. 2008); §400.9-614 RSMo and K.S.A. §84-9-614.[3] The Missouri Court of Appeals has recently explained a number of the legal principles that apply to this Motion for Partial Summary Judgment:

---

[3] The Court's Order denying Defendant's Motion for Summary Judgment concludes that Kansas law applies to Count I of Plaintiff's personal claims against Defendant. *See* Doc. 168, at p.5-6 & n.2. This Motion for Partial

The issues raised in this appeal require an analysis of certain provisions of Article 9 of the UCC. Part 6 of Article 9 defines the rights and remedies of the parties and sets forth the proper procedures after a debtor has defaulted on his obligations under a security agreement. ... Those procedures begin with section 400.9-609, which permits a secured party following a default to "take possession of the collateral," or to repossess it. ***Pursuant to section 400.9-610, the secured party may dispose of the collateral, by sale or otherwise, so long as every aspect of the disposition is "commercially reasonable*** ."

At issue in this case are the specific pre-sale "notice" requirements the secured party must follow before selling the repossessed collateral. ***Section 400.9-611(b) requires a secured party to provide the debtor with reasonable notice of its intent to sell the collateral. The content of the notice for consumer transactions, such as this, is dictated by section 400.9-614.*** Subsection (1) of that statute sets out what must be included in the notice. Section 400.9-614(1). The statute does not require that the notice use any "particular phrasing." Section 400.9-614(2). ***Section 400.9-614(3) sets forth a format, which, if used, "provides sufficient information." This is referred to as the "safe-harbor" format. See section 400.9-614, cmt. 3. Additional information may be included in the notice, pursuant to section 400.9-614(4), and an error in non-required information is allowed so long as it is not "misleading" as to redemption rights. Section 400.9-614(5).***

***A creditor is held to the requirement of strict compliance with these notice provisions. ... Any doubt about what constitutes strict compliance is resolved in the debtor's favor. Id.*** A debtor's remedies for the secured party's failure to comply with these notice requirements can be found at section 400.9-625. It provides, in part, that where the collateral is consumer goods and the secured party fails to comply with the provisions of Part 6 of Article 9, the debtor

> ***may recover for that failure in any event an amount not less than the credit service charge plus ten percent of the principal amount of the***

---

Summary Judgment, however, cites primarily to, and focuses on Missouri law and the claims of the Class Members for the following reasons: First, given Defendant's admissions that Plaintiff's Version 1 communication fails to comply with the provisions of the Uniform Commercial Code, Plaintiff suggests that it is unnecessary to focus on Kansas law to demonstrate the propriety of summary judgment on Plaintiff's *personal* claim in this Motion. *See* PUF-36, 37. Second, the same requirements of the Uniform Commercial Code are at issue in Count I, and both Missouri's and Kansas' Commercial Code's are ***identical*** at §400.9-614 RSMo and K.S.A. §84-9-614. Because the "uniform commercial code must be liberally construed and applied to promote its underlying purposes and policies" which include "to simplify, clarify, and modernize the law governing commercial transactions" and "to make uniform the law among the various jurisdictions," and, given the dearth of recent, relevant Kansas law on these issues, Plaintiff suggests that review of Missouri and other state's case law is appropriate. *Compare Dean Machinery Co. v. Union Bank*, 106 S.W.3d 510, 517 (Mo.App.W.D. 2003)(citing 400.1-102(2)(a) and (c): "Where there is a paucity of Missouri case law interpreting a provision of the UCC, courts of this state look for guidance to decisions of other jurisdictions made under the same provision."); *Fisherman Surgical Instruments, LLC v. Tri-anim Health Services, Inc.*, 502 F.Supp.2d 1170, 1180 (D.Kan. 2007)("The Kansas UCC provides that it shall be liberally construed and applied to promote its underlying purposes and policies.").

> *obligation or the time-price differential plus ten percent of the cash price. Section 400.9-625(c)(2).*

*Id.* at 91-92 (emphasis added; internal citations omitted).

The *Mancuso* decision states the determinative legal standard applicable to the Class Members' claims in Count I: when considering the sufficiency of the pre-sale communications that were in fact sent by Defendant to the Class Members, "***[a]ny doubt as to what constitutes strict compliance with the statutory requirements must be resolved in favor of the [Class Members.]***" *See, e.g.*, *In re Downing,* 286 B.R. 900, 903 (Bkrtcy.W.D.Mo. 2002)(emphasis added); *Mancuso*, 254 S.W.3d at 92 (same); *Fielder v. Credit Acceptance Corp*., 19 F.Supp.2d 966, 985 (W.D.Mo.1998)(citing *Lankheit v. Estate of Scherer,* 811 S.W.2d 853, 858 (Mo.App.S.D.1991)(same). The Official Commercial Code Comment also explains this standard:

> Paragraph (1) sets forth the information required for a reasonable notification in a consumer-goods transaction. ***A notification that lacks any of the information set forth in paragraph (1) is insufficient as a matter of law.*** Compare Section 9-613(2), under which the trier of fact may find a notification to be sufficient even if it lacks some information listed in paragraph (1) of that section.

§400.9-614 RSMo, at Comment, at ¶2 (emphasis added).[4] Thus, with respect to ***consumer*** transactions, as here, there is no "substantial compliance" compliance standard and Defendant's and/or Centrix's intent to comply with the Commercial Code is irrelevant. *If* the notice fails to contain ***all*** content required by §400.9-614(1) *then* the notice fails to comply with the Commercial Code. And, any and all questions as to whether a notice complies with the provisions of the UCC are construed in favor of liability.

Here, because the contents of the communications are not in question, the sufficiency of the written notice, and the claims in Count I, may and should be determined as a matter of law under this strict liability standard. *See Mancuso*, 254 S.W.3d at 90 (citing cases); *In re Downing*,

---

[4] This UCC Comments carryweight, because the Misosuri General Assembly is assumed to have intended to adopt the interpretations expressed in the comments. *In re Nocita*, 914 S.W.2d 358, 359 (Mo. banc 1996)(citing cases).

286 B.R. at 903 n.13; §400.9-614 RSMo, at Comment at ¶2; **Ex. 4, 6-8**; PUF-19, 21-23, 28, 32.

The undisputed facts – *i.e.,* the communications themselves, and Defendant's own admissions –

demonstrate that Defendant did not use, nor does it contend that it used, the safe harbor form in

any version of its pre-sale communications. *See* PUF-22, 37. Thus, all of the Class claims in

Count I will be resolved by the Court's determination that each version of the communications

failed to contain all content required by UCC §9-614 under a strict compliance standard.

> **2.      The secured party's inclusion of "additional information" violates the Commercial Code if that information is unreasonable, misleading or misrepresents the debtor's rights.**

As the *Mancuso* decision notes, there are special rules that apply when the secured party

uses the statutory safe-harbor form **_and_** also includes "additional information" that is "not

required" by UCC §9-614. *Id.*, 254 S.W.3d at 92. The statute states, in pertinent part:

> (4)      A notification in the form of paragraph (3) is sufficient, even if additional information appears at the end of the form;

> (5)      A notification in the form of paragraph (3) is sufficient, even if it includes errors in information not required by paragraph (1), unless the error is misleading with respect to rights arising under this article;

> (6)      If a notification under this section is ***not*** in the form of paragraph (3), law other than this article determines the effect of including information not required by paragraph (1).

§400.9-614(4), (5), (6) RSMo (emphasis added). The Commercial Code Comment states:

> *Safe-Harbor Form of Notification; Errors in Information.* Although paragraph (2) provides that a particular phrasing of a notification is not required, paragraph (3) specifies a safe-harbor form that, when properly completed, satisfies paragraph (1). Paragraphs (4), (5), and (6) contain special rules applicable to erroneous and additional information. Under paragraph (4), a notification in the safe-harbor form specified in paragraph (3) is not rendered insufficient if it contains additional information at the end of the form. Paragraph (5) provides that non-misleading errors in information contained in a notification are permitted ***if*** the safe-harbor form is used ***and if the errors are in information not required by paragraph (1). Finally, if a notification is in a form other than the paragraph (3) safe-harbor***

*form, other law determines the effect of including in the notification information other than that required by paragraph (1).*

§400.9-614, at Comment, at ¶3 (emphasis added).

In *Mancuso*, the secured party used the "safe harbor" form and the plaintiff's claim related to "additional information" included in the safe-harbor notice pursuant to UCC §9-614(5). *Id*., 254 S.W.3d at 92-93. This case is factually distinguishable from *Mancuso* because, as evidenced below, Defendant did ***not*** use the safe harbor form. Here, in contrast, the Class Members' claims relate to: (1) Defendant's failure to include the content required by UCC §9-614(1) in all communications sent to the Class Members, ***and*** (2) Defendant's inclusion of "additional information" in the notice, which is governed by UCC §9-614(6).

Although this case is factually distinguishable, *Mancuso* sets forth rules that apply to the inclusion of "additional information" in the notice which, when applied to the communications, causes them to violate the Commercial Code's "reasonableness" requirement at §9-610(b)("Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."). The issue in *Mancuso* was whether the secured party could include as part of the notice "additional information" consisting of a requirement that the debtor provide proof of insurance in order to redeem their vehicle. *Id*., 254 S.W.3d at 92-93. Reviewing the provisions of Article 9 of the UCC, the Missouri Court of Appeals concluded that a secured party could violate UCC §9-610(b) by sending an "unreasonable" notice. *See id*. at 94. An, unreasonable notice" includes, as a "subcategory," any notice whose content is "misleading" or an "improper discouragement of the right of redemption." *Id*.

Importantly, with respect to the debtor's redemption rights, the Commercial Code states that a "person shall tender: (1) Fulfillment of all obligations secured by the collateral; and (2) The reasonable expenses and attorney's fees." §400.9-623; *Mancuso*, at 96. The Missouri Court

7

of Appeals concluded that the "proof of insurance" requirement at issue in *Mancuso* was *consistent* with the parties' retail installment contract, and thus an appropriate aspect of the debtor's redemption obligation under §400.9-623. *Id*. at 95-96. The Court of Appeals concluded that the *Mancuso* notice was not unreasonable, or misleading, "as a matter of law," "because it did not require of Ms. Mancuso any more than what the contract required of her." *Id*. at 98.

Here, and as explained below, each version of Defendant's pre-sale communications contains "additional information" – a statement of the "current balance" on the Class Members' loan. This Court may determine as matter of law, according to the rules laid out in *Mancuso,* that this additional information in each version of the communication that was sent to the Class members caused the communications to violate §9-611(b)'s "reasonableness" requirement because the additional information was incorrect, misleading and discouraged the Class Members' redemption rights. *See Id.*

> **3.** **The Commercial Code provides a minimum statutory remedy to the Class Members regardless of any actual damage to them.**

The Class Members are not obligated to demonstrate that an insufficient or defective communication in fact prevented them from exercising their right of redemption or even caused them any actual damages. *See Mancuso*, 254 S.W.3d at 92; *see also In re Downing*, 286 B.R. at 905 ("Missouri has long held that the right to a deficiency exists only if the creditor strictly complies with the statutory requirements of the UCC, regardless of whether there was any resulting harm to the debtor from the failed notice."); *In re Hull*, 155 B.R. at 516 ("Given that Missouri requires strict compliance with the statute and requires that the debtor be given written notice of any sale of collateral in order to be entitled to a deficiency judgment, the fact that Debtor had actual knowledge of the sale and even attended the sale does not cure the bank's lack

of compliance with the statute.").[5] Indeed, the Commercial Code's provisions are "designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted." *See Id.* (citing §400.9-625, at Comment, at ¶4). The leading commentators on Article 9 have explained that "[t]his minimum civil penalty, quietly tucked away in a corner of the statute, is probably the most glittering nugget of consumer protection found in all of Article 9." *In re Schwalb*, 347 B.R. 726, 754-55 (Bkrtcy.D.Nev.2006)(quoting Barkley Clark, *Law of Secured Transactions Under the Uniform Commercial Code,* ¶4.12[4], at pp. 4-335 to 4-336 (1988)).

      **4.    The secured party's claim to any remaining deficiency after the vehicle is disposed is barred in the face of a defective notice.**

In ***addition*** to the affirmative statutory remedy for violations of the Commercial Code, each Class Member also is protected from Defendant's claim to or demand for any deficiency remaining on the loan following the disposition of the repossessed vehicle by way of an independent action, counterclaim, or by way of set-off or recoupment.[6] *See In re Downing*, 286 B.R. at 902-03; *Victory Hills Limited Partnership v. Nationsbank, N.A.*, 28 S.W.3d 322, 330 (Mo.App.W.D. 2000); *In re Hull,* 155 B.R. 515, 516 (Bankr.W.D.Mo.1993).[7] The rationale for these rules is as follows:

    Compliance with the notice provision of §400.9-504(3) is a prerequisite to a recovery of a deficiency after resale of the collateral…. A secured party's failure

---

[5] Moreover, neither voluntary surrender of the collateral nor an agreement to immediately sell the collateral by the debtor can operate to waive the notice requirement. *Boatmen's Bank of Nevada v. Dahmer*, 716 S.W.2d 876, 878 (Mo.App.W.D. 1986).

[6] Pursuant to the Court's Order, the Kansas Uniform Consumer Credit Code ("U3C") applies, where applicable, to Plaintiff's Commercial Code claims. See Doc. 168, at p.6. Under the U3C, a consumer is not liable for a deficiency if the pre-sale notice is deficient. *See* K.S.A. §§ 16a-1-103 and 16a-5-103, and Consumer Credit Code Comments to § 16a-5-103, at ¶1, K.S.A. § 84-9-625 and § 400.9-625 RSMo and Official Comment to § 9-625; *Topeka Datsun Motor Co. v. Stratton*, 736 P.2d 82, 86 (Kan.App. 1987)

[7] In July 2001, Article 9 of the Commercial Code was substantially revised and a number of changes were made to provide greater protections to consumers. *See* §400.9-101 at Comment at ¶ 3.j. Prior to 2001, the provisions of UCC §9-504(3) applied to the pre-sale communications. *See Mancuso*, 254 S.W.3d at 95 n.5. Plaintiff has cited to cases construing the prior version of the UCC where the result under the cases is the same as that under the revised UCC.

> to give reasonable notice of the sale of collateral as mandated by this section precludes that party from obtaining a deficiency judgment….Strict compliance is required because deficiency judgments after repossession of collateral are in derogation of common law. ... In other words, since deficiency judgments were unheard of at common law, the right to a deficiency judgment accrues only after strict compliance with the relevant statute.

*McKesson Corp. v. Colman's Grant Village, Inc.,* 938 S.W.2d 631, 633 (Mo.App.E.D. 1997)(internal citations omitted); *see also Fielder v. Credit Acceptance Corp.*, 19 F.Supp.2d 966, 985 (W.D.Mo.1998), *vacated in part on other grounds*, 188 F.3d 1031 (8th Cir. 1999)(quoting *Lankheit v. Estate of Scherer*, 811 S.W.2d 853, 858 (Mo.App.S.D.1991)("Compliance with the notice provision of §400.9-504(3) is a prerequisite to recovery of a deficiency after resale of the collateral… Any doubt as to what constitutes strict compliance with the notice requirement is resolved in favor of the debtor."). While at first glance it may seem harsh or even unfair (as Defendant may argue) to bar a claim to a deficiency and to also assess statutory damages for a failure to comply with the notice requirement, it is not. All the secured party has to do to meet the UCC's requirements is to "cut and paste" the safe harbor form provided in the statute. *See* §400.9-614(3)(the safe harbor form "when completed, provides sufficient information"). None of Defendant's communications, however, strictly followed the "safe harbor" format.

Here, Defendant asserts two related affirmative defenses which seek to "set-off" any statutory damages award by way of the alleged deficiencies remaining on the Class Members' loans. *See* Doc. 7 (Defendants' Answer to First Amended Petition), at Seventh and Thirteenth Defenses. As the party seeking the deficiency, Defendant has the burden of proving the sufficiency of the communications for purposes of its affirmative defenses. *See Ford Motor Credit Co. v. Updegraff*, 218 S.W.3d 617, 630-21 (Mo.App.W.D. 2007); §408.556.2 RSMo; *In re Downing*, 286 B.R. at 903; *Mancuso*, 254 S.W.3d at 92. Indeed, Defendant has conceded that its affirmative defense is meritless if its communications violate the Commercial Code:

> The Kansas Credit Union recognizes that sending a presale notice letter pursuant to the requirements of the Uniform Commercial Code is a prerequisite to obtaining a deficiency judgment against these Class Members.

Doc. 92, at p.2. Because the communications are defective, these defenses *are* meritless.

### B. The consumer protection provisions of the Commercial Code apply to the Class Members' claims.

#### 1. The motor vehicles used as collateral for Defendant's motor vehicle loans were "consumer goods."

As noted, Part 6 of Article 9 of the Commercial Code provides significant protections to debtors in "consumer-goods transactions." *See Mancuso*, at 91-92. Here, the Class Members' loan transactions in connection with the Portfolio Management Program were all consumer–goods transactions and thus the protections of the Commercial Code apply to them. (PUF-3-10)

The Commercial Code defines "consumer goods" as "goods that are used or bought for use primarily for personal, family, or household purposes" and a "consumer-goods transaction" as "a consumer transaction in which: (A) An individual incurs an obligation primarily for personal, family, or household purposes; and (B) A security interest in consumer goods secures the obligation." §400.9-102(a)(23), (24) RSMo. The Portfolio Management Program targeted subprime borrowers for consumer loans and, to guarantee the insurability of the debtor's default, excluded vehicles which were to be used for "commercial purposes." (PUF-4-9) The undisputed material facts demonstrate that each of the Class Members' motor vehicles that were used as collateral for those loans were consumer goods. (PUF-1-10).

#### 2. Defendant is the secured party on each of the loans.

The secured party (KTCCU) is the entity with a right to repossess the debtor's vehicle after default and the entity liable for violations of the Commercial Code, regardless of the fact that it may have delegated servicing responsibilities to some other entity, such as Centrix.

11

*Mancuso*, 254 S.W.3d at 91-92; §400.9-625, at Comment, at ¶3 ("Subsection (c) identifies who may recover under subsection (b). It affords a remedy to any aggrieved person who is a debtor or obligor….A person who has delegated the duties of a secured party but who remains obligated to perform them is liable under this subsection."). Accordingly, the *secured party* is properly a party defendant and liable to the Class Members on their claims. (PUF-12-13)

It is undisputed Defendant KTCCU was the secured party in connection with the Class Members' loans. (PUF-12-13) Defendant became the "secured party" on the Class Members' loans when it perfected its security interest in their motor vehicles pursuant to the provisions of Missouri law at §§301.600, *et seq.* RSMo by filing a *Notice of Lien* with the Missouri Department of Revenue. *See* §400.9-102(a)(71)(A) RSMo (a "secured party" is "[a] person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding."); §400.9-102, Comment, at ¶2(b)("The secured party is the person in whose favor the security interest has been created, as determined by reference to the security agreement. This definition controls, among other things, which person has the duties and potential liability that Part 6 imposes upon a secured party."); PUF-12-13.[8]

### C.    Defendant's communications fail to follow the statutory safe-harbor format.

As noted, Defendant asserts that there were three versions of the pre-sale communications it sent to persons within the proposed class definition. (PUF-21-22). Plaintiffs do not dispute this assertion. As explained briefly below, and in the following section identifying the common deficiencies in each version of Defendants' communications, none of the

---

[8] With respect to the perfection of security interest in a motor vehicle, § 301.600.2 RSMo states, in pertinent part: "Subject to the provisions of section 301.620, a lien or encumbrance on a motor vehicle or trailer is perfected by the delivery to the director of revenue of a notice of a lien in a format as prescribed by the director of revenue."  In turn, § 301.620(2) RSMo states: "If an owner creates a lien or encumbrance on a motor vehicle or trailer: … The lienholder or an authorized agent licensed pursuant to sections 301.112 to 301.119 shall deliver to the director of revenue a notice of lien as prescribed by the director accompanied by all other necessary documentation to perfect a lien as provided in section 301.600."

communications strictly follow the safe-harbor format set forth at UCC §9-614 (§400.9-614(3) RSMo; K.S.A. §84-9-614) so that they could be considered to contain the information required by the provisions of §§9-613 and 9-614 (§§400.9-613 and 400.9-614 RSMo and K.S.A. §§84-9-613 and 84-9-614). Each version differs from, or fails to follow, the "safe harbor" form for the following "general" reasons explained below:

**Version 1:**

- Does not include the phrase "NOTICE OF OUR PLAN TO SELL PROPERTY";
- Does not strictly follow the safe harbor format;
- Does not include the same language as safe harbor form; and
- Contains additional information throughout the communication not included in the safe harbor format for consumer goods transactions.

(PUF-21-27, 37-38).

**Version 2:**

- Does not include the phrase "NOTICE OF OUR PLAN TO SELL PROPERTY";
- Does not strictly follow the safe harbor format;
- Does not include the same language as safe harbor form; and
- Contains additional information throughout the communication not included in the safe harbor format for consumer goods transactions.

(PUF-21-22, 28-31).

**Version 3:**

- Does not strictly follow the safe harbor format;
- Does not include the same language as safe harbor form; and
- Contains additional information throughout the communication not included in the safe harbor format for consumer goods transactions.

(PUF-21, 22, 32-36).

Further, it does not appear from Defendant's prior analyses of Versions 2 and 3 of the communications in its briefing that it even contends that its communications followed the safe harbor format. (PUF-22, 37, 38). Instead, Defendant's Answer asserts that "the presale notice sent to each Class member *substantially complied* with the provisions of the Uniform

13

Commercial Code." *See* Doc. 7, at "Fifth Defense" (emphasis added). Thus, Defendant cannot point to the "safe harbor" form in an attempt to argue it ***strictly complied*** with UCC §9-614 and thereby attempt to avoid liability for violations of the Commercial Code.

> **D.      Each version of Defendant's pre-sale communication, as to all Class Members, is defective because each fails to contain all content required by UCC §9-614(1).**

Each version of the communication, as to all Class Members, is legally insufficient for the same reasons. Each version of the communication fails to include *all* of the information required by UCC §9-614(1) in at least three respects, discussed below. *See* **Ex. 1** at ¶¶49-50. These defects and deficiencies cause each version of the communication to fail to meet the "strict compliance" standard required by law, such that the Court may and should readily find that each of the three versions of the communications violates the Commercial Code. *See Mancuso*, 254 S.W.3d at 91-92; §400.9-614, at Comment, at ¶1.

> **1.      The communications fail to identify the Secured Party as required by UCC §9-614(1)(A).**

First, each version of Defendant's pre-sale communications is deficient because each version fails to identify KTCCU as the secured party and lienholder with respect to the Class Members' vehicles. *See* §§400.9-614(1)(A) and 400.9-613(1)(A); PUF-21-23, 28, 32. Instead, the letters were sent by Centrix, on its letterhead, and they do not identify the secured party anywhere, much less identify the secured party as KTCCU. PUF-21-23, 28, 32. This is a simple and straightforward violation of the Commercial Code under the strict compliance standard for consumer transactions. Each version of the communication fails to strictly meet the requirements of §§400.9-614(1)(A) and 400.9-613(1)(A) and thus violates the Commercial Code. *See Mancuso*, 254 S.W.3d at 90, 92. This is a major defect that prevents the communications from

complying with UCC §9-614(1)(A). This deficiency, standing alone, is a sufficient basis for the Court to grant summary judgment on Count I.

a.      **The UCC does not permit the secured party to identify its agent or some other entity on the pre-sale notice.**

The fact that *Centrix* is identified on the pre-sale communications does ***not*** mean that the secured party, KTCCU, has been identified on the communication as UCC §9-614(1) unambiguously requires. For a number of reasons, the Court should reject any argument that the communications are compliant because they identify Centrix or the secured party's agent.

First, as a general matter, the argument lacks merit in light of the express provisions of the UCC. As noted above, Article 9 of the Commercial Code was substantially revised in 2001. *See Mancuso*, 254 S.W.3d at 95 n.5; *see generally* §400.9-101 at Comments. In the Revised UCC, the drafters specifically incorporated state certificate of title statutes and rejected the use of filed financing statements or other documents as the means to perfect security interests in motor vehicles. *See* §§400.9-303; 400.9-313(a)(2) RSMo; *see also* §301.600.2 RSMo (perfection of lien on motor vehicle). Under the certificate of title statutes, the "notice of lien shall contain ***the name and address of*** the owner of the motor vehicle or trailer and ***the secured party***, a description of the motor vehicle or trailer, including the vehicle identification number, and such other information as the department of revenue may prescribe." *See* §301.600.2 RSMo (emphasis added). And, consistent with Missouri statutes, ***Defendant***, and ***not*** Centrix, is identified as the lienholder on the Class Members' motor vehicles. (PUF-12, 13, **Ex. 35** at Hopkins000034).

The drafters of the Revised UCC were very well aware that secured parties sometimes act through agents and representatives. Indeed, they deliberately included special and distinct statutory provisions that address the identification of the "secured party" in UCC financing statements that are filed to record and perfect a security interest in non-consumer non-moveable

15

goods when the secured party acts through representatives. *See, e.g.,* §§400.9-309(1); 400.9-502, 9-503, 9-511. The same types of provisions do ***not***, however, appear in Part 6 of Article 9, where the UCC addresses the required content for notices *sent to consumer debtors*. *See, e.g.*, §§400.9-611(b); 400.9-613(1)(A) RSMo. That is, nowhere does Part 6 of Article 9 suggest that it would be appropriate to identify a loan servicer or other "representative" or "agent" of the secured party in the pre-sale notices sent to consumers as required by §§400.9-611(b) and 400.9-614(1)(A) although it very easily could have given Article 9's revisions. Instead, the statutory provisions at issue specifically speak only in terms of describing the "secured party" and do not allow the secured party to identify or describe its servicer or agent in the pre-sale notice. *See* §400.9-613(1)(A). The statutory provisions mandate a strict compliance standard with respect to identifying the secured party. This is intentional legislation. There is no support for an argument which allows the secured party to identify its servicing agent in the pre-sale notice.[9] In fact, as noted, the Comments to the UCC's remedies provision themselves note the distinction and provide that "[a] person who has delegated the duties of a secured party but who remains obligated to perform them is liable under this subsection." *See* §400.9-625, at Comment, at ¶3.

> **b.** **All versions of the communications misrepresent Centrix as the secured party.**

Second, here the pre-sale communications also serve to misrepresent Centrix as the secured party or lienholder. That is, if the Court assumes for the sake of argument that it is appropriate under the UCC to merely identify the loan servicer on the pre-sale communication, then the communications must be defective by their failure to identify Centrix as the servicing

---

[9] *See., e.g., Berra v. Danter*, 299 S.W.3d 690, 696 (Mo.App. E.D. 2009)("When the legislature uses different statutory terms in different subsections of a statute, we presume that the legislature intended the terms to have different meaning and effect."); *White v. White*, 293 S.W.3d 1, 11 (Mo.App. W.D. 2009)("when the legislature adopts a model act, we must presume that the General Assembly intended to adopt the interpretation of that section contained in the applicable comments to the model act...."); *Russello v. United States*, 464 U.S. 16, 23 (1983("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

agent or representative. By their failure to identify Centrix's representative capacity, the communications are misleading to the debtor because Centrix is *not* the lienholder or secured party under Missouri law and is not reflected as lienholder on the Class Members' certificates of title or in the Missouri Department of Revenue Records. *See* §301.600 RSMo; PUF-12, 13. Centrix also has no right to obtain ownership of the vehicle after repossession under Missouri's certificate of title statutes in order to have the legal right to dispose of the vehicles. *See* §301.215 RSMo (certificate of title on repossession); §400.9-619 (transfer of legal title to repossessed collateral). Centrix also has no right to seek a deficiency judgment from the Class Members. *See, e.g.*, §§400.9-615; 400.9-626. Centrix is also not the financial institution that extended credit to the Class Members with a right to report derogatory credit information on their credit reports. 15 U.S.C. §§1681(c)(4), (5); 1681s-2(a)(7). Given the strict compliance standard with respect to the communications sent to the Class Members, the lack of specificity as to Centrix's role and status is misleading and causes the communications to violate the Commercial Code.

### c. The Version 2 and 3 communications misrepresent Defendant's status as additional debtor or secondary obligor.

Third, the Version 2 and Version 3 communications also misrepresent Defendant's KTCCU's status with respect to the loans. To be clear, the Version 2 and Version 3 letters do identify "Kansas Teachers Credit Union" (and in four instances, an additional entity with a participation interest) at the bottom of the communication. In the Version 2 communication, "Kansas Teachers Credit Union" follows the statement: "We are sending notice to the following people who have an interest in, or owe money under your agreement." (**Ex. 7**) The Version 3 communication makes subtle, yet important, changes to Version 2, and "Kansas Teachers Credit Union" follows the statement: "We are sending this notice to the following other people who

have an interest in the [description of collateral] or who **_we_** owe money under your agreement."
(**Ex. 8**)(emphasis added). Both of versions of the communications are non-compliant.

That bottom portion of the safe-harbor form is used to identify **_additional debtors or obligors_** on the loan, and not the secured party, because those persons are entitled to receive the notice as well. §§400.9-611(c); 400.9-614(3) RSMo. The secured party is, instead, required to be identified at the **_top_** of the form as it is one of the most critical items of information required by the UCC, without any exceptions. _See_ §§400.9-611; 400.9-614(1)(A) RSMo. KTCCU is clearly **_not_** a debtor or obligor on the Class Members' loans and does not have such rights under the Commercial Code. _See_ §400.9-102(a)(28)("debtor"); (59)("obligor"); (70)("secondary obligor") and Comment at ¶2.a ("Parties to Secured Transactions"). Indeed, as explained more fully below, each version of the communication is _also_ deficient because it fails to identify any co-debtors or obligors on the loans. (PUF-11, 24-25, 29-30, 33-34).

Altogether, each version of the pre-sale communications fails to properly identify the secured party, Kansas Teachers Credit Union as §400.9-614(1)(A) requires. Accordingly, the Court should grant summary judgment in Plaintiff's favor on Count I.

> 2. **The communications violate the Commercial Code because they both fail to set forth and describe the Class Members' redemption rights and accounting rights as required by UCC §9-614(1)(A)-(D) _and_ they are made unreasonable, misleading and defective by the inclusion of additional information that misrepresents the Class member's redemption and accounting rights.**

Each of the three versions of the communication also violate the Commercial Code at §§9-610 and 9-614 for interrelated reasons caused by Defendant's failure to use the words in the statutory safe-harbor form, its changes to the words used in the safe-harbor form, concerning the Class Members' redemption and accounting rights, and the inclusion of both legally and factually inaccurate "additional information" concerning those rights. The changes to the safe

18

harbor form, and the inclusion of "additional information" cause the communications to not only fail to contain the content required by UCC §9-614(1)(A) *through* (D) but also renders them unreasonable and misleading in violation of UCC §§9-610 and 9-611. *See* **Ex. 1**, at ¶¶49-50.

> In relevant part, the statutory "safe-harbor" form states:

> You can get the property back at any time before we sell it by paying us the ***full amount you owe*** (not just the past due payments), including our expenses. To learn the exact amount you must pay, call us at (*telephone number*).

§400.9-614(3) RSMo (emphasis added).

> The Version 1 communication does not follow this language. It states:

> You are also advised that any time before the above described collateral has been sold, or before a contract has been entered into for the sale of said collateral, which ever comes first, you have the right to redeem the collateral by tendering to CENTRIX RESOURCE SYSTEMS, LLC 6782 S. POTOMAC ST, CENTENNIAL, CO 80012 ***the full amount of the balance of $___ your account with us,*** together with the expenses incurred retaking, holding, preparing for sale, and other like expenses incurred in disposing of the above described collateral as well as an attorneys' fees as provided in the Security Agreement evidencing this transaction."

**Ex. 4.** The Version 2 and 3 communications change the statutory language and include the following "additional" language:

> You can get the property back at any time before we sell it by paying us the full amount ***of the balance*** that you owe (not just past due payments), including our expenses. ***Your current balance is ____.*** To learn the exact amount you must pay, call us toll free at 866-740-1380 or write us at the address provided below.

**Ex. 8** (emphasis added). The phrases "*current balance*" and "*the full amount of the balance of $__ on your account*" are "additional information" that is ***not*** included as part of the safe-harbor form. As explained below, their inclusion in the notice frustrate the purpose of the notice requirement itself. Further, this information is also legally inaccurate and/or factually inaccurate. And, because Defendant has either omitted required statutory language (Version 1) or changed

the statutory language (Version 2 and 3), it is misleading as to the debtor's accounting and redemption rights, §400.9-623 and unreasonable communications in violation of UCC §9-610.

> **a.** **The statement of the "current balance" frustrates the purposes of the Commercial Code and causes all versions to violate the Commercial Code regardless of its accuracy or inaccuracy.**

First, Defendant's inclusion of a figure purported to be the "current balance" or the "balance… on your account" is improper and causes the communications to be unreasonable and in violation of UCC §9-610(b) because it is the type of information – regardless of its inaccuracy– that serves to frustrate the underlying purposes of the Commercial Code.

The purpose of the pre-sale notice requirement is "to apprise the debtor of the details of disposition so that [he] may take appropriate action to protect his [ ] interest." *Mancuso*, 254 S.W.3d at 95 (citing *Thong v. My River Home Harbour, Inc.,* 3 S.W.3d 373, 377 (Mo.App.E.D. 1999)). "Proper notice gives the debtor the opportunity (1) to discharge the debt and reclaim the collateral, (2) to find another purchaser, or (3) to verify that the sale is conducted in a commercially reasonable manner." *Id.*

Perhaps even more importantly, with respect to the disclosure of the borrower's redemption and accounting rights, the consumer protection provisions of UCC §9-614 do ***not*** require or obligate the secured party to provide any amount or figure in the pre-sale notice. Certainly, the drafters of the UCC could have included a requirement to disclose the redemption amount in the pre-sale notice if they deemed that to be important information with respect to promoting the purpose of the notice requirements. They did not. Instead, the drafters required the secured party to provide only a *telephone number* to secure the redemption amount or to request an accounting so as to encourage affirmative action by the consumer debtor, in the form of communication from the debtor to the secured party regarding the debt, to protect his interests in

the collateral. *See* §400.9-614(1)(A); (C) & (3)("to learn the exact amount you must pay.");
§400.9-613(1)(D). Here, Defendant's statement of the "current balance" or the "balance… on
your account" on the loan frustrates these purposes. Defendant's inclusion of such numerical
information presents the defaulting Class member, who has already fallen behind on his car
payments, with a *fait accompli* as to permanent loss of the vehicle, and the attendant deficiency
issues and negative credit reporting, by the presentation to the debtor of a large figure that
Defendant certainly knows the debtor cannot pay. If the debtor could afford to pay the entire
debt, he probably would not have defaulted in the first place. It may be that Defendant would
have been willing to accept the repossessed vehicle in full satisfaction of the debt, *see* UCC §§9-
620 to 9-622, or agree to allow the debtor to catch up on overdue payments, or to enter into a
new payment plan, or other type of workout agreement. The inclusion of the "current balance"
effectively forecloses any inquiry or attempt by the debtor to protect or redeem the collateral

The Commercial Code does not contemplate or intend for the secured party to set forth
any numerical amounts and instead requires only the disclosure of phone numbers to encourage
affirmative action by the debtor and to encourage his communications with the secured party.
Hence, the communications fail because by including the "current balance" figure the Defendant
has undermined the purpose of the notice itself. *Mancuso*, 254 S.W.3d at 94-95 (citing cases).

> **b.** **Version 2 and 3 communications: the "current balance" is
> legally and factually inaccurate, and causes the
> communications to be misleading as to the Class Members'
> *redemption* rights.**

In the Version 2 and 3 communications, the additional information consisting of the
"current balance" figure is inaccurate and misleading with respect to the borrowers' redemption
rights under the Commercial Code. *See* §400.9-614(1)(C). "The notice will violate Article 9 if it

voluntarily includes information regarding redemption, but the information is wrong." *See The Law of Secured Transactions*, at ¶4.08[7].

The UCC, at §9-623, governs the right to redeem collateral. It states, in pertinent part:

(a)     A debtor, any secondary obligor, or any other secured party or lienholder may redeem collateral.

(b)     To redeem collateral, a person shall tender:

(1)     Fulfillment of all obligations secured by the collateral; and

(2)     The reasonable expenses and attorney's fees described in section 400.9-615(a)(1).

§400.9-623 RSMo (emphasis added); *Mancuso*, 254 S.W.2d at 96.  Here, the information in the Version 2 and 3 communications is both legally wrong and factually wrong.

> **(1)     The communications mislead the Class Members into believing that the "current balance" is the "redemption amount."**

The Version 2 and 3 communications inform the Class Members that they "*can get the property back at any time before we sell it by paying us the full amount of the balance that you owe (not just past due payments), including our expenses.*"  It then states: "*Your current balance is ____.*"  Defendants' use of the word "balance" in both sentences is misleading and causes the communication to set forth inaccurate information.

The word "*amount*" and ***not*** "balance" is used in the statutorily-required language to refer only to the *redemption amount*. *See* §400.9-614(1)(C) and (3)(safe harbor form). Defendant has changed the word "amount" to "balance." Because it follows the statutorily-required language, as modified by Defendant, the additional information that includes the number set forth as the "current balance" is misleading because it appears to be the redemption amount.

The figure is not, however, the *redemption amount* as it is determined by §400.9-623(b). By statute, the redemption amount *also* includes the secured party's related repossession expenses and attorney's fees, as is described in §400.9-623(b)(2) and specifically set forth in §400.9-615(a)(1) as "the reasonable expenses of retaking, holding, preparing for disposition, processing, and disposing, and, to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses incurred by the secured party."

Indeed, Plaintiffs have confirmed that the amount set forth as the "current balance" in the Version 2 and 3 communications matches the amount set forth in the "Balance at Repo" column in Defendant's spreadsheet. **Ex. 37**, at Column "AN." According to Defendant's description of columns, that amount reflects the "loan balance at repossession date." **Ex. 37** at "Balance of Repo Column." As such, **<u>no</u>** Class member could have "redeemed" their collateral by tendering or paying the amount stated as the "current balance" or the "balance on your account," because that number was not the redemption amount. Defendant was actually entitled to *more* than the disclosed amounts from a debtor seeking to redeem the collateral. *See* **Ex. 33**; §400.9-623(b).

Thus, the communications are misleading and unreasonable because they state an amount that appears to be the redemption amount but is ***not*** the redemption amount. *See Mancuso*, 254 S.W.3d at 95 (citing cases: "courts have found that notice may be 'not reasonable' if it misstates the amount owed or requires things of the debtor that are not actually owed"); *Fielder*, 19 F.Supp.2d at 986 ("the notice of resale may not contain such misleading information even if the other basic information required by the statute is included… the debtors did not have 'reasonable notification of the sale' because such notice is designed to ensure the debtors are aware of their rights which include redemption."); §400.9-614 (6) RSMo.[10]

---

[10] *See also Travis v. Boulevard Bank N.A.*, 880 F.Supp. 1226, 1234 (N.D.Ill. 1995)(improper to include balance owed on notice because it is not required by Commercial Code); *Cessna Finance Corp. v. Design Engineering &*

       **(2)**     **The "current balance" misstates the Class Members' obligations under the parties' contract in order to redeem the collateral.**

The numerical amount set forth as the "current balance" is also inaccurate and misleading in every instance because it misstates the Class Members' obligations under the parties' contract in order to redeem the collateral. Again, the communications state: "*You can get the property back at any time before we sell it by paying us the full amount of the balance that you owe (not just past due payments), including our expenses. Your current balance is _____.*" **Ex. 7-10.**

The redemption amount includes the "fulfillment of all obligations secured by the collateral." §400.9-623(b)(1). Here, the numerical amount does *not*, however, include all amounts "necessary to fulfill all obligations secured by the collateral."

As noted above, in *Mancuso*, the Missouri Court of Appeals concluded that a "proof of insurance" requirement included as "additional information" in the communication did not misstate the plaintiff's redemption rights because it was consistent with the parties' retail installment contract and thus an appropriate aspect of the debtor's redemption obligation under §400.9-623. *Id.* at 95-96. The Court of Appeals concluded that the notice was not unreasonable or misleading, "because it did not require of Ms. Mancuso any more than what the contract required of her." *Id.* at 98. Here, the parties' contract states:

> If you default, you agree to pay our costs for collecting accounts owing, including court costs, attorneys' fees, and fees for repossession, repair, storage and sale of the property securing this contract….

**Ex. 33** (at "Default"). The contract also states:

---

*Const. Intern., Inc.*, 335 S.E.2d 625, 627 (Ga.App.1985)("it is reasonable to conclude that the statement of the amount due prevented DECI from taking steps to insure there remained no deficiency"); *Wilmington Trust Co. v. Conner*, 415 A.2d 773, 776 (Del. 1980)("The plaintiff contends that s 9-504(3) does not require that the balance due be stated in the notice for a private sale since it only demands "reasonable notification of the time after which any private sale . . . is to be made." Therefore, it is argued, an error in the balance stated cannot be a defect in the notice under s 9-504(3). We cannot accept this conclusion. The adoption of this rationale would lead to the absurd conclusion that the notice of resale may contain misleading information of any kind so long as certain statutory catch words or phrases are also included.").

If you default are in default on this Contract and, if applicable, we gave you any required notice of cure for failure to make a required payment and you failed to cure any default, we will have all of the remedies provided by law and this Contract:

    A.    We may require you to immediately pay us, subject to any refund required by law, the remaining ***unpaid balance of the amount financed, financed charges and all other agreed charges***.

    B.    We may pay taxes, assessments, or other liens or make repairs to the Property if you have not done so, provided we give you prior notice and an opportunity to perform. However, we are not required to make any such payments or repairs. ***Any amount we pay will be added to the amount you owe and will be due immediately. This amount will earn finance charges from the date paid by us at the rate described in the PROMISE TO PAY AND PAYMENT TERMS section until paid in full.***

**Ex. 33** (at "Remedies")(emphasis added).  Again, as noted above, the amount set forth as the "current balance" in the Version 2 and 3 communications reflects the "loan balance at repossession date." *See* **Ex. 37** at "Balance of Repo Column." With respect to the Version 2 and 3 communications, those amounts are also inaccurate and misleading as to the Class Members' redemption rights under UCC §9-623 because the figure that is stated does not even state the amount "necessary to fulfill all obligations secured by the collateral." In terms of the parties' contracts, the stated "current balance" includes only the "unpaid balance of the amount financed" as is set forth on Defendant's spreadsheet, when it should also include (but does not) all other accrued "financed charges and all other agreed charges." **Ex. 33** (at "Remedies"). In other words, the stated "current balance" fails to include any unpaid interest charges and other charges and is misleading as to the borrower's redemption rights as a result. *See* §400.9-623(b)(1).

Certainly, and again, the UCC could have directed secured parties to put forth a figure as the redemption amount if it deemed it appropriate and important. It does not. There are obvious reasons why the Commercial Code does not require the secured party to include numbers or

figures on the pre-sale communications: the figures and numbers will always be inaccurate, and will always misrepresent and mislead with respect to the debtor's redemption rights under the Commercial Code because the amounts necessary to redeem the collateral are not set or fixed at the time the vehicle is repossessed and the notice is sent. For example, how can the secured party calculate accrued interest when it does not know if and when the borrower intends to redeem his collateral? How can the secured party calculate the amount of its storage costs when the vehicle has not even been stored? How can it determine its repair costs if it has not repaired the vehicle?

Defendant changed the terms used in the safe harbor form and included "additional information" which was misleading and inaccurate. The Court should grant summary judgment on Defendant's communications for these reasons. *See* §400.9-614(6) RSMo.

> c.    **Version 1 communications: the amount stated as the "balance on your account" is inaccurate and misleading in every instance to the extent it is intended to set forth either the redemption amount or the outstanding principal balance on the loan.**

In the Version 1 communications, the amounts set forth as the "balance on your account" was factually incorrect and misstated in every instance to the extent the figure was either intended to set forth the amount necessary for "fulfillment of all obligations secured by the collateral" §400.9-623(b)(1); the redemption amount, or even the principal balance of the loan at the time of repossession. (PUF-20, 27)

For example, the Version 1 communication sent to Plaintiff identified a "balance of $17,108.40 on your account." The letter stated:

> [Y]ou have the right to redeem the collateral by tendering to … the full amount of the balance of $17,108.40 your account with us, together with the expenses incurred retaking, holding, preparing for sale, and other like expenses incurred in disposing of the above described collateral as well as an attorneys' fees as provided in the Security Agreement evidencing this transaction."

26

(PUF-20; **Ex. 4**)

First, that figure (***$17,108.40***) differed from the amount set forth in Defendant's own servicing records as the "current principal balance" - ***$15,713.00***. (PUF-20, 27; **Ex. 37**, at Column "AN"). This same misstatement of the "balance of $___ on your account" persists with every Version 1 communication. (PUF-27)

Second, like the disclosure of the "current balance," the disclosure of the "balance of $___ on your account" includes only the "unpaid balance of the amount financed" and not other accrued "financed charges and all other agreed charges" necessary to fulfill the debtor's obligations with the Defendant. *See* **Ex. 33** (at "Remedies"). Thus, to the extent that the disclosure is of the "current balance" on the loan, it is inaccurate because it does not also include in the sum any accrued unpaid interest and other charges. *See* §400.9-623(b)(1). Given these defects, the Version 1 communications violate the Commercial Code for additional reasons.

### d. The statement of the "current balance" is also misleading as to the Class Members' accounting rights.

Third, inclusion of a purported "current balance" or "balance on your account" conflicts with, and makes misleading, the information provided to the debtor concerning his right to an accounting. Importantly, the secured party's disclosure of a "current balance" on loan is *not* the "accounting" contemplated by the Commercial Code. *See Parks v. CNAC-Joliet, Inc.*, 886 N.E.2d 376, 381 (Ill.App.2008). Instead, an "accounting" is a "record" that is "(A) Authenticated by a secured party; (B) Indicating the aggregate unpaid secured obligations as of a date not more than thirty-five days earlier or thirty-five days later than the date of the record; and (C) Identifying the components of the obligations in reasonable detail." *See* §400.9-102(a)(4).

The Version 1 communications do not set forth any statements concerning the borrowers' rights to an accounting in violation of UCC §9-614(1)(A)(incorporating §9-613(1)(D)).

The statement of the "current balance" in the Version 2 and 3 communications is not the "accounting" as set forth in the UCC definition at §9-102(a)(4) in that it is not "authenticated by the secured party" nor does it identify the "components of the Class Members' obligations in reasonable detail." Indeed, the "current balance" does not even set forth the principal and interest components of the Class Members' obligations which, as explained above, adds to the confusing and misleading aspects of the "additional information" included in the notice. Thus, and altogether, by its inclusion of the "current balance" in each version of the communication, Defendant has violated §§400.9-610 and 400.9-614 of the Commercial Code regardless of whether the amount stated as the "current balance" is correct or not. *See* §400.9-614(6) RSMo.

### 3. The communications fail to set forth the Class Members' rights to an accounting, as required by UCC §9-614(1)(A).

Each version of Defendants' communications fails to set forth all information required by UCC §9-614 and to comply with the strict compliance standard in a third way: Each fails to "state the charge, if any, for an accounting" as the Commercial Code requires. *See* §§400.9-613(1)(D), 400.9-614(1)(A).[11] Specifically, the Version 3 communication states:

> You are entitled to an accounting of the amount necessary to redeem the collateral. If you want us to explain to you in writing how we have figured the amount that you owe or if you have further questions concerning redeeming the collateral you may call us at 866-740-1380 or write us at the address provided below.

**Ex. 8**. The "safe-harbor" form contains *different* language, and states:

> If you want us to explain to you in writing how we have figured the amount that you owe us, you may call us at (*telephone number*) (or write us at (*secured party's address*)) and request a written explanation. ***(We will charge you $ for the explanation if we sent you another written explanation of the amount you owe us within the last six months.)***

§400.9-614(3) RSMo (bold emphasis added).

---

[11] As noted, the Version 1 communications do not set forth any statements concerning the borrowers rights to an accounting in violation of the Commercial Code.

This requirement – to "state the charge, if any, for an accounting" – is required language deemed necessary by the drafters of the Commercial Code. It is important because Commercial Code's notice provisions require the secured party to provide accurate information concerning the debtor's right to an accounting. The Commercial Code, at §9-210(f), specifically regulates the charges for accountings and allows the secured party to impose charges only for repeat requests for accountings. Because the Commercial Code specifically requires the secured party to disclose this specific information with the other information concerning the debtor's right to an accounting, the fact that each version of Defendant's communication lacks this information is legally significant and causes the communications to fail to meet the "strict compliance" standard. *See Coxall v. Clover Commercial Corp.*, 781 N.Y.S.2d 567, 573 (N.Y.City Civ.Ct. 2004)(deficiencies in letters included failure to state "the charge, if any, for an accounting.").

Altogether, Defendant has not *strictly complied* with the requirements of the Commercial Code and, as such, each of its communications violates the Commercial Code for the same reasons. The Court should grant summary judgment on Count 1 of the Class Members' claims.

### E.   Defendant violated the Commercial Code on each loan with multiple borrowers or debtors.

With respect to at least 42 of the 98 Class member loans, and with respect to at least 84 of the 140 identified Class Members, Defendant also violated the Commercial Code in two related respects, explained below. Important to understanding this violation is the uncontroverted material fact that on each of these 42 loans there is a co-debtor, co-obligor or guarantor, such as a spouse, significant other, or parent. *See* PUF-11; s*ee also* §400.9-102(28), (59) and at Comment, at ¶2.a (definition of "debtor" includes "all persons with a property interest (other than a security interest in or other lien on collateral)").

1. **Defendant failed to provide Plaintiff with any evidence that the pre-sale communication was sent to co-debtors and co-borrowers**

First, Defendant violated the Commercial Code by its failure to send any pre-sale communications to these co-debtors, co-obligors or guarantors. The law is clear that "a co-debtor or guarantor is a debtor entitled to notice as a prerequisite to the collection of a deficiency from the co-debtor or guarantor." *See, e.g., In re Huffman*, 204 B.R. 562, 564 (Bkrtcy.W.D.Mo. 1997)(citing cases); §400.9-611(c)(1).[12] "Thus, even if the debtor concedes that a commercially reasonable sale was held, a creditor must prove it gave notice to the debtor in its own right." *Thong v. My River Home Harbour, Inc.*, 3 S.W.3d 373, 377 (Mo.App. E.D. 1999).

Here, Defendant failed to produce or provide to Plaintiff any pre-sale communications which would evidence that it sent those communications to any co-debtors or co-obligors. (PUF-21, 24-26, 29-31, 33-35)  Moreover, it affirmatively represented to the Court in two separate pleadings, and with its own uncontroverted evidentiary support, that that it only sent the communications to approximately 104 of the Class Members, when at least 140 have been identified by the parties. *See* PUF-21, 24-26, 29-31, 33-35. Under these facts, the Court should find Defendant failed to send notice to the Class Members who are co-borrowers, co-debtors and co-obligors on Defendant's loans and enter summary judgment their claims in Count I. *Compare*

---

[12] *See also, e.g., In re Carter*, 203 B.R. 697, 702 (Bkrtcy.W.D.Mo.1996)(same);  *Lankheit v. Estate of Scherer*, 811 S.W.2d 853, 858 (Mo.App. S.D. 1991)("A notice addressed and sent only to one of two debtors is not, when sent, notice to the co-debtor to whom it was not addressed."); *Cherry Manor, Inc. v. American Health Care, Inc.*, 797 S.W.2d 817, 821 (Mo.App. S.D. 1990)("A guarantor … is a debtor within the meaning of § 400.9-504(3) and is, therefore, entitled to notice the same as the maker of the note."); *Lendal Leasing, Ltd. v. Farmer's Wayside Stores, Inc.*, 720 S.W.2d 376, 379-80 (Mo.App. E.D. 1986)("We are troubled by the fact that Lendal's letter was not addressed to Doris Meyer. As a guarantor of the copier "lease," she is a debtor and is entitled to notice."); *Culbertson v. U.S.*, 960 F.Supp. 1497, 1508 (D.Kan.1997)(Applying Missouri law: "Under this section, a guarantor is a debtor and is entitled to notice."); *HEW Federal Credit Union v. Battle*, 772 A.2d 252, 254-55 (D.C. 2001)(citing cases: "The vast majority of the courts to consider the issue agree that a guarantor is among those obligors owing a duty to pay deficiencies who are "debtors" as defined by Article 9."); *Huntington Nat. Bank of Washington Court House v. Stockwell*, 460 N.E.2d 303, 305 (Ohio App.,1983)(both spouses are to receive notice.).

*General Motors Acceptance Corp. v. Stoval*, 872 N.E.2d 91, 100 (Ill.App.2007)(creditor failed to produce copies of notice purportedly issued by automated billing system).

> ### 2. Each version of Defendant's pre-sale communication fails to identify any co-debtors and co-borrowers.

Second, each of the related 42 communications for those loans with co-debtors or co-obligors also fails to identify those persons as such in the communication. It is a requirement of the Commercial Code for the secured party to identify *all* debtors and obligors on the required notice of disposition. The requirement is also made clear by the consumer safe-harbor form. *See* §400.9-614(1)(A), (3)(Top of form: "Name and address of any obligor who is also a debtor"; Bottom of form: "Names of all other debtors and obligors, if any"); §400.9-611(c).

Additionally, as noted above, Defendant included its name "Kansas Teachers Credit Union" in the space at the *bottom* of the form where co-debtors and co-obligors are to be identified, and not in the space on the *top* of the form where it was to identify itself as the secured party. By its failure to identify co-debtors, co-obligors or guarantors on the required notice, Defendant has clearly violated the Commercial Code. *See* §400.9-614(1)(A) RSMo and at Comment, at ¶2; *Midstate Educators Credit Union, Inc. v. Werner*, 886 N.E.2d 893, 900-01 (Ohio App. 2008)(court determined that notice that failed to identify co-borrower was deficient). Therefore, as to all 42 Class Members loans with co-debtors or co-obligors the communication violates the Commercial Code and partial summary judgment is appropriate.

> ### F. Defendant has admitted that its Version 1 communication fails to comply with the Commercial Code

> #### 1. Defendant's judicial and evidentiary admissions.

In its *Suggestions in Support of Motion for Leave to File a First Amended Answer*, Defendant admitted that the Version 1 communications violated the Commercial Code:

The Kansas Credit Union recognizes that sending a presale notice letter pursuant to the requirements of the Uniform Commercial Code is a prerequisite to obtaining a deficiency judgment against these Class Members. ***It submits that at least seventy six (76) of the one hundred four (104) pre-sale notice letters sent to proposed Class Members meet this requirement.***

*** ***

In approximately May 2005, shortly after April Smith filed her lawsuit, Centrix discontinued using the pre-sale notice form that was the subject of the *April Smith* litigation, and ***began using pre-sale notice letters that complied with the mandates of the Uniform Commercial Code***.

PUF-37 (emphasis added). Plaintiff also received a letter in February 2006 from Centrix Financial which *admitted* that the Version 1 communication

"contained an error because it may not have described things [1] like Centrix's phone number, [2] Centrix's address, [3] the secured party, [4] the intended method of sale of the car, [5] a right to an accounting and [6] the particulars of the sale of the car and [7] you may not have understood the letter."

(PUF-38)(numerical emphasis added).

These are *judicial and evidentiary admissions* upon which the Court may grant summary judgment as to the Version 1 communications. First, Defendant's statements in its legal memoranda were deliberate and measured, and should be considered as binding judicial admissions concerning the illegality of the Version 1 communication.[13]

Second, the February 2006 letter that Plaintiff received from Centrix may be treated by the Court as an admission of a party-opponent pursuant to Federal Rule of Evidence 801(d)(2)(D) as "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." (PUF-38) Importantly, this Court has already determined that Centrix was acting as Defendant's agent at

---

[13] *See Structural Polymer Group, Ltd. v. Zoltek Corp.,* 543 F.3d 987, 996 (8th Cir. 2008)("A statement by a party's attorney can be admissible as an admission by a party opponent if it is relevant."); *National Sur. Corp. v. Ranger Ins. Co.,* 260 F.3d 881, 886 (8th Cir. 2001)("judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible."); *Mendota Ins. Co. v. Hurst,* 965 F.Supp. 1282, 1286 (W.D.Mo. 1997)("Such judicial admissions may even serve as the basis of granting summary judgment against the party making the admission.").

the time it repossessed Plaintiff's vehicle and sent to him the Version 1 communication. *See* Doc. 168, at p.3 ("on or about July 20, 2004, Centrix, as defendant's agent, repossessed the Vehicle in Carl Junction, Missouri… On that same day Centrix sent Plaintiff a notice…"). While Defendant may dispute having knowledge of that letter, it is clear that the statements in the letter were made by Defendant's agent concerning a matter clearly within the scope of its agency with Defendant. (PUF-16-18, 19, 21 38-39). Accordingly, by virtue of these admissions, the Court should enter summary judgment with respect to all of the Version 1 communications.

> **2. Defendant's admissions concerning the defects in the Version 1 communication are consistent with the actual defects.**

Defendants' admissions concerning the defects in the Version 1 communication are consistent with the actual defects in the communication such that it is reasonable and appropriate for the Court to grant partial summary judgment on the Version 1 communications. Indeed, the February 2006 letter from Centrix, which is directed towards the Version 1 communication, identifies the following "errors" in the communication because "it may not have described things" such as: (1) Centrix's phone number; (2) Centrix's address; (3) the secured party; (4) the intended method of sale of the car; (5) a right to an accounting; (6) the particulars of the sale of the car; and (7) "you may not have understood the letter." (PUF-36). Plaintiff submits the Version 1 communication is defective and fails to strictly comply with the requirements of the Commercial Code for these seven reasons. Therefore, it is reasonable and appropriate for the Court to grant partial summary judgment on the Version 1 communications. *See Mancuso*, 254 S.W.3d at 92; §400.9-610; §400.9-614, at Comment, at ¶1.

## V. SUMMARY JUDGMENT IS APPROPRIATE ON DEFENDANT'S RELATED AFFIRMATIVE DEFENSES.

### A. Defendant's Fifth Affirmative Defense, claiming that its notice "substantially complied" with the Missouri Commercial Code has no legal merit.

In its Answer to Plaintiff's First Amended Petition, Defendant asserts the following affirmative defense:

> Plaintiff's First Amended Petition fails to state a claim as to Plaintiff because in the event that KTCCU had a duty to send a pre-sale notice complying with the Missouri Commercial Code, the presale notice sent to Plaintiff **substantially complied** with the provisions of the Missouri Commercial Code. Similarly, in the event a class is certified, Plaintiff's First Amended Petition would fail to state a claim as to members of the putative Class because the presale notice sent to each Class member substantially complied with the provisions of the Uniform Commercial Code adopted by the State whose laws governs the rights of the Class member.

Doc. 7, at "Fifth Defense" (emphasis added).

This affirmative defense has no legal merit. With respect to **consumer** debtors, the test is one of "strict compliance," not "substantial compliance." *See Mancuso*, 254 S.W.3d at 92 ("A creditor is held to the requirement of strict compliance with these notice provisions.... Any doubt about what constitutes strict compliance is resolved in the debtor's favor.); §400.9-614, at Comment, at ¶1 ("Paragraph (1) sets forth the information required for a reasonable notification in a consumer-goods transaction. A notification that lacks any of the information set forth in paragraph (1) is insufficient as a matter of law. Compare Section 9-613(2), under which the trier of fact may find a notification to be sufficient even if it lacks some information listed in paragraph (1) of that section."). The Fifth Affirmative Defense is a legally insufficient attempt to invoke in this consumer transaction a defense to liability applicable only for *non-consumer* transactions set forth at §400.9-614(3), which states "[t]he contents of a notification providing **substantially** the information specified in paragraph (1) are sufficient, even if the notification

includes:…)(emphasis added). The Court should deny the defense and grant summary judgment in favor of Plaintiffs on it.

Additionally, as demonstrated above, each version of Defendant's communication fails to comply with this "strict compliance" standard such that the defense has no merit in any event.

### B. Defendant's Seventh and Thirteenth Affirmative Defenses, claiming a right to set-off a remaining deficiency balance, have no legal merit.

Defendant has also asserted two affirmative defenses which seek to "set-off" any statutory damages award under §9-625(c)(2) with the remaining deficiency balance on the loans. These defenses are as follows:

> *Seventh*: In the event a class is certified, any damages recovered by Class Members should be subjected to a setoff for amounts that members of the putative Class still owe on their respective loans because their repossessed vehicles were sold in a commercially reasonable manner and generated proceeds less than the balance due on their loans.
> ***
> *Thirteenth*: Pursuant to Mo. Rev. Stat. §408.405, or as otherwise provided by law, any damages sought or recovered by Plaintiff or putative Class Members are and would be subject to a setoff for amounts owed by Plaintiff or putative Class Members on their loans.

Doc. 7, at "Seventh and Thirteenth Defenses."

The Court should grant summary judgment on these related defenses because Defendant cannot establish its right to any deficiency by way of a claimed set-off in the face of its violative pre-sale communications. *See, e.g., In re Downing,* 286 B.R. at 902 ("compliance with the notice provisions of Article 9 is a prerequisite to the recovery of a deficiency following the sale of repossessed collateral"). Indeed, Missouri statutes require Defendant to "allege facts sufficient to show compliance with the provisions of sections 400.9-601 to 400.9-629" in order to recover any deficiency from a borrower. *See* §408.556.1, and .2 RSMo; *Updegraff,* 218 S.W.3d at 620 (citing §408.556.1 RSMo: "Given the express language of this subsection, it mandates, *inter alia,* that to

properly plead a cause of action for a deficiency judgment, the petition must allege, *inter alia,* facts sufficient to show compliance with the provisions of §400.9-610(b)."); *Fielder,* 19 F.Supp.2d at 987 (due to deficient communications, Defendant could not satisfy §408.556 RSMo); *compare* §400.9-626(a)(Defendant's burden to prove compliance in non-consumer transactions).[14] Defendant cannot allege these facts if its communications are defective.

The deficiency bar also specifically encompasses Defendant's attempt to obtain a deficiency by way of a "set-off" to a statutory damages award. *See McKesson*, 938 S.W.2d at 634 (rejecting *Comm. Credit Equipment Corp. v. Parsons,* 820 S.W.2d 315 (Mo.App.W.D. 1991), previously relied upon by Defendant: "The set-off rule allows a misbehaving creditor to collect a deficiency judgment, subject however to whatever damages are awarded to the debtor under section 400.9-507(1). The impediment of this rule is that the burden to prove damages rests on the debtor. ... It has no currency in our decisions.")(internal citation omitted).

As such, the Court should grant partial summary judgment on Defendant's Seventh and Thirteenth Affirmative Defenses.[15]

---

[14] To the extent that the U3C applies to any claims, such as Plaintiff's individual claim, the deficiency bar is provided by statue. *See, e.g.,* K.S.A. §16a-5-103; 14A Ok. Stat. Ann. § 5-103; *see also Topeka Datsun,* 736 P.2d at 86 (" a consumer credit transaction under the UCCC is subject to K.S.A. 16a-5-103(1) which provides, 'a consumer is not liable for a deficiency unless the creditor has disposed of the goods in good faith and in a commercially reasonable manner.' Thus, when the UCCC applies, creditor misconduct in the disposal of collateral will operate to completely relieve the consumer debtor of the burden of paying a deficiency judgment as a matter of law.").

[15] Certainly, any attempt by Defendant to seek a deficiency from a Class Member by way of another action would be barred by either recognized principles of claim or issue preclusion. *E.g., Dodson v. University of Ark. for Med. Sciences* 601 F.3d 750, 760 (8th Cir. 2010); *Knutson v. City of Fargo*, 600 F.3d 992, 996 (8th Cir. 2010). The Commercial Code §400.9-625(a) also provides a basis for the Court to enjoin any attempt by Defendant to collect deficiencies from the Class Members in other proceedings. It states: "If it is established that a secured party is not proceeding in accordance with this article, a court may restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." The Comments following this subsection observe that under it, "The aggrieved person may seek injunctive relief." *See* §400.9-625 RSMo, at Comment, at §2. Thus, the statute also provides a basis for the Court's order restraining Defendant from collecting deficiency balances from Class Members and for requiring Defendant to refund any sums collected from the Class Members on their deficiencies by way of restitution. *See Fireside Bank v. Superior Court,* 155 P.3d 268, 282 (Cal. 2007); *Miles v. N.J. Motors, Inc.,* 338 N.E.2d 784, 789 (Ohio App. 1975).

**VI. DEFENDANT'S LIABILITY FOR STATUTORY DAMAGES**

**A. The Class Members are entitled to statutory damages.**

As a consequence of Defendant's violations of the Commercial Code, Plaintiff and the Class Members are entitled to, and seek by way of this motion for partial summary judgment, the indisputable statutory damages provided by §9-625(c)(2) *See* §400.9-625(c)(2) RSMo; K.S.A. §84-9-625(c)(2)); *Mancuso,* 254 S.W.3d at 92 (citing §400.9-625(c)(2)). The statute allows the Class Members to recover "***an amount not less than the credit service charge plus ten percent of the principal amount of the obligation or the time-price differential plus ten percent of the cash price.***" *Id* (emphasis added). This "glittering nugget of consumer protection" "'provides a minimum, statutory, damage recovery for a debtor' independent of a showing of damage" and is "designed to ensure that every noncompliance with the requirements of Part 6 in a consumer goods transaction results in liability, regardless of any injury that may have resulted." *Mancuso,* 254 S.W.3d at 92 (citing §400.9-625, at Comment, at §4); *In re Schwalb*, 347 B.R. at 754-55.

The deficiency bar and statutory damages are ***cumulative*** remedies. *See McKesson,* 938 S.W.2d at 634-5 (citing cases); Doc. 168 at p.7, 8 ("Plaintiff is not foreclosed from seeking both protection from a deficiency judgment and statutory damages under the KsUCC."). This is a result *long intended* by the law. When Article of the UCC was amended in 2001, the General Assembly left both the absolute bar rule and statutory damages in place for consumer transactions, while, at the same time pointedly abrogating the "absolute bar" rule in non-consumer or commercial transactions. *Compare* §400.9-626(a)(in actions other than consumer transactions, the debtor must affirmatively place the creditor's compliance in issue; further adopting a "rebuttable presumption rule" for such transactions). However, §400.9-626(b) expressly left it to the courts to continue in consumer transactions to apply established

Case 3:08-cv-05052-GAF   Document 178   Filed 10/14/10   Page 61 of 67

approaches. §400.9-626, at Comment, at §3 and 4. Courts since have continued to apply the established absolute bar rule in consumer transactions. *See, e.g., Mancuso*, 254 S.W.3d at 92; *Updegraff*, 218 S.W.3d at 620; *Consumer Finance Corp. v. Reams*, 158 S.W.3d 792, 796 (Mo.App.W.D. 2005). Had the legislature wanted to change the rules for consumer transactions to limit the consumers' remedies to either the absolute bar rule or statutory damages as the sole consequence of a creditor's noncompliance, it obviously knew how to do so. It did not, thereby ensuring that the remedies are cumulative.

This result is also fair. It must be remembered that the UCC provides secured party with a remedy that is "in derogation of the common law" – a right to seek a deficiency judgment from a debtor who has been dispossessed of his motor vehicle. *See Victory Hills*, 28 S.W.3d at 330 (citing *Gateway Aviation, Inc. v. Cessna Aircraft Co.*, 577 S.W.2d 860, 863 (Mo.App.E.D. 1978)). The creditor is in a position to determine whether the collateral is sufficient to secure the amount of credit it is extending. If the debtor defaults, all a creditor or secured party has to do is to use the UCC's safe harbor form to ensure its right to a deficiency. *See Mancuso,* 254 S.W.3d at 91-2. The UCC makes it easy for the creditor to comply with the statute. Here, it is obvious that Defendant, acting through its agent, Centrix, gave little thought to the Commercial Code's consumer protection provisions because it had obtained default insurance protecting it from deficiency losses, and it had no real intent or interest in trying to collect deficiencies from the Class Members. (PUF-4, 7-9) It was only when April Smith sought statutory damages in another lawsuit that anyone at Centrix gave any thought as to whether the pre-sale communications actually complied with the UCC. (PUF-21; 38).

**B.** **Application of the statutory damages provisions to the Class Members' claims.**

Each Class Members' statutory damages may be determined – and has been determined by Plaintiff's experts – by a mechanical application of the statutory formula set forth in §9-625(c)(2) to the figures set forth on each Class Members' Retail Installment Contract and Security Agreement. (PUF-40-43). The statutory formula provides for recovery by each class member of "an amount not less than the credit service charge plus ten percent of the principal amount of the obligation or the time price differential plus 10% of the cash price."

The UCC does not define these terms. *See* §400.9-625, at Comment, at ¶4 ("Following former Section 9-507(1), this Article does not include a definition or explanation of the terms "credit service charge," "principal amount," "time-price differential," or "cash price," as used in subsection (c)(2). It leaves their construction and application to the court, taking into account the subsection's purpose of providing a minimum recovery in consumer-goods transactions."). The latter phrasing – the "time price differential" and "cash price" –applies to credit sales, which includes the Class Members' transactions. *See* §§365.020(10) and (11) (defining "retail installment contract" and "retail installment transaction"); *D.A.N. Joint Venture, III v. Clark*, 218 S.W.3d 455, 459 (Mo.App.W.D. 2006). The "time sale price" is defined in §365.020(15) as the total of the "cash sale price of the motor vehicle" and the "time price differential."

Here, each of the Class Members' transactions is evidenced by a Retail Installment Contract and Security Agreement. To apply the formula, and to ensure uniform treatment of all Class Members, Plaintiff has determined the "cash price" for each transaction by reference to the definition set forth in §365.010(1) for "cash sale price" and has deducted any listed cost for a purchased service contract. (PUF-40-43)[16] The "time-price differential" is merely the finance

---

[16] . There is some support in the case law for treatment of the "amount financed" (which is of course set forth on the Class Members' retail installment contracts) as the "cash price." *See Muro v. Hermanos Auto Wholesalers, Inc*., 514 F.Supp.2d 1343, 1352 (S.D.Fla. 2007). If the Court is inclined to use the amount financed, or any other amount in the calculation, Plaintiff can very easily provide an updated expert report using the Court's preferred figure.

charge identified on the retail installment contract and security agreement.[17] Application of the formula for Plaintiff yields the following statutory damages:

| | | |
|---|---|---|
| Listed Cash Price | | $16,165.00 |
| Service Contract | - | $ 1175.00 |
| Cash Price | | $14,990.00 |
| | | |
| 10% of Cash Price | | $1,499.00 |
| Time Price Differential / Finance Charge | + | $9,262.06 |
| **Total** | **=** | **$10,761.06** |

PUF-40-43; *see also* **Ex. 33**. This same analysis has been done by Plaintiff's experts with respect to the 98 Class loans of the 140 Class Members. *See* PUF-40-43 and **Ex. 19** at Supplemental Disclosure at Table 1. With respect to the 98 Class loans, the sum of the statutory damages is $1,187,724.78. *See* PUF- 40-43 and **Ex. 19** at Supplemental Disclosure at Table 1; §400.9-625(c)(2). The Court should grant summary judgment in favor of the Class on their claims for statutory damages pursuant to §9-625(c)(2), consistent with the calculations prepared by Plaintiff and his experts. (PUF-40-43); **Ex. 19.**

## VII.    CONCLUSION

As demonstrated above, the material facts giving rise to Plaintiffs' *Motion for Partial Summary Judgment* are not subject to genuine dispute and Plaintiff is entitled to judgment as a matter of law. For the reasons set forth above, the Court should enter partial summary judgment in favor of Plaintiff and the Class Members on their claims for Defendant's violations of the Uniform Commercial Code and award them their full statutory damages.

---

[17] The Truth in Lending Act, passed in 1969, mandated credit sale disclosures in uniform terminology nationwide, so that the "time price differential" is now called the "finance charge" and the "time sale price" is now the "total sale price." *See* 15 U.S.C. § 1638(3) and (7). The phrase "time price differential" does not appear on the face of the Class Members' installment sale contracts because the Federal Truth in Lending Act requires that the cost of the credit, whether a loan or a credit sale, be disclosed using the words "finance charge." *See* 15 U.S.C. §§ 1605(a)(1) and 1638(1)(3).

Dated: October 14, 2010          Respectfully submitted,

WALTERS BENDER STROHBEHN &
  VAUGHAN, P.C.

By: */s/ Garrett M. Hodes*
R. Frederick Walters – Mo. Bar 25069
J. Michael Vaughan – Mo. Bar 24989
Kip D. Richards - Mo. Bar 39743
Garrett M. Hodes – Mo. Bar 50221
   2500 City Center Square
   1100 Main Street
   Kansas City, Missouri 64105
   (816) 421-6620
   (816) 421-4747 (Facsimile)

ATTORNEYS FOR PLAINTIFF AND
CLASS COUNSEL

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically with the United States District Court for the Western District of Missouri with notice of case activity to be generated and sent electronically by the Clerk of the Court to all designated persons this **14ᵗʰ day of October 2010**.

*/s/ Garrett M. Hodes*
Attorneys for Plaintiff

**<u>EXHIBITS</u>**

| | *Pleadings and Memoranda* |
|---|---|
| 1. | Plaintiff's *First Amended Class Action Petition*, dated April 23, 2008 (Doc. 1-2) |
| 2. | *Defendant Kansas Teachers Community Credit Union's Suggestions in Opposition to Plaintiff's Motion for Class Certification* (Doc. 93) |
| 3. | *Defendant Kansas Teachers Community Credit Union's Motion for Leave to File A First Amended Answer Containing a Counterclaim Against Some members of the Proposed Class* (Doc. 91, 92) |
| 4. | Letter dated July 30, 2004 (Peak5 000006)(Version 1 pre-sale communication sent to Plaintiff)(Defendant's Exhibit Q) |
| 5. | Account Notes/Individual Statement Report for Hopkins, Cecil E (KSTCU000909)(Defendant's Exhibit P) |
| 6. | Defendant's "Pre-Sale Notice" letters to Putative Class Members – 02/09/04 – 04/18/05 – Version 1" (Defendant's Exhibit Y) |
| 7. | Defendant's "Pre-Sale Notice" letters to Putative Class Members – 05/13/05 – 09/13/05  - Version 2" (Defendant's Exhibit Z) |
| 8. | Defendant's "Pre-Sale Notice" letters to Putative Class Members – 10/03/05 – 07/18/08 – Version 3" (Defendant's Exhibit AA) |
| 9. | Defendant's "Illustration of Version 3 "Pre-Sale" Notice Letter (Defendant's Exhibit DD) |
| 10. | Defendant's "Illustration of Version 2 "Pre-Sale" Notice Letter (Defendant's Exhibit EE) |
| 11. | Defendant's "Diagram of "Pre Sale" Notice Letters" (Defendant's Exhibit FF) |
| 12. | Defendant's "Spreadsheet of Payment Details" (Defendant's Exhibit MM) |
| 13. | Defendant's "Chronological Listing of Class Members By Date of Vehicle Repossession" (Defendant's Exhibit RR) |
| | |
| | *Depositions and Discovery* |
| | |
| 14. | Defendant's Supplemental Answers to Plaintiff's First Set of Interrogatories |
| 15. | Defendant's Supplemental Answers to Plaintiff's Second Set of Interrogatories |
| 16. | Plaintiff's Supplemental Answers to Plaintiff's Defendant's First Set of Interrogatories |
| 17. | Plaintiff's Second Supplemental Answers to Plaintiff's Defendant's First Set of Interrogatories |
| 18. | Excerpts of Deposition of Cecil E. Hopkins |
| 19. | Plaintiff's Expert Witness Disclosure dated November 2, 2009; Supplemental Expert Witness Disclosure dated September 24, 2010 |
| 20. | Excerpts of Deposition of John O. Ward, Ph.D. |
| 21. | Excerpts of Deposition of Kurt V. Krueger, Ph.D. |
| 22. | *Subpoena Duces Tecum* dated February 20, 2009 to Kutak Rock, LLP; *Subpoena Duces Tecum* dated February 2, 2009 to Kutak Rock, LLP |
| | |
| | |

| | | |
|---|---|---|
| | | ***Business and Other Records*** |
| | | |
| 23. | | Standard Loan Placement Agreement dated December 31, 2002 (KSTCU0011085) |
| 24. | | Portfolio Servicing Agreement dated December 31, 2002 (KSTCU001070) |
| 25. | | Financial Institution Approval of Sub-Prime Credit Guidelines (Centrix-NCUA000915) |
| 26. | | Financial Institution Oversight of Centrix Servicing (Centrix-NCUA000923) |
| 27. | | Centrix PMP Procedure – Title-Lien Perfection (Centrix-NCUA000971) |
| 28. | | Financial Institution Oversight of Centrix/LMG Repossession and Liquidation (Centrix-NCUA000929) |
| 29. | | Introduction to Centrix and its Portfolio Management Program (KSTCU000026) |
| 30. | | Centrix Financial Dealer Program (KSTCU00070; Centrix-NCUA000864) |
| 31. | | Credit Policy Manual dated October 15, 2004 (KSTCU000423) |
| 32. | | Letter dated February 1, 2006 to Cecil E. Hopkins (Doc. No. 1-2); Check dated January 30, 2006, payable to Cecil E. Hopkins in the amount of $100.00 |
| 33. | | Hopkins Retail Installment Contract and Security Agreement (KSTCU00833)(Defendant's Exhibit L) |
| 34. | | Scheduled Property Floater Inland Marine Policy – Lender's Indemnity Coverage (KSTCU00139); Repossessed Property Modified Single Interest Coverage Form (KSTCU000116) |
| 35. | | Missouri Department of Revenue (Hopkins Records)(Hopkins000023 through Hopkins000034)(Defendant's Exhibit BB) |
| 36. | | Excel Spreadsheet produced by Defendant on October 27, 2009 (CD-Rom); with Description of Columns |
| 37. | | Retail Installment Contract and Security Agreement Database; CD-Roms of supporting Loan Files |
| 38. | | Missouri Department of Revenue (Class Member's Title Records)(CD-Rom) |
| 39. | | Spreadsheet Produced by Kutak Rock, LLP; accompanying pre-sale communications (CD-Rom) |
| | | |
| | | ***Affidavits*** |
| | | |
| 40. | | Affidavit of Mark S. Kolarik (Defendant's Exhibit V) |
| 41. | | Affidavit of Christi M. Gumbs |
| 42. | | Affidavit of Garrett M. Hodes |